**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| **CHARLES H. SCHMIDT, JR.,** | ) | |
| | ) | |
| **KRISTOPHER C. GOAD,** | ) | |
| | ) | |
| **GREYSON GOODENOW** | ) | |
| *aka* **VANNA GOODENOW,** | ) | |
| | ) | |
| **JIMMIE LEE JARVIS,** | ) | |
| | ) | |
| **ALICE MINIUM, and** | ) | Case No. 3:22cv404 |
| | ) | _____ |
| **THERESSA N. WELLER** | ) | |
| *aka* **ÉILÍS WELLER,** | ) | |
| | ) | |
| **ANDREW RINGLE,** | ) | |
| | ) | |
| **EDUARDO ACEVEDO,** | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| **CITY OF RICHMOND,** | ) | |
| | ) | |
| **WILLIAM C. SMITH,** | ) | |
| In his individual capacity, | ) | |
| | ) | |
| **WILLIAM BLACKWELL,** | ) | |
| In his individual capacity, | ) | |
| | ) | |
| **GERALD M. SMITH,** | ) | |
| In his individual capacity, | ) | |
| | ) | |
| **JOHN BRIDGES,** | ) | |
| In his individual capacity, | ) | |
| | ) | |
| **THOMAS W. LLOYD,** | ) | |
| In his individual capacity, | ) | |
| | ) | |
| **JAKOB A. TORRES,** | ) | |
| In his individual capacity, | ) | |

)
)
**BRENDA RUIZ-OYLER,**                )
In her individual capacity,           )
                                      )
**BENJAMIN J. FRAZER,**               )
In his individual capacity,           )
                                      )
**APRIL M. DIXON,**                   )
In her individual capacity,           )
                                      )
**PATRICK DIGIROLAMO,**               )
In his individual capacity,           )
                                      )
**PAUL D. CAMPBELL,**                 )
In his individual capacity,           )
                                      )
**JUNIUS THORPE,**                    )
In his individual capacity,           )
                                      )
**NICO YOUNG,**                       )
In his individual capacity,           )
                                      )
**JOHN BEASLEY,**                     )
In his individual capacity,           )
                                      )
**CHRISTOPHER GLEASON**,              )
In his individual capacity,           )
                                      )
**FRANK SCARPA,**                     )
In his individual capacity,           )
                                      )
**KATE LEONE**,                       )
In her individual capacity,           )
                                      )
**DUANE PEPPEL**,                     )
In his individual capacity,           )
                                      )
**KHALID HARRIS**,                    )
In his individual capacity,           )
                                      )
**BEN MALONE**,                       )
In his individual capacity,           )
                                      )
**TYLER CRAIG**,                      )
In his individual capacity,           )

**KEEGAN MILLS**,
In his individual capacity,

**DARIO BURALIEV**,
In his individual capacity,

**BENJAMIN O'ROURKE**,
In his individual capacity,

**DOMINIC COLOMBO**,
In his individual capacity,

**DAN BONDY**,
In his individual capacity,

**JASON KUTI**,
In his individual capacity;

**STEVE RAWLINGS**,
In his individual capacity,

**OFFICERS DOE 1-50**,
In their individual capacities.

  *Defendants.*

_____

## COMPLAINT

  COMES NOW Plaintiffs, Charles H. Schmidt, Jr., Kristopher C. Goad, Greyson Goodenow, *aka* Vanna Goodenow, Jimmie Lee Jarvis, Alice Minium, Theressa N. Weller, *aka* Éilís Weller, Andrew Ringle and Eduardo Acevedo, by counsel, bring this action under 42 U.S.C. § 1983 for violations of their First and Fourth Amendments to the United States Constitution, as made applicable to the States by the Fourteenth Amendment, against Defendants City of Richmond, Former Richmond Police Department ("RPD" or "Richmond Police") Chief William C. Smith, Former Interim RPD Police Chief William Blackwell, RPD Chief of Police Gerald M. Smith, RPD Sergeant John Bridges, RPD Lieutenant Thomas W. Lloyd, RPD Officer Jakob A.

Torres, (former) RPD Officer Brenda Ruiz-Oyler, RPD Officer Benjamin J. Frazer, RPD Officer April M. Dixon, RPD officer Patrick Digirolamo, RPD Officer Paul D. Campbell, RPD Officer Junius Thorpe, RPD Officer Nico Young, RPD Lieutenant John Beasley, RPD Lieutenant Christopher Gleason, RPD Lieutenant Frank Scarpa, RPD Officer Kate Leone, RPD Officer Duane Peppel, RPD Officer Khalid Harris, RPD Officer Ben Malone, RPD Office Tyler Craig, RPD Officer Keegan Mills, RPD Officer Dario Buraliev, RPD Officer Benjamin O'Rourke, RPD Officer Dominic Colombo, RPD Officer Dan Bondy, RPD Officer Jason Kuti, RPD Officer Steve Rawlings and current and former RPD Officers Doe 1-50 (collectively "Defendants").

**Introduction**

1.      It is not a crime to observe the public behavior of police officers. It is, in fact, an activity protected by the First Amendment to the United States Constitution. This action arises from the ongoing and repeated unlawful conduct of officers, agents and employees of the City of Richmond Police Department, who routinely retaliate against civilians and members of the press who dare question, observe or record Richmond Police activity.

2.      The Richmond Police Department and its officers, agents and employees frequently bring bogus criminal charges against individuals exercising their First Amendment rights, arrest them, unlawfully confiscate their personal property, and generally harass them in thinly veiled attempts to intimidate. Such acts of intimidation are also evidenced by the Richmond Police Department and its officers, agents and employees' common employment of excessive force when encountering, detaining or arresting individuals such as these Plaintiffs.

3.      This action is brought by several individuals, including an attorney and multiple members of the press, who as a result of the deliberate and unlawful actions of multiple Richmond Police officers, agents and employees, were at various and completely unrelated times, verbally

and physically assaulted, doused with chemical agents, handcuffed, harassed in person and on-line and arrested and prosecuted, simply for commenting, observing and/or recording Richmond Police Department officers at work.

4.      As a result of the systemic killing by police of black and brown men and women, and ignited by the murder of George Floyd at the hands of Minneapolis police on May 25, 2020, the Summer of 2020 was a period of great civil unrest throughout much of the United States, including Richmond, Virginia.

5.      The public unrest was a matter of national and international news and members of the press had an inherent interest in being able to report on the unrest to the public. In addition, police departments all over the Country aggressively controlled members of the media and their efforts to report on the demonstrations and protests. The Richmond Police Department was no exception.

6.      Even though members of the news media were expressly exempt from the unlawful gathering declatations, Defendants ignored the exemption. Even when members of the news media clearly identified themselves, Defendants continued to target and intimidate the press by threatening, assaulting and deploying chemical agents at members of the media. They further interfered with the news media's right to cover public events by refusing access to areas where events were unfolding and creating obstacles to reporters' movement about the city. These incidents constitute flagrant infringements on the constitutional rights of individual reporters, as well as the public's interest in the dissemination of accurate information and accountability of government for its actions.

7.      While many of the instances of unlawful Richmond Police Department activity occurred around or near protest actions in Richmond during that period, other Plaintiffs were harassed, detained and/or arrested in situations unrelated to the George Floyd protests. The

Richmond Police Department's motivation to retaliate against citizen observers and members of the press extends far beyond those protests.

8.     Defendants' unlawful conduct has the purpose and effect of retaliating against and ultimately chilling Plaintiffs' constitutionally protected speech, which Defendants view as critical of government and the police.

9.     Each of the journalist Plaintiffs as alleged herein were tear-gassed, pepper-sprayed, detained without cause, threatened and physically assaulted by one or more officers, agents or employees of the Richmond Police Department, despite clearly and repeatedly identifying themselves as members of the press and while otherwise engaging in their reporting duties.

10.     Not one single Plaintiff that was arrested and charged for the actions described herein was convicted of said charges. All charges resulted in either dismissals or not guilty verdicts, with one such Plaintiff obtaining an apology from the presiding judge at the conclusion of his trial.

11.     The Plaintiffs' injuries are the direct result of the policies, practices and customs of the Richmond Police Department, who routinely harass, detain, assault and arrest citizens and members of the press who observe or record police activity.

12.     This pattern and practice of conduct by law enforcement tramples on the Constitution and violates the sacred rights to freedom of speech and freedom of the press under the First Amendment that form the very foundations of a democratic society. The actions of these Defendants constitute a pattern of unreasonable force and unlawful seizures under the Fourth Amendment and deprives the Plaintiffs their liberty without due process as protected by the Fourteenth Amendment.

13.    This civil rights action seeks declaratory and injunctive relief, compensatory and punitive damages for violations of Plaintiffs' First, Fourth and Fourteenth Amendment rights, and compensatory and punitive damages for Plaintiffs' physical, emotional and financial injuries they sustained as a result of Defendants' unlawful conduct and bogus arrests.

## Jurisdiction and Venue

14.    This action to vindicate Plaintiffs' rights to the First, Fourth and Fourteenth Amendments to the United States Constitution is brought pursuant to 42 U.S.C. § 1983.

15.    The Court has jurisdiction over civil rights actions pursuant to 28 U.S.C. §§ 1331 and 1343 based on 42 U.S.C. § 1983; and jurisdiction under the Declaratory Judgment Act under §§ 2201 and 2202 to declare the rights of the parties and to grant all further relief found necessary and proper.

16.    Venue is proper in the U.S. District Court for the Eastern District of Virginia – Richmond Division ("Eastern District of Virginia") pursuant to 28 U.S.C. §§ 127 and 1391 and Local Civil Rule 3, in that the Defendants are subject to personal jurisdiction within the Eastern District of Virginia and the events that give rise to this action occurred within the Eastern District of Virginia.

## PARTIES

17.    Plaintiff Charles H. Schmidt, Jr. is an adult individual, a citizen of the United States and resident of the Commonwealth of Virginia (the "Commonwealth").

18.    Plaintiff Kristopher C. Goad is an adult individual, a citizen of the United States and resident of the Commonwealth.

19.    Plaintiff Greyson Goodenow, *aka* Vanna Goodenow, is an adult individual, a citizen of the United States and resident of the Commonwealth.

20.     Plaintiff Jimmie Lee Jarvis is an adult individual, a citizen of the United States and resident of the Commonwealth.

21.     Plaintiff Alice Minium is an adult individual, a citizen of the United States and resident of the Commonwealth.

22.     Plaintiff Theressa N. Weller, *aka* Éilís Weller, is an adult individual, a citizen of the United States and a resident of the Commonwealth.

23.     Plaintiff Andrew Ringle is an adult individual, a citizen of the United States and a resident of the Commonwealth.

24.     Plaintiff Eduardo Acevedo is an adult individual, a citizen of the United States and a resident of the Commonwealth.

25.     Defendant City of Richmond (the "City") is responsible for the oversight, administration, education, training and management of the City of Richmond Police Department and its individual officers, including Officers Doe 1-50. The City is responsible for ensuring that proper training, policies and procedures are in place to prevent its officers from unnecessarily violating the constitutional rights of those with whom they interact. The City is required to ensure the protection of the constitutional rights of all persons who come into contact with the Richmond Police Department, and for ensuring that the Richmond Police Department and its officers do not deliberately and maliciously interfere with the rights of its citizens, members of the press, residents and visitors to peacefully assemble and exercise their rights to free speech under the First Amendment. The City is also responsible for ensuring that the Richmond Police Department and its officers do not violate citizens' Fourth Amendment rights to be free from unlawful seizure and from the application of the use of excessive force.  The City is also responsible for ensuring that

the Richmond Police Department and its officers do not violate citizens' Fourteenth Amendment rights to due process.

26.     Defendant William C. Smith ("William Smith") was the Chief of Police of the Richmond Police Department from 2019 until approximately June 16, 2020, when he resigned at the request of Mayor Levar Stoney. He is sued in his individual capacity. During his tenure, he was the chief law enforcement officer for the City of Richmond and was responsible for the oversight, administration, policy making, education and management of the Richmond Police Department and its individual officers. At all times relevant to this Complaint, Defendant William Smith was acting under color of state law. During his tenure, William Smith was responsible for ensuring that proper training, policies and procedures were in place to prevent the Richmond Police Department and its officers from unnecessarily violating the constitutional rights of those with whom they interact. William Smith was required to ensure the protection of the constitutional rights of all persons who come into contact with the Richmond Police Department, and for ensuring that Richmond Police and its officers did not deliberately and maliciously interfere with the rights of the City's citizens, members of the press, residents and visitors to peacefully assemble and exercise their rights to free speech under the First Amendment. William Smith was also responsible for ensuring that the Richmond Police Department and its officers did not violate citizens' Fourth Amendment rights to be free from unlawful seizure and the application of the use of excessive force. He was also responsible for ensuring that the Richmond Police and its officers do not violate citizens' Fourteenth Amendment rights to due process.

27.     Defendant William Blackwell ("Blackwell") was the Interim Chief of Police of the Richmond Police Department from approximately June 16, 2020 to June 26, 2020. He is sued in his individual capacity. During his tenure, he was the chief law enforcement officer for the City of

Richmond and was responsible for the oversight, administration, policy making, education and management of the Richmond Police Department and its individual officers. At all times relevant to this Complaint, Defendant Blackwell was acting under color of state law. During his tenure, Blackwell was responsible for ensuring that proper training, policies and procedures are in place to Richmond Police officers from unnecessarily violating the constitutional rights of those with whom they interact. He was required to ensure the protection of the constitutional rights of all persons who come into contact with the Richmond Police Department, and for ensuring that it and its officers did not deliberately and maliciously interfere with the rights of the City's citizens, members of the press, residents and visitors to peacefully assemble and exercise their rights to free speech under the First Amendment. Blackwell was also responsible for ensuring that Richmond Police Department and its officers did not violate citizens' Fourth Amendment rights to be free from unlawful seizure and the application of the use of excessive force. He was also responsible for ensuring that the Richmond Police and its officers do not violate citizens' Fourteenth Amendment rights to due process.

28.    Defendant Gerald M. Smith ("Gerald Smith") is the current Chief of Police of the Richmond Police Department. He is sued in his individual capacity. He is the chief law enforcement officer for the City of Richmond and is responsible for the oversight, administration, policy making, education and management of the Richmond Police Department and its individual officers. At all times relevant to this Complaint, Defendant Gerald Smith was acting under color of state law. He is responsible for ensuring that proper training, policies and procedures are in place to Richmond Police Department and its officers from unnecessarily violating the constitutional rights of those with whom they interact. Gerald Smith is required to ensure the protection of the constitutional rights of all persons who come into contact with the Richmond

Police Department, and for ensuring that it and its officers do not deliberately and maliciously interfere with the rights of the City's citizens, members of the press, residents and visitors to peacefully assemble and exercise their rights to free speech under the First Amendment. He is also responsible for ensuring that Richmond Police and its officers do not violate citizens' Fourth Amendment rights to be free from unlawful seizure and the application of the use of excessive force. He is also responsible for ensuring that the Richmond Police and its officers do not violate citizens' Fourteenth Amendment rights to due process.

29.     Defendant Lieutenant Thomas W. Lloyd ("Lloyd") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

30.     Defendant Sergeant John Bridges ("Bridges") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

31.     Defendant Jakob A. Torres ("Torres") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

32.     Defendant Brenda Ruiz-Oyler ("Ruiz-Oyler") is a former uniformed member of the Richmond Police Department. She is sued in her individual capacity. She was acting under the color of state law at all times relevant to this case.

33.     Defendant Benjamin J. Frazer ("Frazer") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

34.     Defendant April M. Dixon ("Dixon") is a uniformed member of the Richmond

Police Department. She is sued in her individual capacity. She was acting under the color of state law at all times relevant to this case.

35.     Defendant Paul D. Campbell ("Campbell") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

36.     Defendant Junius Thorpe ("Thorpe") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

37.     Defendant Patrick Digirolamo ("Digirolamo") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

38.     Defendant Nico Young ("Young") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

39.     Defendant Lieutenant John Beasley ("Beasley") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

40.     Defendant Lieutenant Christopher Gleason ("Gleason") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

41.     Defendant Lieutenant Frank Scarpa ("Scarpa") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

42.    Defendant Officer Kate Leone ("Leone") is a uniformed member of the Richmond Police Department. She is sued in her individual capacity. She was acting under the color of state law at all times relevant to this case.

43.    Defendant Duane Peppel ("Peppel") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

44.    Defendant Khalid Harris ("Harris") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

45.    Defendant Ben Malone ("Malone") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

46.    Defendant Tyler Craig ("Craig") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

47.    Defendant Keegan Mills ("Mills") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

48.    Defendant Dario Buraliev ("Buraliev") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

49.    Defendant Benjamin O'Rourke ("O'Rourke") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color

of state law at all times relevant to this case.

50.   Defendant Dominic Colombo ("Colombo") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

51.   Defendant Dan Bondy ("Bondy") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

52.   Defendant Jason Kuti ("Kuti") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

53.   Defendant Steve Rawlings ("Rawlings") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

54.   Defendant Officers Doe 1-50 ("Officers Doe") are a uniformed-members of the Richmond Police Department. They are sued in their individual capacities. They were acting under the color of state law at all times relevant to this case. The Plaintiffs are currently unaware of the names and identities of Officers Doe 1-50. Generally, however, Officers Doe 1-50 may consist of the following persons.

   a.   Any officer, employee or agent of the Richmond Police Department who verbally and physically assaulted, intimidated (in person or on-line), detained, conducted unlawful searches, withheld or destroyed property belonging to Plaintiffs, deployed less lethal ammunition and chemical weapons, unlawfully arrested and/or threatened the constitutional protections of Plaintiffs at the following times and places:

14

i.      June 1, 2020 from approximately 1:45 a.m. until 3:00 a.m. near the intersections of Madison Street and West Broad Streets, south of North Belvidere Street;

ii.     June 14-15, 2020 between 9:30 p.m. and 3:00 a.m. at the Richmond Police Department headquarters at 200 West Grace Street and the adjacent sidewalks and parking lots;

iii.    June 15-16, 2020 between 10:00 p.m. and 11:00 p.m. on North Jefferson Street near the Richmond Police Department headquarters;

iv.     June 21, 2020 between 10:00 p.m. and 11:00 p.m. at and around the intersection of Monument Avenue and North Lombardy Streets at the J.E.B. Stuart Monument ("Stuart Circle");

v.      June 26-27, 2020 from approximately 10:00 p.m. until 3:00 a.m. in the Whole Foods Parking lot located at 2024 West Broad Street, Richmond and the adjacent Rear Parking Lot;

vi.     June 27, 2020 between 12:00 a.m. and 4:00 a.m. near the intersection of Monument and Park Avenues near the Community Church of Christ;

vii.    July 25-26, 2020 between 9:00 p.m. and 11:00 p.m. at or around Monroe Park, and between 11:00 p.m. and 12:00 a.m. near the Richmond Police Department headquarters and adjacent parking lots and sidewalks;

viii.   July 26, 2020 between approximately 9:00 p.m. and 1:00 a.m. on July 27, 2020 at the western edge of Monroe Park at North Laurel Street at Sacred Heart Cathedral;

ix.     August 16, 2020 between approximately 9:00 p.m. and

10:45 p.m., beginning at the southwest corner of West Broad and North Belvidere Streets and continuing south on North Belvidere and towards the corner of West Franklin and North Belvidere Streets, then west towards the Fan;

        x.     August 18, 2020 between 2:00 p.m. and 4:00 p.m. along Broad Street following the path by demonstrators from downtown to the Science Museum;

        xi.     August 20, 2020 between 10:00 p.m. and 11:50 p.m. at and around 217 West Clay Street;

        xii.     September 14, 2020 along the path by demonstrators from Martin Luther King Middle School on Mosby Street to City Hall;

        xiii.     September 26, 2020 between midnight and 1:45 a.m. at and around Richmond Police Department headquarters;

        xiv.     September 28, 2020 at the Circle on Monument Avenue from approximately 2:30 p.m. until 4:00 p.m.;

        xv.     October 17, 2020 between 11:30 a.m. and 2:15 p.m. at the intersection of 8th and Grace Streets towards Richmond Police Department headquarters, and later that afternoon (2:15 p.m.) along Park Avenue;

        xvi.     October 27, 2020 between 8:45 p.m. and 10:45 p.m. at or around Monroe Park;

        xvii.     November 7, 2020 between 12:00 p.m. and 2:30 p.m. at and around the Virginia State Capital;

        xviii.     November 12, 2020 between 8:30 p.m. and 9:30 p.m.at the "Stop the Steal" rally; and

        xix.     June 16, 2021 at the "Protest for Palestine" held at

Scuffletown Park on Strawberry Street towards Circle on Monument Avenue

b.      Any officer, employee or agent of the Richmond Police Department who knew or should have known that their fellow officers were violating, or were intending to violate, the constitutional rights of the individuals described herein, had reasonable opportunity to prevent the harm, and chose not to prevent the harm.

c.      Supervisors and other agents of the Richmond Police Department of the foregoing Officers Doe 1-50 who planned or authorized the conduct described herein.

d.      Supervisors of the foregoing Officers Doe 1-50 who had or have actual or constructive knowledge that their subordinates were or were intending to engage in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens, and whose response to that knowledge was so inadequate as to show deliberate indifference or tacit authorization of the conduct, which inaction was an affirmative cause of the constitutional injury.

## FACTS

### Schmidt's Unlawful Arrest: June 26, 2020

55.      Plaintiff Charles H. Schmidt, Jr. ("Schmidt") is an attorney licensed to practice in the Commonwealth of Virginia.

56.      In addition to his employment as a lawyer, Schmidt is a trained legal observer and has volunteered with the National Lawyer's Guild ("NLG") and the American Civil Liberties Union ("ACLU").

57.      In his capacity as a trained legal observer, Schmidt has attended political and social justice demonstrations to counsel demonstrators on their rights to assembly and free speech and to observe and record any conflict between law enforcement officers and demonstrators.

58.     Based on his ten years in the practice of law and fifteen years serving as a legal observer, Schmidt is familiar with legal protections for political and other demonstrators, and further, the legal rules concerning the rights of citizens to observe and record police in the performance of their duties.

59.     During this time frame, Schmidt was a cooperating attorney with the American Civil Liberties Union ("ACLU") of Virginia.

60.     On June 26, 2020, the ACLU of Virginia filed an emergency petition with the Richmond Circuit Court for injunction against the City of Richmond, Richmond Police Department, and State and Capitol Police to stop their use of tear gas and "less lethal" munitions on protesters for the events of June 22-23, 2020.

61.     Schmidt and his ACLU colleagues had a hearing scheduled on the injunction in Richmond Circuit Court on Monday, June 29, 2020.

62.     That evening, Schmidt was monitoring (via local new reports and through social media, Twitter, etc.) the protests on Monument Avenue and the intersection of Allen Avenue, commonly referred to as Marcus-David Peters Circle ("MDP Circle" or the "Circle"), renamed from "Lee Circle" in reference to a statue of Robert E. Lee which has since been removed.

63.     Schmidt learned that at approximately 10:00 p.m., Richmond Police Department had again fired tear gas into a crowd of peaceful protesters inside MDP Circle.

64.     As he learned of the use of tear gas and less lethal weapons being fired on the peaceful crowd, Schmidt drove to MDP Circle, arriving approximately 10-15 minutes later.  By the time he arrived, however, the police presence has dissipated.

65.     Schmidt learned that the departure by Richmond Police was abrupt, and the people in the crowd were unaware of the reason.

66.     According to observers, unknown Richmond Police officers came out, cleared the Circle, fired tear gas into the crowd, and then abruptly left.

67.     Schmidt subsequently drove away from MDP Circle via Monument Avenue, then proceeded west on to Broad Street, eventually ended up at the corner of Hermitage Road and West Leigh Street.

68.     It was there that Schmidt noticed several Richmond Police cars inside the recently renovated Saur's shopping business center.  He turned right on Hermitage, then turned right again into the back entrance to the parking lot, parking in the back north/west corner ("Rear Parking Lot"). A large faction of Richmond Police were in the front of the parking lot, closer to Whole Foods and Broad Street ("Whole Foods Parking Lot"). Schmidt estimates that 45-50 Richmond Police officers were present and upon information and belief, the area was being used by them as staging for some other action offsite or event.

69.     Schmidt sat in his car observing for a few minutes when an unknown Richmond Police officer crossed the entire length of the Whole Foods Parking to the separate Rear Parking Lot where Schmidt was parked. He asked Schmidt if he "was okay," to which Schmidt responded "yes." The officer walked back to his police car in the Whole Foods Parking Lot.

70.     A second officer, Benjamin Frazer ("Frazer"), approached Schmidt's car with the same question, to which Schmidt again responded "yes, I'm fine."

71.     Frazer then advised Schmidt that he needed to leave the Rear Parking Lot because Richmond Police had been asked to enforce security for a private business Whole Foods, which was not true.

72.     Schmidt questioned Frazer's authority to enforce such an order, given that the Rear Parking Lot appeared to be public space and another car was parked in the same lot.  There were

no "No Parking" or "No Trespass" signs in the Rear Parking Lot nor were there any signs indicating the Rear Parking Lot was closed at night.

73.     Schmidt asked Frazer if anyone could verify that the Rear Parking Lot was closed or that he was legally required to leave the premises.

74.     In response to Schmidt's questioning the authority of Richmond Police to demand he leave the Rear Parking Lot, Frazer unnecessarily escalated the situation.

75.     Despite Schmidt identifying himself as an attorney and trained legal observer, Frazer again demanded that Schmidt leave because Richmond Police Department had had people "doxing" them and causing Richmond Police "problems."

76.     By this point, Schmidt's car was surrounded by approximately 6-8 Richmond Police officers; one in front of his car and several others behind and on either side. Schmidt was unable to leave the Rear Parking Lot as his car was surrounded by officers.

77.     Schmidt then asked Frazer his name, who refused, in violation of Richmond Police Department's own policy. Frazer merely repeated that Schmidt needed to leave.

78.     Schmidt asked a second officer standing nearby for his name and was told "I'm not allowed to give out that information," again, a violation of Department policy. Schmidt advised that he needed someone's name in order to follow up with Richmond Police. None of the officers would identify themselves.

79.     Schmidt then advised Frazer and the other Richmond Police officers that he would leave and put his car into "drive." As he was leaving, Schmidt reached for his smart phone, held it up for the officers to see, and advised he was going to snap a quick picture of the scene before he left.

80.     Frazer's knee-jerk reaction to Schmidt's attempt take a picture was to reach through

Schmidt's window while he was driving. Frazer advised Schmidt that he was under arrest and that he needed to get out of the car. Frazer and another officer opened Schmidt's car door to forcibly yank him from his car. Schmidt advised that his car was in "drive" and that he needed to put in "park."

81.  By this point, several officers were now screaming at Schmidt.

82.  Frazer advised Schmidt that was he going to jail and began to process him for arrest.

83.  Another officer advised Schmidt to shut off the car and remove his keys.

84.  Richmond Police officers thereafter zip-tied Schmidt's hands incredibly tight and detained him while Frazer began to write up the paperwork.



85.  Schmidt again calmly advised the Richmond Police officers that he was a lawyer and there were no grounds to arrest him, quoting the applicable Virginia code sections on criminal procedure (Virginia Code § 19.2-74), which states essentially that an officer shall release someone accused of a misdemeanor on summons, rather than arrest, unless the officer can determine that person is a flight risk, danger to themselves or others, or will not stop doing the offending action.

None of those situations applied to Schmidt.

86.    A few minutes later, a higher-ranking Richmond Police officer drove over to where Schmidt was being detained and spoke with Frazer. After this, Frazer turned on his body-worn camera.

87.    Frazer then begrudgingly advised Schmidt he would be released on summons and Schmidt was given a ticket.

88.    The zip-ties, now removed, left painful marks on Schmidt's wrists where they had been placed by the officers.



89.    Because his signature was illegible on the summons, Schmidt asked Frazer to clarify his name. Frazer said his name for the first time and walked away in a gruff manner. As he walked away, Frazer stated to other officers that he was "definitely getting sued for this."

90.    Frazer cited Schmidt with a violation of Virginia Code § 18.2-119, or "[t]respass after having been forbidden to do so."

91.    Thereafter, Schmidt left the Rear Parking Lot and returned to Monument Avenue

near the Circle. After the sudden and unwarranted attack by Richmond Police earlier in the evening, demonstrators had retreated a block or so west to North Allen and Park Avenues, which is where Schmidt found the group after his almost arrest.

92.     Approximately twenty minutes later, several Richmond Police patrol cars suddenly appeared on Park Avenue heading east and stopped in front of the Community Church of Christ, largely where Schmidt and the demonstrators were congregating.

93.     The Richmond Police officers jumped out of their patrol cars, which were double-parked and blocking the street. They began aggressively walking towards the crowd, to Schmidt, they appeared agitated and "looking for a fight." Several demonstrators grabbed their phones and began to record their actions.

94.     It was then that Schmidt recognized several of the same Richmond Police officers as having been part of the same group who had tried to arrest him less than an hour before.

95.     Schmidt, now believing that Richmond Police had left the Whole Foods Parking Lot, headed back there to photograph the scene.

96.     The Richmond Police cars were now gone, only empty beer cans, cigarette butts and trash remained in the spots where Richmond Police officers had congregated just before.



97.     Schmidt appeared in Richmond General District Court on December 29, 2020 for a trial on his charges, Case No. GC20015498-00, at the conclusion of which all charges against him were dismissed.

98.     Upon dismissal of the charges, Schmidt received a verbal apology from the presiding judge.

**(Former) Commonwealth Times Executive Editor and Reporter Andrew Ringle**

**June 21, 2020**

99.     On the night of June 21, 2020, Plaintiff Andrew Ringle ("Ringle") was covering the protests and the unrest around Richmond as a reporter and executive editor for the Commonwealth Times, Virginia Commonwealth University's student newspaper.

100.     Ringle was reporting on a demonstration near the former statue of J.E.B. Stuart on Monument Avenue. He was live streaming events on Twitter when dozens of Richmond Police and Virginia State Police ("VSP") formed a line and demanded that demonstrators leave the area.

101.     Around 9:00 p.m., unknown Richmond Police Department officers were using pepper spray to push the crowd off the median. Ringle was sprayed twice in the face by a Richmond Police officer despite clearly identifying himself as press and wearing a state-issued press badge.

102.     The image below shows the unknown Richmond Police officer just before he raises the pepper spray canister directly to Ringle's face.

24



103.    Upon information and belief, the Richmond officer that sprayed Ringle in the face with pepper spray despite him clearly identifying himself as press is Steve Rawlings.

104.    Ringle immediately felt the effects of the pepper spray and his vision became severely reduced. He stumbled backwards, where another unknown Richmond Police officer picked Ringle up by his shirt and threw him into the street, causing injury to his left knee and left elbow, a scar for which remains to this day.

105.    A protestor helped Ringle to his feet, after which they left the demonstration and went to his friend's apartment to tend to his wounds.

106.    In addition to the injury to his elbow and knee, Ringle suffered the side effects to pepper spray for several days after Richmond Police assaulted him.

**July 26, 2020**

107.    On July 26, 2020, Ringle was reporting on another demonstration in Monroe Park.

108.    Richmond Police officers arrived and announced that everyone must leave.

109.    Ringle was with another student reporter at the time, and they both quickly started walking toward the edge of Monroe Park in order to follow the officers' orders.

110.    As they stepped onto the sidewalk that wraps around the perimeter, they were

rushed by unknown Richmond Police officers. Ringle was grabbed and handcuffed before he could make it outside of the park, which is where he was trying to go.

111.    An unknown Richmond Police officer then informed Ringle that he was being detained. Ringle advised that he was present as a reporter and not to protest. He directed the officer to the identification on his person.

112.    The officer took a photo of Ringle's face and demanded that he repeat his social security number multiple times as they worked to verify his state-issued press ID. Once the unknown Richmond Police officers were satisfied, they released Ringle on the condition that he leave Monroe Park and not return to the that night.

113.    Upon information and belief, one of the Richmond Police officer's last names was Peterson.

**(Former) Commonwealth Times News Editor and Reporter Eduardo Acevedo**

**July 25, 2020**

114.    On the night of July 25, 2020, Plaintiff and Commonwealth Times News Editor and reporter Eduardo Acevedo ("Acevedo"), along with two colleagues from the Commonwealth Times, were covering a protest outside of the Richmond Police Headquarters. Police had formed a riot shield wall and shortly after 11:00 p.m., declared the demonstration an "unlawful assembly."

115.    Someone in the crowd threw a flaming object into a Humvee that had been parked to block protesters. About 10 minutes later, Richmond Police lobbied a flash-bang grenade into the middle of a parking lot across from the police station where members of the media were gathered to the side of the protesters.

116.    At this point, Acevedo became separated from his Commonwealth Times colleagues. He was disoriented and "running blind" because of the tear gas.

117.    A fellow reporter from the Richmond Times Dispatch ("RTD Reporter") had also become disoriented trying to leave the area and dropped her press pass.

118.    Acevedo ran to retrieve her press pass and was hit by tear gas. The two journalists ran to another parking lot, where the RTD Reporter helped Acevedo around the corner of a building and began pouring milk in his eyes to help him recover from the gas.

119.    As the RTD Reporter leaned down to return the bottle of milk to her backpack, at least five or more Richmond Police officers came around the corner of the building and suddenly moved in to restrain the two journalists.

120.    Acevedo and the RTD Reporter were swarmed by multiple RPD officers despite loudly screaming that they were press.





121.    One officer threw the RTD Reporter up against the wall.

122.    Other unknown Richmond Police officers grabbed Acevedo, pulled his hands behind his back, and pushed him face down on the ground, despite his shouts identifying himself as a journalist. After he had shouted his identity at least a dozen times, the officers released Acevedo.

123.    When he stood up, Acevedo was feeling claustrophobic from the lingering effects of the tear gas. The Richmond Police officers in riot gear crowded around him, so he asked an officer to give him some more space. The officer responded "no" close to his face.

124.    They released Acevedo approximately ten minutes later and only after he showed them his press credentials containing his photo as working with The Commonwealth Times.

125.    Richmond Police told both Acevedo and the RDT Reporter to leave the area immediately and advised them they would be arrested if seen again.

126.    Acevedo and his RTD colleague went to a nearby convenience store parking lot to collect themselves and inspect their injuries. A few minutes later, some of the same Richmond Police officers appeared and "were making jokes about how they almost arrested members of the

press and told [them] to go home."

127.    Upon information and belief, the Richmond Police officers did not believe or understand that members of the media were exempt from rules dictating an unlawful assembly.

128.    On September 1, 2020, concerns about the Richmond Police Department's treatment of the press during protests, including their assault of Acevedo, were included in a letter from Student Press Law Center and other press freedom groups to Richmond Mayor Levar Stoney and Defendant Police Chief Gerald Smith.

129.    Acevedo did not file a complaint with the Richmond Police Department about the incident, however upon information and belief, the RTD Reporter did.

130.    According to an article published in the Times-Dispatch the next day, Defendant Chief Gerald Smith said he would "make a thorough inquiry into the incident and that it will be under review."

131.    Upon information and belief, the RTD Reporter filed a complaint with the Richmond Police Department several weeks later, she said. In March 2021, she was advised in a letter that the Internal Affairs investigation had concluded that the RTD Reporter's claims were unsubstantiated, but that in the course of the investigation other issues were discovered that were not in accordance with Richmond Police Department policy.

**Kristopher Goad's Unlawful Arrests: July 26, 2020 and September 28, 2020**

**July 26, 2020**

132.    Plaintiff Kristopher Goad ("Goad") is well known by Richmond Police for his Twitter and social media presence and his observations of police activity in and around Richmond. He has been singled out by Richmond Police multiple times.

133.    On the night of July 26, 2020, he and several others were gathered on the steps of

the Sacred Heart Cathedral ("Sacred Heart"), a public place, across the street from Monroe Park.

134.    Richmond Police Department had previously declared Monroe Park closed and that all those in the park would be arrested, upon information and belief, for trespass or unlawful assembly.

135.    Goad's presence on the steps of Sacred Heart were to monitor and record Richmond Police activity from a safe distance. He intentionally avoided Monroe Park because of Richmond Police Department's closure of the same.

136.    Around 10:20 p.m., approximately 10 or more Richmond Police officers left Monroe Park, crossed Franklin Street and made a beeline towards Goad, who was filming them from the Sacred Heart steps.



137.    Without warning, RPD officer Jakob Torres ("Torres"), lead by Richmond Police officer Patrick Digirolamo ("Digirolamo"), climbed the steps and headed straight to Goad. Digirolamo thereafter ambushed Goad, who was subsequently arrested by Torres for no reason, injuring Goad's knee in the process.

138.    Like Schmidt, Goad was charged with a violation of Virginia Code § 18.2-119, or "[t]respass after having been forbidden to do so," Richmond General District Court Case No. GC2015188-00.

139.    Goad was held in a VCU police van with a number of other individuals that evening.

140.    He was released approximately three hours later after a magistrate found no probable cause for his arrest.

141.    Goad's backpack was seized at the time of his arrest, and when returned to him after in the possession of Richmond Police Department, the straps had been cut, rendering it useless.

142.    Torres later swore out a complaint against Goad on August 24, 2020 for the same charge.

143.    A few days later, Goad was present at MDP Circle when Richmond Police Sergeant John Bridges ("Bridges") detained him to issue a citation stemming from Torres' criminal complaint.

**September 28, 2020 Arrest**

144.    Goad attended and was documenting a march of peaceful protestors on September 14, 2020 on Broad Street as the crowd proceeded west from Shockoe Bottom.

145.    Richmond Police Officers were present at the march on September 14, but upon information and belief, did not issue advise anyone that day they were in violation of any law or issue summons or citations to anyone in the crowd.

146.    Approximately two weeks later, on September 28, 2020, Goad was at MDP Circle when he was arrested without warning by Richmond Police Officers April Dixon ("Dixon") and Nico Young ("Young") for an apparent warrant stemming from the September 14, 2020 peaceful march.

147.    Goad was charged with a violation of Virginia Code § 18.2-404, or "obstructing the free passage of others," Richmond General District Court Case No. GC200116855-00.

148.    Goad later learned that Richmond Police Defendant Lieutenant Thomas Lloyd ("Lloyd") was the officer to swear out a complaint against him.

149.    Goad's two cases were consolidated and trial in the Richmond General District Court was held on February 5, 2021. All charges against him were dismissed.

150.    Upon information and belief, Dixon maintains a Twitter account "@apeyape12," which was used to taunt Goad several months after the Court found all charges against him to be unfounded.

151.    On September 8, 2021, "@apeyape12" responded to a message about a prior misidentification of Dixon with "Hey Christopher you want your phone back? Oh wait I took it. Next time you get arrested ask for the officer's names. Isn't that antifa 101? Ahh they kicked you out I forgot."



152.    @apeyape12 followed that Tweet with a comment directed at Goad.



**Jimmie Lee Jarvis Unlawful Harassment by Richmond Police Department:**
**May – Nov. 2020**

153.    Plaintiff Jimmie Lee Jarvis ("Jarvis") is well known by Richmond Police for his Twitter and social media presence and his observations of police activity in and around Richmond. He has been singled out by them multiple times.

**May 31, 2020 – June 1, 2020**

154.    Late on the night of May 31, 2020, Jarvis was following behind the main body of protesters through The Fan and The Museum District and then North up Arthur Ashe Boulevard to Broad Street.

155.    As he proceeded East on Broad at approximately 12:30 a.m., he observed that the CVS, GameStop, and DTLR shops had been smashed open and looted. In the company of attorney and former school board member, who wanted to observe the unrest occurring in his district, Jarvis encountered VSP officers at Broad and Foushee at 1:30 a.m.

156.    VSP did not seem to be taking action against protesters or pedestrians, merely keeping the crowd on Broad Street in check and deterring looting through their visible presence.

157.    Jarvis thereafter proceeded West on Broad Street towards Belvidere, when he observed Richmond Police positioned on Madison Street, just South of Broad, beginning to deploy tear gas and less lethal ammunition at 1:50 a.m. It was unclear to Jarvis who police were

specifically targeting, but he witnessed drivers on Broad Street being affected by the gas.

158.    Jarvis was standing peacefully on the sidewalk, across Broad Street from the Richmond Police, and at least a block east from the body of protesters, when unknown Richmond Police officers began firing less lethal ammunition and tear gas canisters at him with no warning.

159.    Jarvis retreated to the lot on the southeast corner of Broad Street and Belvidere where he took time to recover from the tear gas and less lethal ammunition, invited some injured college students into his car, drove them home, and then proceeded back to the Museum District to survey damage.

**June 14-15, 2020**

160.    On the night of June 14, 2020, Jarvis joined protesters in the vacant lot on Grace Street across from Richmond Police headquarters. At about 9:30 p.m., Jarvis witnessed a young woman be attacked, pepper sprayed, thrown to the ground and arrested by Richmond Police.

161.    The crowd was extremely irate and Jarvis learned that Defendant Bridges was the commanding officer.  Jarvis spoke with him multiple times throughout the night, trying to get an update on the status of the woman attacked by police earlier that evening.

162.    At 10:37 p.m., Jarvis was standing with a group of protesters peacefully filming when unknown Richmond Police officers began spraying pepper spray into the air around them indiscriminately. Jarvis was forced to temporarily quit filming while dealing with the pepper spray.

163.    Around 1:15 a.m., Jarvis again approached Bridges and the two spoke about the arrest of the young woman earlier that evening.  Jarvis was then joined by a campaign worker for a Richmond City Council member ("Councilmember 1"), who spoke with Bridges by telephone. Shortly thereafter Bridges gave the phone to Richmond Police Lieutenant Armstead ("Armstead") and said Councilmember 1 requested to speak with him.

164.    While Councilmember 1 spoke with Armstead by telephone, Jarvis had another and this time lengthy conversation with Bridges about the contradictory statements Bridges had given to protesters.

165.    By 1:47 a.m., Jarvis was joined in person by Councilmember 1 and a second Richmond City Council member ("Councilmember 2"). In response to concerns about the violent arrest earlier, Bridges advised "everyone hold on to your video."

166.    Just a few minutes later, Richmond Police officers began advancing on the crowd along Grace Street, pointing tear gas launchers directly into the faces of protesters, and directly at Jarvis while was filming.

167.    At 1:57 a.m., Councilmember 1 and her staffer were sprayed with pepper spray with no provocation. At this point, the front line of police appeared to be a mix of Henrico Police Department and VSP, based on their riot shields. Police appeared to be making some kind of announcement, but nobody could hear them. Councilmember 1 approached the officers and attempted to ask them to communicate their inaudible announcement. They, along with Jarvis, were positioned at the edge of the lot, abutting the 217 West Grace Street lot. Around 2:00 a.m., Richmond Police officers began launching explosives, tear gas, pepper spray, and less lethal ammunition into the crowd in the parking lot, sparking a chaotic stampede.

168.    While Jarvis was filming police assaulting protesters in the parking lot, upon information and belief, a line of what Jarvis believed to be Henrico Police began advancing towards Jarvis and Councilmember 1, slamming their riot shields into their bodies and faces. Councilmember 1 tried to tell them that there was nowhere for them to go and repeatedly asked why they were doing this. By this time the crowd had mostly fallen back to the far side of the parking lot, and the police organized back into a line of riot shields standing in Grace Street. Jarvis

remained filming until about 2:30 a.m.

**June 15, 2020**

169.    Jarvis returned to Richmond Police headquarters on the evening of June 15, 2020, accompanied by his sister. At approximately 10:15 p.m., Richmond Police officers began attacking the crowd without provocation.  As Jarvis began to film police actions from a safe distance, an unidentified Richmond Police officer raced over to him and sprayed Jarvis' face (and camera) with a torrent of pepper spray.

170.    Jarvis wiped the liquid from his camera and resumed filming. He was temporarily and partially blinded and disoriented by the pepper spray and began wandering around the area, continuing to hold his phone up and hoping to capture useable footage.

171.    Jarvis trying to get to the sidewalk on North Jefferson Street when an unknown Richmond Police officer followed him and continued to douse him with pepper spray, despite Jarvis' verbal protestations that he was not doing anything other than peacefully filming.

172.    Two unknown Richmond Police officers thereafter approached Jarvis's sister and shoved her, attempting to provoke her into confrontation, while another unknown Richmond Police officer used his body to block Jarvis from filming.

173.    Jarvis repeatedly asked for the names and badge numbers of the Richmond Police officers, but all refused to answer.

174.    Around 10:25 p.m., Jarvis removed himself from the area to treat his injuries. His face and legs were covered in burning pepper spray and he had multiple scrapes and bruises from being shoved and bashed by police.

175.     Later the next day, Richmond Mayor Levar Stoney accepted the resignation of Richmond Police Chief William Smith.

**June 21, 2020**

176.   Around 10:00 p.m. on June 21, 2020, Jarvis was present at the intersection of Monument Avenue and North Lombardy Street at Stuart Circle, when a large body of Richmond Police and VSP officers began massing in the street.

177.   Approximately twenty minutes later, a group of Richmond Police officers headed west on Monument toward the crowd of protesters, and Jarvis observed the deployment of less lethal ammunition. At 10:33 p.m, police detonated a tear gas canister right in front of their line, which gassed both police and bystanders such as Jarvis on the Monument Avenue sidewalk.

178.   At 10:35 p.m., the police continued moving west on Monument Avenue, detonating explosives, tear gas, and deploying less lethal ammunition. Jarvis was standing with a group of residents and bystanders on the sidewalk while two unknown Richmond Police officers began handling their tear gas foggers while facing Jarvis and others. Officers thereafter shined their flashlights directly into Jarvis' camera to prevent his filming.

179.   A few minutes later, a VSP officer began gesturing and shouting at Jarvis, who responded that he was unable to understand what was being said. Jarvis asked the officer if he was ok to film from where he was and was told "yes."

180.   At 10:42 p.m., Jarvis observed officers in the median of Monument Avenue begin chasing an individual with a light and camera, dousing his camera and spraying him in the face at point blank range while he fell to the ground. Jarvis later learned it was Commonwealth Times reporter Plaintiff Andrew Ringle ("Ringle").

181.   As Jarvis filmed this interaction between Ringle and Richmond Police, another officer dressed in green fatigues shined his flashlight directly into Jarvis' camera lens to prevent his filming.

**July 25, 2020**

182.    At about 9:00 p.m. on July 25, 2020, Jarvis was in Monroe Park, photographing and filming a growing number of Richmond Police officers. A group of officers noticed his filming and told Jarvis to leave the park. As Jarvis complied, other Richmond Police officers ran up to Jarvis to rush him along, after which Jarvis exited Monroe Park.

183.    By 11:15 p.m., the demonstrators had marched to the Richmond Police headquarters on Grace Street. Jarvis was standing with journalists and media in the parking lot of 217 West Grace Street, away from the large parking lot that had become a rallying point for protesters.

184.    Richmond Police officers began firing volleys of explosives and gas, and as Jarvis filmed, he was struck with a gas canister that had been launched like a projectile directly at him from only a few yards away.

185.    Jarvis sustained cuts, bruises, and burns on his torso and was disoriented from the tear gas.

186.    Riot police began advancing on the journalists gathered in the side lot, and the group of reporters retreated to the back lot of 217 West Grace Street.

187.    Unidentified Richmond Police officers rushed forward to violently grab journalists Eduardo Acevedo ("Acevedo") and a Richmond Times-Dispatch Reporter, who were disoriented from the tear gas. Jarvis stood filming on the sidewalk of Madison Street when a white female Richmond Police officer walked up, arms outstretched shouting "I'm right here! I'm right here," trying to instigate a confrontation.

188.    Jarvis continued filming as Acevedo and the other reporter were released, and approximately a dozen Richmond Police officers stood on the sidewalk, shouting insults at

protesters and further escalating tensions. As Jarvis remained on the sidewalk filming, yards away from Acevedo, another unknown Richmond Police officer pointed a strobe light at Jarvis to prevent his camera from capturing useable footage.

**August 16, 2020**

189.    At about 9:15 p.m., on August 16, 2020, Jarvis approached a group of Richmond Police officers on the Southwest corner of Broad and Belvidere Streets, including Lieutenant John Beasley ("Beasley"), Lieutenant Christopher Gleason ("Gleason"), Lieutenant Frank Scarpa ("Scarpa"), Defendant Ruiz-Oyler, and Officer Kate Leone ("Leone").

190.    They appeared to be harassing a group of pedestrians on the sidewalk they believed to be protesters. Leone bragged about making overtime for harassing law-abiding pedestrians.

191.    At about 9:50 p.m., Jarvis walked a block south, only to realize he was being followed by Beasley, Gleason, Leone, and Ruiz-Oyler, among others. Leone repeatedly referred to Jarvis by name, despite the fact that he was not engaging with her at all, saying at one point "I hope you have a great night, Jimmie. All rainbows and butterflies." As Jarvis crossed Belvidere Street to remove himself from the situation, Leone and Ruiz-Oyler called after him, taunting "Bye, Jimmie."

192.    At about 10:00 p.m., Jarvis arrived at the intersections of Franklin Street and Belvidere, across from Monroe Park. He filmed unknown Richmond Police officers interacting with protesters until a march began heading west at about 10:30 p.m.

193.    Jarvis deliberately trailed the march by several blocks, but found himself, along with Plaintiff Goad, being followed by a white Richmond Police van and cruiser, despite Jarvis and Goad's distance from the protest. Jarvis and Goad walked for about 15 minutes through the Fan before the Richmond Police tail peeled away.

**August 18, 2020**

194.     On August 18, 2020, starting at approximately 10:00 a.m. through 1:30 p.m., heavily armed right-wing extremists marched through the streets of Richmond, blocking streets, and openly wielding body armor, handguns, rifles, and other weapons.

195.     The march moved west from downtown Richmond to the Virginia Science Museum, where the General Assembly was meeting because of coronavirus precautions.

196.     There was very little police presence for the right-wing march.



197.     At approximately 2:00 p.m., a "Black Lives Matter" march began at on the very same route, where dozens of VSP and VCU officers swooped in and surrounded the crowd.

198.     Jarvis observed a VSP officer with a camcorder recording the faces of anyone taking pictures or videos. Many officers appeared to have secured their personal phones to their uniform, taking video of protesters. Many also had their name tags hidden and non-standard weapons on display, such as daggers and Bouie knives.

199.     At approximately 3:08 p.m., while walking east on Broad Street, Jarvis spotted and photographed Defendant Beasley recording protesters from the passenger seat of a black SUV. As

he continued east, the SUV followed Jarvis and Beasley and waved at Jarvis through the open window.

200.     By 3:43 p.m., Jarvis had begun walking south on 8th street, past the Federal Courthouse. Unknown Richmond Police Department vehicles continued to follow Jarvis, and the driver of one Richmond Police SUV vigorously pointed in Jarvis' direction and waved while veering out of his lane.

**August 20, 2020**

201.     At about 10:00 p.m., Jarvis arrived at GWARbar, on West Clay Street intending to have a drink and see if anyone would show up after an anonymous call to action was posted earlier in the day. Richmond Police vehicles began arriving in the neighborhood and parking around the restaurant at about 10:15 p.m.

202.     A few minutes later, at approximately 10:18 p.m., several Richmond Police Department officers, Defendants Beasley, Officer Duane Peppel ("Peppel"), Defendant Frazer, Defendant Harris, Officer Ben Malone ("Malone"), Officer Tyler Craig ("Craig"), Officer Keegan Mills ("Mills"), Officer Dario Buraliev ("Buraliev"), Officer Benjamin O'Rourke ("O'Rourke"), Officer Dominic Colombo ("Colombo"), Officer Dan Bondy ("Bondy"), and Officer Jason Kuti ("Kuti") advanced toward the GWARbar property and began generally harassing customers in the parking lot and the outdoor seating area.

203.     None of the Richmond Police officers appeared to be wearing identifying information.

204.     GWARbar co-owner Michael Derks ("Derks") came outside and informed the Richmond Police officers that the individuals they were harassing were on private property with

his permission. Richmond Police ignored Derks and began demanding everyone present produce their identification.

205.    Without warning, one man was grabbed and led off the property, then a woman was thrown to the pavement, where two officers began wrestling with her.

206.    Defendant Peppel then launched himself into the crowd, tackling a woman while Defendant Frazer rushed forward with a raised tear gas fogger, screaming to "Get back."

207.    While filming the simultaneous violent arrests, Defendant Beasley repeatedly positioned his body to obstruct Jarvis's camera's line of sight, and repeatedly told Jarvis to step back.

208.    Derks repeatedly tried to ask Beasley what was happening and to leave the private property, but he was ignored.

209.    Beasley finally told Derks that he was conducting an investigation and Richmond Police would not leave the property and claimed he would come and explain everything to Derks when things settled down, but he did not keep that promise.

210.    While Richmond Police officers milled around in the parking lot and ignored Derks' repeated demands that they step back onto the sidewalk, Jarvis asked several officers, including Beasley, to identify themselves for the purposes of filing a formal complaint regarding their violent conduct.

211.    Beasley refused to identify himself with his name or badge number and demanded to know if Jarvis was carrying his own identification. A bystander reacted by saying "You know who he is! You shout his name out every time you see him!" to which Beasley shrugged and said "I don't know who he is."

212.     In succession, Jarvis asked an unknown black female Richmond Police officer, and Buraliev, Frazer, and Craig for their identifying information. Only Craig replied with his last name, claiming "You already know me." At the time, Jarvis did not know Craig.

213.     Jarvis then made the same request to Officer Keegan Mills ("Mills") and three other white male officers he did not recognize. None of them identified themselves and Beasley made no effort to make them do so.

214.     By this point, it was approximately 10:30 p.m. and over two dozen Richmond Police Department officers and multiple vehicles, including an armored truck, had surrounded the GWARbar property. They made no instructions or demands, simply milling around and refusing to leave GWARbar's private property.

215.     A pickup truck with a bed full of VSP officers in riot gear pulled up, and there were now scores of various law enforcement surrounding a bar with approximately 12-15 frightened patrons, unable to leave because of the police siege on the establishment.

216.     At 10:57 p.m., Jarvis witnessed Officer Matt McHugh ("McHugh") ignore a stop sign at the intersection of Madison and Clay Streets before turning around and driving the wrong way headed south on Clay Street.  As he exited his vehicle and saw Jarvis filming, he asked "How ya doin?" Jarvis asked him if he'd ever heard of a stop sign, to which McHugh replied "Nope, never heard of them" with a shrug.

217.     Jarvis then realized that even more Richmond Police officers had arrived, including Ruiz-Oyler and Leone, who were lined up just outside of the property line.

218.     Jarvis filmed the approaching officers, and at approximately 11:00 p.m. witnessed two other women filming the heavy police presence as well. He recognized one of the women as Plaintiff Alice Minium, who was filming Ruiz-Oyler.

43

219.    Ruiz-Oyler thereafter advanced onto the GWARbar property and pushed her way into Minium and the other woman's face, without provocation.

220.    A few moments later, Ruiz-Oyler grabbed Minium and violently yanked her off the property and subsequently arrested her.

221.    As Jarvis filmed Minium's arrest, without provocation or warning, Defendant Malone dashed over to Jarvis and threw him onto the ground, injuring Jarvis' wrist in the process, the injury of which persists to this day.

222.    A petite woman behind Jarvis was knocked to the ground under Jarvis and began crying, clearly injured.

223.    Defendant Leone then rushed forward without a facemask to be front and center in Jarvis' recording, where she began performatively smirking directly into the camera.

224.    Jarvis thereafter repeatedly asked Malone to identify himself so for the purposes of Jarvis filing a complaint with the Richmond Police for the unwarranted assault upon him. Malone refused to identify himself.

225.    At this point, Jarvis contacted Councilmember 1 and asked that she come and surveil the scene.  Her arrival appeared to prompt a drastic change in behavior of the Richmond Police still at the scene.

226.    At 11:15 p.m., VSP officers in riot gear replaced the Richmond Police Department officers who had been surrounding the GWARbar establishment, where they remained until 11:51 p.m.

**September 14, 2020**

227.    On September 14, 2020, Jarvis was present to witness a peaceful daytime demonstration and march from Martin Luther King, Jr. Middle School on Mosby Street. The march was planned to end at Richmond's City Hall.

228.    Jarvis noticed a suspicious vehicle trailing protesters. Jarvis filmed the individual, who subsequently followed the march on foot. Jarvis later identified him as Defendant Lloyd.

**September 25, 2020**

229.    Shortly after midnight on September 25, 2020, Jarvis was documenting a protest outside of Richmond Police Department headquarters when a group of VSP and Richmond Police officers in riot gear stood in a line across Grace Street, facing off with angry protesters.

230.    While filming, Defendant Harris charged forward to grab a young woman, but he was rebuffed and began bashing Jarvis with his riot shield instead. Richmond Police Sergeant Anthony Catoggio grabbed Harris by the arm and pulled him back into the police line.

231.    Harris made another attempt to rush and grab the young woman, but multiple officers wrapped their arms around Harris' arms and head, and again pulled him back to the police line. Harris was then removed from the front line until about 1:00 a.m., when he returned, noticeably calmer.

232.    At about 1:30 a.m., Jarvis spotted Defendant Bridges moving up and down the police line. As Jarvis was filming, a VSP officer in green fatigues and armor pointed his gas launcher directly at Jarvis from only a couple feet away.

233.    Then Defendant Ruiz-Oyler rushed forward without warning or provocation, putting her hand over Jarvis' camera lens, slapping his arm, and yelling "Move, Jimmie! Move, Jimmie! Move, Jimmie!" while shoving Jarvis backwards into another individual.

**October 17, 2020**

234.    At approximately 11:30 a.m. on October 17, 2020, Jarvis was walking to a planned demonstration at 8th Street and East Grace Streets when he spotted Defendant Lloyd's car down the block, appearing to be following Jarvis.

235.    Later, at 1:15 p.m., Jarvis was walking west on Grace Street when a line of four Richmond Police Department vehicles pulled up next to Jarvis. Defendant Bridges leaned out of the passenger side of the lead vehicle and shouted something Jarvis was unable to hear. Jarvis asked him to repeat it, and Bridge's replied "Happy Birthday." Jarvis's birthday was two days prior. Bridges was intentionally attempting to intimidate Jarvis by letting him know he knew personal details about Jarvis.

236.    About twenty minutes later, Jarvis walked to the parking lot of Davis Market near the Richmond Police Department headquarters, where Defendant Harris saw him and crossed the street. Harris loudly mocked Jarvis to a bystander on the street.

237.    Later that afternoon around 2:15 p.m., Jarvis noted that Defendant Lloyd was again following him as Jarvis walked along Park Avenue.

**October 27, 2020**

238.    On October 27, 2020, Jarvis was walking past Monroe Park just before 9:00 p.m. when he saw a group of Richmond Police officers, including Defendant Harris, milling around on the sidewalk. The group beckoned Jarvis over, to which he complied, and Harris made a series of sarcastic and defamatory remarks to Jarvis.

239.    When asked why he was filming police, Jarvis responded that public servants should not mind being filmed. Harris pretended that he had never heard the term "public servant"

before and accused Jarvis of likening a Black man to a slave. Harris repeatedly tried to goad Jarvis to cease filming, which Jarvis did not do.

240.    Harris then claimed he was scared of Jarvis' "physically imposing" presence and that this was causing Harris "to fear for his life." Jarvis is approximately 5'2" and several inches shorter than Harris.

241.    Harris was now joined by Defendant Ruiz-Oyler, who yelled at Jarvis to move out of her way. Defendant Brides chimed in and repeatedly asked Jarvis "did you have a good birthday, Jimmie Lee?"

242.    Jarvis continued to film this ridiculous behavior and an unknown Richmond Police officer rushed over to block his filming, telling Jarvis to back up. Jarvis asked how far, and Defendant Bridges said to back up ten feet.

243.    Jarvis complied, but the unknown officer continued pushing Jarvis backwards and blocking his camera. Jarvis continued filming until the group loaded up into their vehicles and drove away.

244.    Later that night, at approximately 10:35 p.m., Jarvis was walking through the Fan when he witnessed an arrest happening on the sidewalk. He began filming and a crowd began to gather around the commotion. A Richmond Police officer unknown to Jarvis, approached Jarvis and began repeatedly referring to him by his full name. The officer directed his flashlight into Jarvis's face and camera, and Jarvis was unable to see. The unknown Richmond officer refused multiple requests to identify himself before jumping in his car and driving away.

**November 7, 2020**

245.    Around noon on November 7, 2020, Jarvis was walking to the State Capital to document a pro-Trump rally falsely claiming that the 2020 presidential election was stolen.

246.    At 12:30 p.m., Jarvis noticed that Defendant Lloyd was once again following him on foot.

247.    Jarvis continued to film and photograph the event and left at 2:19 p.m., when Jarvis noted that Lloyd was also preparing to leave by getting into his car. Jarvis spoke with Lloyd briefly, asking Lloyd why he was always following him.

248.     Lloyd responded with sarcastic and derogatory statements, which Jarvis ignored.

**November 12, 2020**

249.    Jarvis spent the evening of November 12, 2020 documenting a "Stop the Steal" rally represented by a large truck headlined by InfoWars host Alex Jones, who was not present.

250.    At approximately 8:30 p.m., after Jarvis publicly posted on Twitter that he would be observing the event, noticed that Defendant Lloyd was once again following Jarvis on foot, while speaking on the phone.

251.    About twenty minutes later, Jarvis observed Richmond Police chatting casually with pro-Trump demonstrators, who demanded to know why no counter-protestors across the street had been arrested. The counter-protestors were breaking no laws.

252.    The unknown Richmond Police officer replied that "this has been going on since May 29. Once we leave... you're on your own," suggesting to the pro-Trump crowd they were free to do as they like with regard to the counter-protestors.

### Alice Minium's Unlawful Arrest: August 21, 2020

253.    On August 20, 2020, Plaintiff Alice Minium ("Minium") was with a group of individuals outside of GWARbar. The group was in the parking lot on private property when a dozen or more Richmond Police officers lined up along the sidewalk and across the street with VSP.

254.    Minium's group was neither marching nor protesting and was there with the permission of GWARbar owner.

255.    Without explanation, an unknown Richmond Police officer walked up to Minium and demanded identification from her and everyone in the crowd.

256.    Upon witnessing four Richmond Police officers tackle a young Black individual onto the pavement, another officer place his knee on their back, and another lock their neck, then drag them away for arrest entirely unprovoked, Minium calmly and without aggression approached the Richmond Police officers and requested the names and badge numbers of the officers present.

257.    No single officer answered her question, although one unidentified officer responded with "I'm not required to provide that."

258.    One unknown female officer in the row said she knew who Minium was and thereafter demanded Minium's identification.

259.    When Minium inquired as to the purpose, Defendant Ruiz-Oyler and Dan Bondy ("Bondy") forcibly yanked Minium from her peers and threw her to the ground, where she suffered injuries.

260.    Ruiz-Oyler charged Minium with violating Virginia Code § 18.2-408 for conspiracy to incite a riot, a Class 5 felony.

261.    Minium was taken to the magistrate's Office, where Ruiz-Oyler falsely claimed to the magistrate that Minium was an extremist and a known "organizer."

262.    In the process of her arrest, Richmond Police confiscated Minium's phone and other personal belongings. She was also strip-searched in the process.

263.    Five days later, on August 25, 2020, Ruiz-Oyler provided a misleading statement in order to obtain a search warrant for Minium's phone. The warrant also granted Richmond Police

the right to monitor Mimium's social media, contacts and location history.

264.    At a hearing in the Richmond General District Court on November 12, 2020, Case No. GC20015008, Minium's charges were dismissed.

265.    Despite repeated demands, Minium's phone was not returned to her until January 11, 2021.

**Vanna Goodenow's Unlawful Arrest: October 27, 2020**

266.    Plaintiff Vanna Goodenow ("Goodenow") attended several social justice protests in and around Richmond during the summer/fall of 2020.

267.     On October 27, 2020, they had planned to attend a rally that ultimately did not occur.

268.    As Goodenow walked home in the City's Northside, she approached Brookland Parkway and North Street and specifically noted a heavy police presence around the general area.

269.    At the intersection of Norwood and Barton, Goodenow observed that two Richmond Police officers had pulled over and had them out of the car.

270.    Goodenow approached the scene and started filming with their camera, from at least twenty feet away. The police appeared to be arresting the individual who had been pulled over.

271.    The unknown Richmond Police officers ordered Goodenow to leave the scene and go all the way down the block, out of filming sight. One stated that Goodenow did not need to record because their body-worn cameras were recording.

272.    Goodenow declined to leave and stated that they were far enough away and they would not get anywhere closer to the scene. Goodenow insisted on recording on the grounds that body-worn camera footage is frequently missing in cases of injustice.

273.    The two Richmond Police officers left the individual they had been arresting and approached Goodenow, ordering her to retreat to the end of the street (approximately 50-60 additional feet away, or half a block away) or she would be arrested.

274.    Goodenow was subsequently arrested by Richmond Police Officer Junius Thorpe ("Thorpe") and charged with a violation of Virginia Code § 18.2-460(B), which provides in part that "any person who, by threats or force, knowingly attempts to intimidate or impede a judge, magistrate, justice, juror, attorney for the Commonwealth, witness, any law-enforcement officer, …lawfully engaged in his duties as such …is guilty of a Class 1 misdemeanor."

275.    Goodenow was placed in handcuffs and told to sit on the curb, while 2-3 more Richmond Police cars drove up to the scene. She was released on scene.

276.    At the conclusion of a trial conducted in the Richmond General District Court on March 10, 2021, Case No. GC20017905-00, Goodenow was found not guilty.

277.    Goodenow observed during her trial that Thorpe was intentionally vague and misleading. Goodenow's attorney had to remind him several times he was under oath after he was unable to recall the answers to many of the questions.

278.    The presiding judge found Goodenow not guilty, stating at the conclusion that "while officers' jobs are becoming increasingly difficult, and maybe that's a good thing, due to legal precedent, making an officers job 'more' difficult is not obstruction of justice."

**Éilís Weller's Unlawful Arrest: June 16, 2021**

279.    On June 16, 2021, Plaintiff Éilís Weller ("Weller") attended a peaceful protest for Palestine in Scuffletown Park on Strawberry Street in Richmond. The protestors marched from that address to the Circle at Monument Avenue.

280.    As the group turned around and headed back to Scuffletown Park, Weller observed

that they were approached by approximately fifteen or more Richmond Police officers and quickly there were multiple police cars on the scene.

281.     Upon seeing the mass of Richmond Police officers, Weller pulled out their phone to record activities. The police instructed the group to get on the sidewalk.

282.     As a disabled individual, Weller had difficulty getting to the sidewalk quickly. In addition, there were Richmond Police vehicles surrounding them as they tried to navigate their way towards the sidewalk.

283.     Not less than two minutes later, Weller, while attempting to get to the sidewalk, an unknown Richmond Police officer forcibly dragged Weller toward the sidewalk, knocking their shoe off in the process and causing Weller to become further unbalanced. Weller was subsequently arrested by Richmond Police Officer Paul Campbell ("Campbell").

284.     Weller was detained for approximately 5-10 minutes. Richmond Police officers also repeatedly misgendered Weller despite being corrected of their proper pronouns.

285.     At this this same time, they also arrested a black individual who was on a grassy area and no longer in the road. He was released a few minutes after Weller.

286.     Both Weller and the other individual were given summons upon their release with the same court date and time. Weller was verbally advised that the charge was an "illegal participation in a parade" but the charging part of their summons was intentionally blank and the charge code was Virginia Code § 46.2-928: "[w]alk in road – sidewalk available."

287.     A hearing was held in the Richmond General District Court on July 28, 2021, Case No. GT21011221-00. Campbell failed to appear and the presiding judge dismissed the charges.

**INJURY TO PLAINTIFFS**

288.     Plaintiffs incorporate the preceding paragraphs of the Complaint as if the same are

fully set forth herein.

289.    As a result of Defendants' unlawful policies, customs and conduct, Plaintiffs have suffered constitutional injuries, physical pain and injury, emotional distress, property loss, lost employment opportunities and economic injuries.

290.    Plaintiffs have suffered the short and long-term effects of chemical weapons, excessive force and use of violent tactics used by Defendants.

291.    Plaintiffs have suffered emotional trauma and injury, which persist to the present, including fear, anxiety and emotional distress.

292.    Plaintiffs' rights to peacefully observe the Defendants' conduct were chilled and curtailed by the Defendants' unlawful actions.

**CLAIMS FOR RELIEF**

**<u>COUNT I</u>**
**42 U.S.C. § 1983 - FIRST AMENDMENT RETALIATION**
**Seeking Declaratory and Injunctive Relief, Compensatory and Punitive Damages**
**(Against all appropriate Defendants, jointly or severally)**

293.    Plaintiffs incorporate the preceding paragraphs of the Complaint as if the same are fully set forth herein.

294.    42 U.S.C. § 1983 provides, in pertinent part, that: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

295.    Observing public police activities, including public demonstrations and the conduct of police officers without interfering with those duties, is a constitutionally protected, legitimate

means of gathering information for public dissemination and is expressive conduct explicitly protected by the First Amendment.

296.    A First Amendment retaliation claim under §1983 is comprised of three elements: "(1) the plaintiff is engaged in constitutionally protected First Amendment Activity; (2) the defendant took an action that adversely affected that protected activity; and (3) there is a causal relationship between the plaintiff's protected activity and the defendant's conduct." Booker v. S.C. Dep't of Corr., 855 F.3d 533, 537 (4th Cir. 2017); Suarez Corp. Ind. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000)(accord).

297.    Each of the Plaintiffs are "citizens of the United States or other persons within the jurisdiction thereof." The Defendants are "persons" for the purposes of 42 U.S.C. § 1983.

298.    Each and every Plaintiff was engaged in expressive activity by peacefully observing the police in a public forum, conduct that is unequivocally protected by the First Amendment. Am. Life League, Inc. v. Reno, 47 F.3d 642 (4th Cir. 642 1995).

299.    Defendants, including Officers Doe 1-50, at all relevant times herein were acting under the color of state law.

300.    At the time of the events complained of herein, each Plaintiff had a clearly established constitutional right under the First Amendment to peaceably observe and record police activity, without retaliation by the police through a use of force or through conduct that intimated the threat of an imminent use of force, other than force for purpose of making an arrest supported by probable cause.

301.    In an effort to restrict and retaliate against the Plaintiffs' protected speech, which Defendants view as critical of police and government, Richmond Police Department ordered, directed, authorized and affirmatively caused the use of excessive force and unreasonable seizure

described herein, through its policies, customs and indifference to a custom, pattern, practice or policy of allowing officers to retaliate against individuals for their expressive conduct in videotaping and photographing police undertaking their official duties and/or deliberately indifferent failure to properly train, supervise and discipline officers who engage in such conduct, all of which has adversely affected Plaintiffs' constitutionally protected speech.

302.     Furthermore, supervisors and other agents of the Richmond Police Department who planned, authorized, ratified, or condoned the conduct described herein are equally liable as those participating in this conduct; as are officers, agents, or employees of the Richmond Police Department who had actual or constructive knowledge that others were, or were intending, to engage in conduct that poses a pervasive and unreasonable risk of constitutional injury to citizens, and whose response to that knowledge was so inadequate as to show deliberate indifference or tacit authorization of the unlawful conduct, which inaction was an affirmative cause of the constitutional injury.

303.     Any reasonable police officer knew or should have known, by virtue of his or her training and experience and the case law and opinions of federal courts concerning these rights at the time of the events complained of herein (as the law was clearly established at that time), that his or her conduct violated the Plaintiffs' clearly established First Amendment rights. Therefore, Defendants and Officers Doe 1-50 are not entitled to qualified immunity.

304.     The acts of Defendants and Officers Doe 1-50, as described herein, retaliated against the Plaintiffs and involved the use of force and conduct that intimated the threat of an imminent use of force, for purposes other than making an arrest supported by probable cause, in retaliation for protected First Amendment activity.

305.     A similarly situated reasonable person would have been deterred in the exercise of

his or her First Amendment activity by the conduct of Defendants and Officers Doe 1-50. In fact, each of the Plaintiffs were deterred in his or her exercise of their First Amendment activities.

306.    Plaintiffs reasonably fear their continued harassment, unlawful seizure of their person and their property, deployment of chemical agents, physical assault, detention, and/or arrest by Richmond Police if they continue to engage in this constitutionally protected activity

307.    Defendants and Officers Doe 1-50 acted intentionally, willfully and wantonly, and in gross and reckless disregard of the Plaintiffs' rights.

308.    Declaratory judgment that the conduct of the Defendants violated the First Amendment rights of the Plaintiffs and similarly situated individuals is appropriate.

309.    Compensatory damages are appropriate inter alia for the physical and emotional injuries, and the chilling effect of the Defendants' conduct, as well as any out-of-the-pocket expenses or lost income, incurred by the Plaintiffs as a direct and proximate result of the Defendants' conduct in violation of the Plaintiffs' First Amendment rights.

310.    Punitive damages are appropriate as to all or some of the Defendants, as the conduct of at least some of the Defendants showed actual malice, willful and wanton, or gross and reckless disregard of the Plaintiffs' rights.

311.    An award of costs and attorney fees, pursuant to 42 U.S.C. § 1983, is appropriate.

312.    As the Supreme Court of the United States has stated, "a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen and thus be less likely to respond belligerently to fighting."

313.    Defendant Richmond Police Department is liable for violating the Plaintiffs' clearly established First Amendment right to freedom of speech and freedom of assembly, as its official policies, directives and customs deprived Plaintiffs of their First Amendment rights.

## COUNT II
### 42 U.S.C. § 1983 – VIOLATION OF THE FOURTEENTH AMENDMENT
### Seeking Declaratory and Injunctive Relief, Compensatory and Punitive Damages
### (Against all appropriate Defendants, jointly or severally)

314.    Plaintiffs incorporate the preceding paragraphs of this Complaint as is the same are fully set forth herein.

315.    42 U.S.C. § 1983 provides, in pertinent part, that: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

316.    Plaintiffs are "citizens of the United States or other person within the jurisdiction thereof."

317.    Defendants, including Officers Doe 1-50 are "persons" for the purpose of 42 U.S.C. § 1983.

318.    Defendants and Officers Doe 1-50, at all relevant times herein, were acting under the color of state law.

319.    At the time of the events complained of herein, Plaintiffs had clearly established constitutional rights under the Fourteenth Amendment of the United States Constitution, to be free of arbitrary state-actor conduct that deprives an individual of bodily integrity. Doe v. Rosa, 795 F.3d 429, 436-37 (4th Cir. 2015). Under the circumstances, the use of tear gas, pepper spray, physical assault, repeated and unrelenting harassment, unlawful detention and bogus arrests against the Plaintiffs constitute an invasion of bodily security through a "means so brutal, demeaning, and harmful" as to be shocking to the conscience. Hall v. Tawney, 621 F.2d 607, 613

(4th Cir. 1980).

320.    Furthermore, supervisors and other agents of the Richmond Police Department who planned, authorized, ratified, or condoned the conduct described herein are equally liable as those participating in this conduct; as are officers, agents, or employees of the Richmond Police Department who had actual or constructive knowledge that others were, or were intending, to engage in conduct that poses a pervasive and unreasonable risk of constitutional injury to citizens, and whose response to that knowledge was so inadequate as to show deliberate indifference, failure to supervise or tacit authorization of the conduct, which inaction was an affirmative cause of the constitutional injury.

321.    Any reasonable police officer knew or should have known, by virtue of his or her training and experience and the case law and opinions surrounding the Fourteenth Amendment case law concerning these rights at the time of the events complained of herein, as the law was clearly established at that time, that their conduct violated the Plaintiffs' clearly established Fourteenth Amendment rights. Therefore, Defendants and Officers Doe 1-50 are not entitled to qualified immunity.

322.    The acts of Defendants and Officers Doe 1-50, as described herein, involved the use of arbitrary state-actor conduct that deprived Plaintiffs of their right to bodily integrity. Under the circumstances, the use of tear gas, pepper spray, physical assault, repeated and unrelenting harassment, unlawful detention and bogus arrests and the like constitute an invasion of bodily security through a "means so brutal, demeaning, and harmful" as to be shocking to the conscience.

323.    Given the multiple constitutional violations documented herein at different places and different times, the need for more supervision was so obvious, and the inadequacy of training and supervision so likely to result in the trampling of constitutional rights that Defendants

demonstrated deliberate indifference to the need for such training and supervision.

324.    Defendants and Officers Doe 1-50 acted intentionally, willfully and wantonly, in gross and reckless disregard of the Plaintiffs' rights.

325.    Declaratory judgment that the conduct of the Defendants and Officers Doe 1-50 violated the Fourteenth Amendment rights of the Plaintiffs is appropriate.

326.    Compensatory damages are appropriate inter alia for the physical and emotional injuries, as well as any out-of-the-pocket expenses or lost income, incurred by Plaintiffs as a direct and proximate result of the Defendants' conduct in violation of the Plaintiffs' Fourteenth Amendment rights.

327.    Punitive damages may be appropriate as to all or some of the Defendants, as the conduct of at least some of the Defendants showed actual malice, willful and wanton, or gross and reckless disregard of the Plaintiffs' rights.

328.    An award of costs and attorney fees, pursuant to 42 U.S.C. § 1983, is appropriate.

<u>COUNT III</u>
**42 U.S.C. § 1983 - EXCESSIVE USE OF FORCE**
**IN VIOLATION OF THE FOURTH AMENDMENT**
**Seeking Declaratory and Injunctive Relief, Compensatory and Punitive Damages**
**(Against all appropriate Defendants, jointly or severally)**

329.    Plaintiffs incorporate the preceding paragraphs of the Complaint as if the same are fully set forth herein.

330.    To the extent any Defendant, including Officers Doe 1-50, may attempt to justify their conduct as an attempt to arrest or detain individuals under the guise of the Fourth Amendment, this is a Fourth Amendment excessive force claim.

331.    42 U.S.C. § 1983 provides, in pertinent part, that: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of

Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

332.    Each of the Plaintiffs are "citizens of the United States or other persons within the jurisdiction thereof."  The Defendants are "persons" for the purposes of 42 U.S.C. § 1983.

333.    Defendants, including Officers Doe 1-50, at all relevant times herein were acting under the color of state law.

334.    The Fourth Amendment prohibits police officers from using excessive force to seize a free citizen. None of the Plaintiffs in the activities described above had committed any crime by observing, videotaping or photographing the police in their official duties.

335.    Nonetheless, individual Defendants, including Officers Doe 1-50, at times physically assaulted and deployed chemical agents, intended to cause pain and suffering against whom it is deployed.

336.    Defendants, including Officers Doe 1-50, at other times violently, and with the intent to intimate the Plaintiffs, used excessive force in detaining and/or arresting Plaintiffs.

337.    All force employed by law enforcement against an individual must be "objectively reasonable" in order to avoid violations of the Fourth Amendment's prohibition of excessive force.

338.    Defendant Richmond Police Department is liable for violating Plaintiffs' clearly established Fourth Amendment right to be free from excessive force, as its official policies, directives, and customs deprived Plaintiffs of their Fourth Amendment rights. The Richmond Police Department ordered, directed, authorized, and affirmatively caused the use of excessive force as alleged herein, through its policies and customs.

339.   In an effort to restrict and retaliate against the Plaintiffs' protected speech, which Defendants view as critical of police and government, Richmond Police Department ordered, directed, authorized and affirmatively caused the use of excessive force described herein, through its policies, customs and indifference to a custom, pattern, practice or policy of allowing officers to retaliate against individuals for their expressive conduct in videotaping and photographing police undertaking their official duties and/or deliberately indifferent failure to properly train, supervise and discipline officers who engage in such conduct, all of which has violated Plaintiffs' Fourth Amendment rights.

340.   Individually named Defendants, as well as Officers Doe 1-50, are personally liable for violating Plaintiffs' clearly established Fourth Amendment right to be free from the unauthorized use of force because, acting under color of state law, they ordered, directed, authorized, supervised, and affirmatively caused the excessive use of force alleged herein, in an effort to restrict and retaliate against Plaintiffs' protected speech, which Defendants viewed as critical of the police and the government.

341.   Defendants' actions adversely affected Plaintiffs' constitutionally protected speech. Defendants acted intentionally and maliciously, and with willful, callous, wanton, and reckless disregard for the rights of Plaintiffs

342.   Defendants' use of force, including but not limited to pepper spray, tear gas, and other physical forces as alleged herein, were excessive and objectively unreasonable in light of the facts and circumstances confronting them, as Plaintiffs were merely observing and recording police activity at a distance, not interfering, not committing any crime warranting police intervention, not posing any treat to safety of the officers or others, and trying to comply with police orders.

343.    Defendants acted intentionally and maliciously, and with willful, callous, wanton, and reckless disregard for the rights of Plaintiffs.

**COUNT IV**
**42 U.S.C. § 1983 – UNLAWFUL SEIZURE**
**IN VIOLATION OF THE FOURTH AMENDMENT**
**Seeking Declaratory and Injunctive Relief, Compensatory and Punitive Damages**
**(Against all appropriate Defendants, jointly or severally)**

344.    Plaintiffs incorporate the preceding paragraphs of the Complaint as if the same are fully set forth herein.

345.    To the extent any Defendant, including Officers Doe 1-50, may attempt to justify their conduct as an attempt to arrest or detain individuals under the guise of the Fourth Amendment, this is a Fourth Amendment unlawful seizure.

346.    42 U.S.C. § 1983 provides, in pertinent part, that: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

347.    Each of the Plaintiffs are "citizens of the United States or other persons within the jurisdiction thereof."  The Defendants are "persons" for the purposes of 42 U.S.C. § 1983.

348.    Defendants, including Officers Doe 1-50, at all relevant times herein were acting under the color of state law.

349.    The Fourth Amendment prohibits police officers from unreasonable search and seizure of free citizens without probable cause. None of the Plaintiffs in the activities described above had committed any crime by observing, videotaping or photographing the police in their

official duties.

350.    None of the Plaintiffs in the activities described above had committed any crime by observing, videotaping or photographing the police in their official duties, and in fact, Plaintiff members of the press have an express right to do so under the circumstances described herein.

351.    Despite the fact that Plaintiffs had not committed any crimes, Defendants detained and seized each of them, and in the cases of Schmidt, Goodenow, Goad, Weller and Minium, placed them in handcuffs and ultimately placed them under arrest.

352.    At no point did Defendants have probable cause to seize, detain or arrest any of the Plaintiffs described herein.

353.    None of the above Plaintiffs were convicted of the charges for which they were arrested as the charges were either thrown out, dismissed or found not guilty.

354.    Defendant Richmond Police Department is liable for violating Plaintiffs' clearly established Fourth Amendment right to be free from unlawful seizure, as its official policies, directives, and customs deprived Plaintiffs of their Fourth Amendment rights. The Richmond Police Department ordered, directed, authorized, and affirmatively caused the unlawful seizure of Plaintiffs as alleged herein, through its policies and customs.

355.    In an effort to restrict and retaliate against the Plaintiffs' protected speech, which Defendants view as critical of police and government, Richmond Police Department ordered, directed, authorized and affirmatively caused the unlawful seizure described herein, through its policies, customs and indifference to a custom, pattern, practice or policy of allowing officers to retaliate against individuals for their expressive conduct in videotaping and photographing police undertaking their official duties and/or deliberately indifferent failure to properly train, supervise and discipline officers who engage in such conduct, all of which has violated Plaintiffs' Fourth

Amendment rights.

356.    Individual Defendants and Officers Doe 1-50 are personally liable for violating Plaintiffs' clearly established Fourth Amendment right to freedom of speech and assembly because, acting under color of state law, they ordered, directed, authorized, supervised, and affirmatively caused the unlawful seizure of Plaintiffs, in an effort to restrict and retaliate against Plaintiffs' protected speech, which Defendants viewed as critical of the police and the government.

357.    Defendants' actions adversely affected Plaintiffs' constitutionally protected speech. Defendants acted intentionally and maliciously, and with willful, callous, wanton, and reckless disregard for the rights of Plaintiffs

358.    Defendants' actions adversely affected Plaintiffs' constitutionally right to be free from unlawful seizure. Defendants acted intentionally and maliciously, and with willful, callous, wanton, and reckless disregard for the rights of Plaintiffs.

**<u>COUNT V</u>**
**42 U.S.C. § 1983 – SUPERVISOR LIABILITY**
**Seeking Declaratory and Injunctive Relief, Compensatory and Punitive Damages**
**(Against Defendants William Smith, Blackwell and Gerald Smith**

359.    Plaintiffs incorporate the preceding paragraphs of the Complaint as if set forth fully herein.

360.    Until on or around June 16, 2020, Defendant William Smith was Chief of Police of the Richmond Police Department and, as such, was the final policymaker with respect to the matter of establishing the official policy of the Richmond Police Department, selecting the officers employed, training the officers employed, supervising the officers employed, and imposing warranted discipline on officers employed.

361.    From June 16 to June 26, 2020, Defendant Blackwell was Interim Chief of Police of the Richmond Police Department and, as such, was the final policymaker with respect to the

matter of establishing the official policy of the Richmond Police Department, selecting the officers employed, training the officers employed, supervising the officers employed, and imposing warranted discipline on officers employed.

362.    From June 26, 2020 to the present, Defendant Gerald Smith is the Chief of Police of the Richmond Police Department and, as such, was the final policymaker with respect to the matter of establishing the official policy of the Richmond Police Department, selecting the officers employed, training the officers employed, supervising the officers employed, and imposing warranted discipline on officers employed.

363.    Defendants William Smith, Blackwell and Gerald Smith each had affirmative constitutional duties to not be deliberately indifferent to a need for necessary training, hiring, supervision and discipline, within their respective police ranks.

364.    Defendants William Smith, Blackwell and Gerald Smith have each breached these affirmative duties by being deliberately indifferent to such supervisory obligations.

365.    The routine actions by Richmond Police Department to target, harass, injure, detain and arrest citizen individuals who dare record police activity, as detailed hereinabove, were numerous and significant enough to put Defendants William Smith, Blackwell and Gerald Smith on actual or constructive notice of an obvious need to train and direct officers on how and when to appropriately interact with citizens peacefully exercising their First Amendment rights and how and when to appropriately deploy chemical agents, projectile and concussion grenades.

366.    The widespread actions of various Richmond Police Department officers against the Plaintiffs in unrelated events are pervasive and present an unreasonable risk of harm. Tactics employed by Richmond Police Department infringe on the Plaintiffs' protected First, Fourth and Fourteenth Amendments rights are evidence that the conduct is widespread and used by different

officers against different Plaintiffs during separate and unrelated occasions.

367.   The unlawful conduct engaged in by subordinate Richmond Police Department officers poses an unreasonable risk of harm of constitutional injury.

368.   Richmond Police Department officers, **on a routine basis**, detained, physically assaulted, employed chemical agents against and threatened arrest to credentialed and clearly identified Plaintiff members of the press.

369.   None of the Plaintiffs who photographed or took video of Richmond Police Department officers and were subsequently arrested and charged were convicted of any wrongdoing for said charges. Such a dismal success rate put these Defendants on actual notice that their subordinates created an "affirmative causal link" between the Defendants' inactions and the First, Fourth and Fourteenth Amendment injuries suffered by the Plaintiffs.

370.   Despite this obvious need, William Smith, Blackwell and Gerald Smith undertook no substantial steps in training, disciplining, or redirecting the officers of their respective police forces, despite having ample time to take corrective action.

371.   Rather, each continued to allow their officers to employ the same methods, under the same circumstances.

372.   Defendants William Smith, Blackwell and Gerald Smith acted with deliberate indifference to, and tacit approval of the obvious need for training and discipline within their subordinate ranks. Accordingly, rank and file Richmond Police Department officers will continue their patterned course of meeting peaceful recording of police activity with excessive, retaliatory force and unlawful arrest, causing the deprivations of Plaintiffs' rights to free speech, assembly, and against excessive force, as complained of hereinabove.

373.   Such deprivations were the foreseeable and direct result of the inaction of

66

Defendants William Smith, Blackwell and Gerald Smith.

374.    Plaintiffs are foreseeable victims of the inaction of Defendants William Smith, Blackwell and Gerald Smith.

375.    Defendants' actions adversely affected Plaintiffs' constitutionally protected speech. Defendants acted intentionally and maliciously, and with willful, callous, wanton, and reckless disregard for the rights of Plaintiffs.

## COUNT VI
## INJUNCTIVE RELIEF

376.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs of this Complaint as if set forth fully herein.

377.    A real and immediate difference exists between Plaintiffs and Defendants regarding Plaintiffs' rights and Defendants' duty owed to Plaintiffs to protect Plaintiffs' constitutional rights under the First, Fourth and Fourteenth Amendments.

378.    Defendants' policies and actions have resulted and will result in irreparable injury to Plaintiffs and others similarly situated.

379.    There is no plain, adequate or complete remedy at law to address the wrongs described herein.

380.    Defendants have made clear by their repeated escalation of retaliation against members of the press and citizens who dare video or photograph Richmond Police at work.

381.    Defendants have made clear that they intend to continue the practices described above that make it impossible for citizens and members of the press to be confidant that their First, Fourth and Fourteenth Amendment rights will not be violated.

382.    Unless restrained by this Court, Defendants will continue to implement these unlawful policies and practices.

383.     Defendants' acts alleged above violate established constitutional rights of Plaintiffs and Defendants could not reasonably have thought that the conduct of their agents and employees was lawful.

384.     An actual controversy exists between Plaintiffs and Defendants in that Defendants, their agents and employees, have engaged in the unlawful and unconstitutional acts alleged herein and intend to continue to do so. Plaintiffs claim that these acts are contrary to law and seek a declaration of their rights with regard to this controversy.

385.     As a direct and proximate consequence of the acts of Defendants' agents and employees, Plaintiffs have suffered and will continue to suffer damages through injury to their person and to their constitutional rights.

**PRAYER FOR RELIEF**

Plaintiffs request that this Court:

1.     Enter a declaratory judgment that the Defendants' conduct, policies and practices violated Plaintiffs' rights under the First Amendment to the United States Constitution;

2.     Enter a declaratory judgment that the Defendants' conduct, policies and practices violated Plaintiffs' rights under the Fourth Amendment;

3.     Enter a declaratory judgment that the Defendants' conduct, policies and practices violated Plaintiffs' rights under the Fourteenth Amendment;

4.     For a permanent injunction, enjoining and restraining Defendants from engaging in the policies, practices and conduct complained of herein;

5.     Enter judgment awarding Plaintiffs compensatory damages against all Defendants in an amount appropriate to the evidence adduced at trial;

6.      Enter judgment awarding Plaintiffs punitive damages against all Defendants sued in their individual capacities in an amount appropriate to the evidence adduced at trial;

7.      Enter judgment awarding Plaintiffs their costs and reasonable attorneys' fees in this action as provided in 42 U.S.C. § 1988(b); and

8.      Grant Plaintiffs such further relief as this Court may deem just and proper.


## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.


Dated:  May 30, 2022

                                        Respectfully submitted,

                                        */s/ Terry C. Frank, Esq.*_____
                                        Terry C. Frank, Esq. (VSB No. 74890)
                                        Terry Frank Law
                                        108 E. Grace Street, Suite 001
                                        Richmond, VA 23219
                                        Phone: (804) 899.8090
                                        Fax: (804) 899.8229
                                        E-mail: terry@terryfranklaw.com
                                        *Counsel for Plaintiffs*