# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

| | |
|---|---|
| **CHARLES H. SCHMIDT, JR.,** *et al.* | ) |
| | ) |
| *Plaintiffs,* | ) |
| | )     **Case No. 3:22-cv-00404** |
| *v.* | ) |
| | ) |
| **CITY OF RICHMOND,** *et al* | ) |
| | ) |
| *Defendants.* | ) |
| _____ | ) |

## AMENDED COMPLAINT and
## REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF

COMES NOW Plaintiffs, Charles H. Schmidt, Jr., Kristopher C. Goad, Vanna Goodenow, Jimmie Lee Jarvis, Alice Minium, Éilís Weller, Andrew Ringle, Eduardo Acevedo and Roberto Roldan, by counsel, bring this action under 42 U.S.C. § 1983 for violations of their First and Fourth Amendments to the United States Constitution, as made applicable to the States by the Fourteenth Amendment, against Defendants City of Richmond, former Richmond Police Department ("RPD" or "Richmond Police") Chief William C. Smith, former Interim RPD Police Chief William Blackwell, RPD Chief of Police Gerald M. Smith, RPD Sergeant Jon Bridges, RPD Lieutenant Thomas W. Lloyd, RPD Officer Jakob A. Torres, former RPD Officer Brenda Ruiz, RPD Officer Benjamin J. Frazer, former RPD Officer April M. Dixon, former RPD officer Patrick DiGirolamo, RPD Officer Paul D. Campbell, RPD Officer Junius Thorpe, former RPD Lieutenant John Beazley,

RPD Captain[1] Christopher Gleason, former RPD Officer Kate Leone, RPD Officer Duane Peppel, RPD Sergeant[2] Khalid Harris, RPD Officer Ben Malone, former RPD Officer Tyler Craig, RPD Officer Keegan Mills, RPD Officer Dario Buraliev, former RPD Officer Benjamin O'Rourke, RPD Officer Dominic Colombo, RPD Officer Dan Bondy, RPD Officer Jason Kuti, RPD Officer Steve Rawlings and current and former RPD Supervisor Does 1-20 and RPD Officer Does 1-50 (collectively "Defendants").

### Introduction

1.      The Plaintiffs all share one thing in common. They were all horrifically targeted by members of the Richmond Police Department in one way or another for daring to film police activities in a public place.

2.      It is not a crime to observe the public behavior of police officers. It is, in fact, an activity protected by the First Amendment to the United States Constitution. This action arises from the ongoing and repeated unlawful conduct of officers, agents and employees of the City of Richmond Police Department, who routinely retaliate against civilians and members of the press who dare question, observe or record Richmond Police activity.

3.      The Richmond Police Department and its officers, agents and employees routinely bring bogus criminal charges against individuals exercising their First Amendment rights, arrest them without probable cause, unlawfully confiscate their personal property, and generally harass them in thinly veiled attempts to intimidate.

---

[1] At the time of the events alleged in the Amended Complaint, and upon information and belief, Captain Gleason was serving as a sergeant in the Richmond Police Department.
[2] Sergeant Harris has not yet obtained the rank of sergeant at the time of the events alleged in the Amended Complaint.

4.     Such acts of intimidation are also evidenced by the Richmond Police Department and its officers, agents and employees' common employment of excessive force when encountering, detaining or arresting individuals such as these Plaintiffs.

5.     This action is brought by several individuals, including an attorney and multiple members of the press, who as a result of the deliberate and unlawful actions of multiple Richmond Police Officers, agents and employees, were at various and completely unrelated times, verbally and physically assaulted, doused with chemical agents, handcuffed, harassed in person and on-line and arrested and prosecuted, simply for exercising their First Amendment rights in public spaces and commenting, observing and/or recording Richmond Police Department officers at work.

6.     As a result of the systemic killing by police of black and brown men and women and ignited by the murder of George Floyd at the hands of Minneapolis police on May 25, 2020, the Summer of 2020 was a period of great civil unrest throughout much of the United States, including Richmond, Virginia.

7.     The public unrest was a matter of national and international news and members of the press had an inherent interest in being able to report on the unrest to the public. In addition, police departments all over the Country aggressively controlled members of the media and their efforts to report on the demonstrations and protests. The Richmond Police Department was no exception.

8.     Even though members of the news media were expressly exempt from the unlawful gathering declarations, Defendants ignored the exemption. Even when members of the news media clearly identified themselves, Defendants continued to target and intimidate the press by threatening, assaulting and deploying chemical agents at members of the media. They further interfered with the news media's right to cover public events by refusing access to areas where events were unfolding

3

and creating obstacles to reporters' movements about the city. These incidents constitute flagrant infringements on the constitutional rights of individual reporters, as well as the public's interest in the dissemination of accurate information and accountability of government for its actions.

9.     While many of the instances of unlawful RPD activity occurred around or near protest actions in Richmond during that period, other Plaintiffs were harassed, detained and/or arrested in situations unrelated to the George Floyd protests. The Richmond Police Department's motivation to retaliate against citizen observers and members of the press extends far beyond those protests.

10.    Defendants' unlawful conduct has the purpose and effect of retaliating against and ultimately chilling Plaintiffs' constitutionally protected speech, which Defendants view as critical of government and the police.

11.    Each of the journalist Plaintiffs as alleged herein were tear-gassed, pepper-sprayed, detained without probable cause, threatened and physically assaulted by one or more officers, agents or employees of the Richmond Police Department, despite clearly and repeatedly identifying themselves as members of the press and while otherwise engaging in their reporting duties.

12.    At no time during the events alleged herein did the Defendants have probable cause to detain or arrest any of the Plaintiffs as alleged herein.

13.    Not one single Plaintiff that was arrested and charged for the actions described herein was convicted of said charges. All charges resulted in either dismissals or not guilty verdicts, with one such Plaintiff obtaining an apology from the presiding judge at the conclusion of his trial.

14. The Plaintiffs' injuries are the direct result of the policies, practices and customs of the Richmond Police Department, who routinely harass, detain, assault and arrest citizens and members of the press who observe or record police activity.

15. This pattern and practice of conduct by law enforcement tramples on the Constitution and violates the sacred rights to freedom of speech and freedom of the press under the First Amendment that form the very foundations of a democratic society.

16. The actions of these Defendants constitute a pattern of unreasonable force and unlawful seizures under the Fourth Amendment.

17. This civil rights action seeks declaratory and injunctive relief, compensatory and punitive damages for violations of Plaintiffs' First and Fourth Amendment rights, and compensatory and punitive damages for Plaintiffs' physical, emotional and financial injuries they sustained as a result of Defendants' unlawful conduct and bogus arrests.

## Jurisdiction and Venue

18. This action to vindicate Plaintiffs' rights to the First and Fourteenth Amendment protections is brought pursuant to 42 U.S.C. § 1983.

19. The Court has jurisdiction over civil rights actions pursuant to 28 U.S.C. §§ 1331 and 1343 based on 42 U.S.C. § 1983; and jurisdiction under the Declaratory Judgment Act under §§ 2201 and 2202 to declare the rights of the parties and to grant all further relief found necessary and proper.

20. Venue is proper in the U.S. District Court for the Eastern District of Virginia – Richmond Division ("Eastern District of Virginia") pursuant to 28 U.S.C. §§ 127 and 1391 and Local Civil Rule 3, in that the Defendants are subject to personal jurisdiction within the Eastern District of Virginia and the events that give rise to this action occurred in the City of Richmond.

## PARTIES

21.     Plaintiff Charles H. Schmidt, Jr. is an adult individual, a citizen of the United States and resident of the Commonwealth of Virginia (the "Commonwealth").

22.     Plaintiff Roberto Roldan is an adult individual, a citizen of the United States and a resident of Kentucky. Mr. Roldan was a resident of the Commonwealth at the time of incidents alleged herein.

23.     Plaintiff Kristopher C. Goad is an adult individual, a citizen of the United States and resident of the Commonwealth.

24.     Plaintiff Greyson Goodenow, *aka* Vanna Goodenow, is an adult individual, a citizen of the United States and resident of the Commonwealth.

25.     Plaintiff Jimmie Lee Jarvis is an adult individual, a citizen of the United States and resident of the Commonwealth.

26.     Plaintiff Alice Minium is an adult individual, a citizen of the United States and resident of the Commonwealth.

27.     Plaintiff Theressa N. Weller, *aka* Éilís Weller, is an adult individual, a citizen of the United States and a resident of the Commonwealth.

28.     Plaintiff Andrew Ringle is an adult individual, a citizen of the United States and a resident of the Commonwealth.

29.     Plaintiff Eduardo Acevedo is an adult individual, a citizen of the United States and a resident of the Commonwealth.

30.     Defendant City of Richmond (the "City") is responsible for the oversight, administration, education, training and management of the City of Richmond Police Department and its individual officers, including Supervisor Does 1-20 and Officers Doe 1-50. The City is

6

responsible for ensuring that proper training, policies and procedures are in place to prevent its officers from unnecessarily violating the constitutional rights of those with whom they interact.

31.    The City is required to ensure the protection of the constitutional rights of all persons who come into contact with the Richmond Police Department, and for ensuring that the Richmond Police Department and its officers do not deliberately and maliciously interfere with the rights of its citizens, members of the press, residents and visitors to peacefully assemble and exercise their rights to free speech under the First Amendment.

32.    The City is also responsible for ensuring that the Richmond Police Department and its officers do not violate citizens' Fourth Amendment rights to be free from unlawful seizure and from the application of the use of excessive force.

33.    Defendant William C. Smith ("Former Chief W. Smith") was the Chief of Police of the Richmond Police Department from 2019 until approximately June 16, 2020, when upon information and belief, he resigned at the request of Mayor Levar Stoney. He is sued in his individual capacity.

34.    During his tenure, Former Chief W. Smith was the chief law enforcement officer for the City of Richmond and was responsible for the oversight, administration, policy making, education and management of the Richmond Police Department and its individual officers.

35.    At all times relevant to this Amended Complaint, Former Chief W. Smith was acting under color of state law.

36.    During his tenure, he was responsible for ensuring that proper training, policies and procedures were in place to prevent the Richmond Police Department and its officers from unnecessarily violating the constitutional rights of those with whom they interact.

7

37.     During his tenure, Former Chief W. Smith was required to ensure the protection of the constitutional rights of all persons who come into contact with the Richmond Police Department, and for ensuring that Richmond Police and its officers did not deliberately and maliciously interfere with the rights of the City's citizens, members of the press, residents and visitors to peacefully assemble and exercise their rights to free speech under the First Amendment.

38.     He was also responsible for ensuring that the Richmond Police Department and its officers did not violate citizens' Fourth Amendment rights to be free from unlawful seizure and the application of the use of excessive force.

39.     Defendant William Blackwell ("Former Interim Chief Blackwell") was the Interim Chief of Police of the Richmond Police Department from approximately June 16, 2020 to June 26, 2020. He is sued in his individual capacity.

40.     During his tenure, Former Interim Chief Blackwell was the chief law enforcement officer for the City of Richmond and was responsible for the oversight, administration, policy making, education and management of the Richmond Police Department and its individual officers.

41.     At all times relevant to this Amended Complaint, Interim Chief Blackwell was acting under color of state law.

42.     During his tenure, he was responsible for ensuring that proper training, policies and procedures are in place to Richmond Police officers from unnecessarily violating the constitutional rights of those with whom they interact. He was also required to ensure the protection of the constitutional rights of all persons who come into contact with the Richmond Police Department, and for ensuring that it and its officers did not deliberately and maliciously interfere with the rights

8

of the City's citizens, members of the press, residents and visitors to peacefully assemble and exercise their rights to free speech under the First Amendment.

43.     Interim Chief Blackwell was also responsible for ensuring that Richmond Police Department and its officers did not violate citizens' Fourth Amendment rights to be free from unlawful seizure and the application of the use of excessive force.

44.     Defendant Gerald M. Smith ("Chief G. Smith") is the current Chief of Police of the Richmond Police Department. He is sued in his individual capacity. He is the chief law enforcement officer for the City of Richmond and is responsible for the oversight, administration, policy making, education and management of the Richmond Police Department and its individual officers.

45.     At all times relevant to this Amended Complaint, Chief G. Smith was acting under color of state law.

46.     He is responsible for ensuring that proper training, policies and procedures are in place to Richmond Police Department and its officers from unnecessarily violating the constitutional rights of those with whom they interact.

47.     Chief G. Smith is required to ensure the protection of the constitutional rights of all persons who come into contact with the Richmond Police Department, and for ensuring that it and its officers do not deliberately and maliciously interfere with the rights of the City's citizens, members of the press, residents and visitors to peacefully assemble and exercise their rights to free speech under the First Amendment.

48.     He is also responsible for ensuring that Richmond Police and its officers do not violate citizens' Fourth Amendment rights to be free from unlawful seizure and the application of the use of excessive force.

9

49.     Defendant Lieutenant Thomas W. Lloyd ("Lt. Lloyd") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

50.     Defendant Sergeant Jon Bridges ("Sgt. Bridges") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

51.     Defendant Jakob A. Torres ("Torres") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

52.     Defendant Brenda Ruiz ("Ruiz") is a former uniformed member of the Richmond Police Department. She is sued in her individual capacity. She was acting under the color of state law at all times relevant to this case.

53.     Defendant Benjamin J. Frazer ("Frazer") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

54.     Defendant April M. Dixon ("Dixon") is a former uniformed member of the Richmond Police Department. She is sued in her individual capacity. She was acting under the color of state law at all times relevant to this case.

55.     Defendant Paul D. Campbell ("Campbell") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

56.     Defendant Junius Thorpe ("Thorpe") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state

law at all times relevant to this case.

57.    Defendant Patrick Digirolamo ("DiGirolamo") is a former uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

58.    Defendant Lieutenant John Beazley ("Lt. Beazley") is a former uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

59.    Defendant Captain Christopher Gleason ("Captain Gleason") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

60.    Defendant Officer Kate Leone ("Leone") is former uniformed member of the Richmond Police Department. She is sued in her individual capacity. She was acting under the color of state law at all times relevant to this case.

61.    Defendant Duane Peppel ("Peppel") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

62.    Defendant Sergeant Khalid Harris ("Sgt. Harris") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

63.    Defendant Ben Malone ("Malone") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

64.    Defendant Tyler Craig ("Craig") is a uniformed member of the Richmond Police

11

Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

65. Defendant Keegan Mills ("Mills") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

66. Defendant Dario Buraliev ("Buraliev") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

67. Defendant Benjamin O'Rourke ("O'Rourke") is a former uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

68. Defendant Dominic Colombo ("Colombo") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

69. Defendant Dan Bondy ("Bondy") is former uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

70. Defendant Jason Kuti ("Kuti") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

71. Defendant Steve Rawlings ("Rawlings") is a uniformed member of the Richmond Police Department. He is sued in his individual capacity. He was acting under the color of state law at all times relevant to this case.

72.     Defendant Officer Does 1-50 ("Officer Does") are current or former uniformed members of the Richmond Police Department. They are sued in their individual capacities. They were acting under the color of state law at all times relevant to this case.

73.     The Plaintiffs are currently unaware of the names and identities of Officer Does 1-50. Generally, however, they may consist of the following persons:

a.      Any officer, employee or agent of the Richmond Police Department who verbally and physically assaulted, intimidated (in person or on-line), detained, conducted unlawful searches, withheld or destroyed property belonging to Plaintiffs, deployed less lethal ammunition and chemical weapons, unlawfully arrested and/or threatened the constitutional protections of Plaintiffs at the following times and places:

i.      May 31, 2020, from approximately 8:00 p.m. until 10:30 p.m. in the areas between the former Robert E. Lee monument ("Lee Circle") and 12th Street and Broad Streets.

ii.      June 1, 2020, from approximately 1:45 a.m. until 3:00 a.m. near the intersections of Madison Street and West Broad Streets, south of North Belvidere Street;

iii.      June 14-15, 2020, between 9:30 p.m. and 3:00 a.m. at the Richmond Police Department headquarters at 200 West Grace Street and the adjacent sidewalks and parking lots;

iv.      June 15-16, 2020, between 10:00 p.m. and 11:00 p.m. on North Jefferson Street near the Richmond Police Department headquarters;

v.      June 21, 2020, between 10:00 p.m. and 11:00 p.m. at and around the

13

intersection of Monument Avenue and North Lombardy Streets at the J.E.B. Stuart Monument ("Stuart Circle");

vi. June 26-27, 2020, from approximately 10:00 p.m. until 3:00 a.m. in the Whole Foods Parking lot located at 2024 West Broad Street, Richmond and the adjacent Rear Parking Lot;

vii. June 27, 2020, between 12:00 a.m. and 4:00 a.m. near the intersection of Monument and Park Avenues near the Community Church of Christ;

viii. July 25-26, 2020, between 9:00 p.m. and 11:00 p.m. at or around Monroe Park, and between 11:00 p.m. and 12:00 a.m. near the Richmond Police Department headquarters and adjacent parking lots and sidewalks;

ix. July 26, 2020, between approximately 9:00 p.m. and 1:00 a.m. on July 27, 2020 at the western edge of Monroe Park at North Laurel Street at Sacred Heart Cathedral;

x. August 16, 2020, between approximately 9:00 p.m. and 10:45 p.m., beginning at the southwest corner of West Broad and North Belvidere Streets and continuing south on North Belvidere and towards the corner of West Franklin and North Belvidere Streets, then west towards the Fan;

xi. August 18, 2020, between 2:00 p.m. and 4:00 p.m. along Broad Street following the path by demonstrators from downtown to the Science Museum;

14

xii.     August 20, 2020, between 10:00 p.m. and 11:50 p.m. at and around 217 West Clay Street;

xiii.     September 14, 2020, along the path by demonstrators from Martin Luther King Middle School on Mosby Street to City Hall;

xiv.     September 26, 2020, between midnight and 1:45 a.m. at and around Richmond Police Department headquarters;

xv.     September 28, 2020, at the Circle on Monument Avenue from approximately 2:30 p.m. until 4:00 p.m.;

xvi.     October 17, 2020, between 11:30 a.m. and 2:15 p.m. at the intersection of 8th and Grace Streets towards Richmond Police Department headquarters, and later that afternoon (2:15 p.m.) along Park Avenue;

xvii.     October 27, 2020, between 8:45 p.m. and 10:45 p.m. at or around Monroe Park;

xviii.     November 7, 2020, between 12:00 p.m. and 2:30 p.m. at and around the Virginia State Capital;

xix.     November 12, 2020, between 8:30 p.m. and 9:30 p.m. at the "Stop the Steal" rally; and

xx.     June 16, 2021, at the "Protest for Palestine" held at Scuffletown Park on Strawberry Street towards Circle on Monument Avenue

b.     Any officer, employee or agent of the Richmond Police Department who knew or should have known that their fellow officers were violating, or were intending to violate, the constitutional rights of the individuals described herein, had reasonable

opportunity to prevent the harm, and chose not to prevent the harm.

74.     Defendants Supervisor Does 1-20 ("Supervisor Does") are current and former uniformed members of the Richmond Police Department acting in a supervisory role. They are sued in their individual capacities. They were acting under the color of state law at all times relevant to this case. The Plaintiffs are currently unaware of the names and identities of Supervisor Does 1-20. Generally, however, Supervisors Doe 1-20 may consist of any Richmond Police Department officer serving in a supervisory role during the times and at the places identified in the preceding paragraph.

### FACTS

### *(Former) Virginia Public Media News Reporter Roberto Roldan*
### *May 31, 2020*

75.     On the evening of May 31, 2020, Plaintiff Roberto Roldan ("Roldan"), along with one colleague, was covering the racial justice protests around Richmond as a reporter for Virginia Public Media (VPM).

76.     Roldan was live Tweeting and reporting on demonstrations at the former Robert E. Lee Memorial and the former statue of J.E.B. Stuart on Monument Avenue.

77.     At or around 8:00 p.m., Roldan observed and recorded as protestors began to congregate around the former Robert E. Lee Memorial. As the 8:00 p.m. curfew drew near, the number of protestors increased.

78.     After the 8:00 p.m. curfew passed, Roldan began to follow the hundreds of protestors as they moved southeast on Monument Avenue, then West Franklin Street, toward downtown Richmond. Roldan was recording audio and taking photographs as the protestors continued toward downtown.

16

79.     At approximately 8:30 p.m., Roldan noted a heavy presence of Richmond Police Department officers and vehicles on Broad Street.

80.     At or around 8:41 p.m., Roldan observed the protestors turn left off of West Franklin Street onto 2nd Street. From there, the protestors made a right turn onto Broad Street toward Shockoe Bottom.

81.     At approximately 8:45 p.m., Roldan was at the front of the group of protestors when he noticed that officers from the Richmond Police Department were surrounding the protestors and were attempting to corral both the protesters and members of the press onto 5th Street.

82.     At or about 9:05 p.m., from behind the crowd of protestors, unknown Richmond Police Department officers armed with riot gear fired tear gas canisters directly into the center of the crowd, causing panic. Roldan and other members of the press, as well as many protestors, began to move eastward on Broad Street to take cover from the tear gas.

83.     Upon information and belief, one or more Supervisor Does gave orders to subordinate RPD officers to fire chemical gas cannisters at it, with the intention of causing pain and injury.

84.     Once Roldan reached 12th Street, he stopped to assist a press photographer who was suffering from the effects of the chemical gas. Roldan assisted the photographer rinse the spray out of his eyes and encouraged him to continue moving eastward down Broad Street. At that same time, the chemical gas hit Roldan and he immediately began to feel its effects.

85.     At or around 9:10 p.m., Roldan made a left off of Broad Street onto College Street. At this point, Roldan was severely suffering from the effects of the chemical gas. His vision became so impacted that he could hardly see, he was coughing, and his sinuses were draining. A medic assisted Roldan by helping him flush his eyes to lessen the effects of the it.

86.     After receiving medical aid, Roldan continued down College Street, then Marshall Street, toward Richmond City Hall. As he passed VCU Hospital complex around N.13th Street, Roldan noticed officers from the Richmond Police Department had set up a line at or around N. 10th Street and/or N. 11th Street.

87.     As the tear gas had engulfed Broad Street and the line of police officers were blocking N. 10th and/or N. 11th Street, Roldan was corralled in with the protestors with no clear exit.

88.     As Roldan approached N. 10th/N. 11th Street, he loudly called out to the line of Richmond Police Officers that he was a member of the press. Roldan was wearing a press badge issued by the Virginia General Assembly and a reflective vest with the word "press" written on the back. Roldan also had a camera around his neck.

89.     Within seconds after identifying himself as a member of the press, an unknown Richmond Police Department officer ("Officer Doe") on the line who had a tank of pepper spray in his hand deployed the pepper spray, striking Roldan in the face. Roldan was immediately doubled over as a result of the pepper spray and, while bent over, Officer Doe, who was large in stature, ran quickly toward Roldan and pushed him off of the sidewalk and into the road.

90.     After Roldan was assisted to his feet by his colleague, he continued to move toward the police line, again loudly verbally identifying himself as a member of the press.

91.     Once on the other side of the police line, near Richmond City Hall, Roldan identified an unknown Richmond Police Department officer that appeared to be in charge ("Supervisor Doe"). Roldan stated to Supervisor Doe that officers were repeatedly assaulting members of the press. Supervisor Doe checked Roldan's press identification and made statements

indicating that he was unsure what he was looking at. He then returned Roldan's press pass without saying another word.

92.     Supervisor Doe's actions show a deliberate indifference to subordinate RPD officers attack on members of the press.

93.     Roldan then noted that Richmond Police Department officers were arresting protesters on E. Marshall Street, on the other side of the police line. Roldan and his colleague contacted an editor from VPM to request that the editor pick them up and extract them from downtown. At that same time, Roldan witnessed a group of officers, including the officer that had pushed him into the road, move westward on E. Marshall Street toward City Hall.

94.     Roldan asked Officer Doe for his badge number, but he refused to stop or respond. Roldan noted the numbers on the back of Officer Doe's helmet as "3397."

95.     At 9:18 p.m., once his vision was restored enough to use his phone, Roldan sent a Tweet about the events that had just occurred.

96.     Roldan's Tweet is below:



97.     At or about 9:35 p.m., Roldan's editor picked him and his colleague up and drove them to their respective apartments.

98.     At or around 10:00 p.m., Roldan received a phone call from an unlisted number. The phone call was from Richmond City Mayor Levar Stoney ("Mayor Stoney"), who asked Roldan about the incident and apologized for the assault. Mayor Stoney went on to advise Roldan

19

that he was initiating an investigation. Indeed, the following morning, on June 1, 2020, Mayor Stoney sent a Tweet as follows:



Mayor Levar M. Stoney ✔ @LevarStoney · Jun 1, 2020
There is NO reason this should have happened to a member of the **press**. No reason. It is absolutely unacceptable, and we are investigating the matter.

💬 178          🔁 168          ♡ 499          ⬆

99.     In a press conference on June 1, 2020, Former Chief W. Smith called the assault "completely accidental" and stated that the officer "was actually running, and sadly is not as agile as we would like. We weren't throwing [Roldan] to the ground to effect arrest. It was really in a very tense moment and we were trying to affect other things."

100.    Upon information and belief, these statements by Former Chief W. Smith were false.

101.    Approximately one week later, VPM lawyer Craig Merritt ("Merritt") and Roldan met with two RPD detectives who stated that they were from Richmond Police Department Internal Affairs.

102.    Roldan provided them with a statement of facts and identified himself in still images that the detectives stated were taken from body worn camera videos.

103.    In approximately November 2020, Roldan was told an investigation was ongoing and that RPD would update its investigation.

104.    Having heard nothing, Merritt reached out to City attorney Haskell Brown in April 2021, who advised he would look into it.

105.    Despite the City's and its Police Department's reassurances to the contrary, Roldan never received an update on the investigation or was told the results of the same.

20

106. Upon information and belief, the City and the Richmond Police Department failed to conduct a meaningful investigation and were not truthful when they advised Roldan they would provide him with updates or the results of any such investigation.

107. At all relevant times alleged herein, Roldan was engaged in constitutionally protected First Amendment activity.

108. The actions by Officer Doe and other RPD officers against Roldan adversely affected his activities protected by the First Amendment.

109. But for the actions of RPD officers that evening, Roldan would have been able to continue reporting on the demonstrations around the City of Richmond that night.

110. Instead, he was forced to retreat to his home to tend to his wounds.

111. Despite promises by Mayor Stoney and the Richmond Police Department, no meaningful investigation was conducted, nor were corrective measures taken to ensure similar situations did not occur.

112. On the contrary, the Richmond Police Department would attack members of the press multiple additional times over the course of the next few months.

113. Roldan was not committing any crimes or posing a threat to any of the RPD officers he encountered.

114. RPD did not use reasonable force in dispersing Roldan as he was not part of an unruly or destructive crowd, was clearly identified as a member of the press and was exercising his First Amendment rights at the time he was attacked by Officer Doe.

115. The incident caused Roldan significant physical and emotional stress. The skin on Roldan's face remained irritated from the pepper spray, Roldan's throat and sinuses were raw from

the tear gas, and Roldan's leg was sore from being shoved onto the ground. For weeks following the incident, Roldan had difficulty getting the memories of what occurred out of his head.

***Charles Schmidt's Unlawful Arrest***
***June 26, 2020***

116.     Plaintiff Charles H. Schmidt, Jr. ("Schmidt") is an attorney licensed to practice in the Commonwealth of Virginia.

117.     In addition to his employment as a lawyer, Schmidt is a trained legal observer and has volunteered with the National Lawyer's Guild ("NLG") and the American Civil Liberties Union ("ACLU").

118.     In his capacity as a trained legal observer, Schmidt has attended political and social justice demonstrations to counsel demonstrators on their rights to assembly and free speech and to observe and record any conflict between law enforcement officers and demonstrators.

119.     Based on his ten years in the practice of law and fifteen years serving as a legal observer, Schmidt is familiar with legal protections for political and other demonstrators, and further, the legal rules concerning the rights of citizens to observe and record police in the performance of their duties.

120.     During this time frame, Schmidt was a cooperating attorney with the American Civil Liberties Union ("ACLU") of Virginia.

121.     On June 26, 2020, the ACLU of Virginia filed an emergency petition with the Richmond Circuit Court for injunction against the City of Richmond, Richmond Police Department, and State and Capitol Police to stop their use of tear gas and "less lethal" munitions on protesters for the events of June 22-23, 2020.

122.     Schmidt and his ACLU colleagues had a hearing scheduled on the injunction in

Richmond Circuit Court on Monday, June 29, 2020.

123.    That evening, Schmidt was monitoring (via local new reports and through social media, Twitter, etc.) the protests on Monument Avenue and the intersection of Allen Avenue, and Lee Circle.

124.    Schmidt learned that at approximately 10:00 p.m., Richmond Police Department had again fired tear gas into a crowd of peaceful protesters inside Lee Circle.

125.    As he learned of the use of tear gas and less lethal weapons being fired on the peaceful crowd, Schmidt drove to Lee Circle, arriving approximately 10-15 minutes later.  By the time he arrived, however, the police presence had dissipated.

126.    Schmidt learned that the departure by Richmond Police was abrupt, and the people in the crowd were unaware of the reason.

127.    According to observers, unknown Richmond Police officers came out, cleared the Circle, fired tear gas into the crowd, and then abruptly left.

128.    Schmidt subsequently drove away from Lee Circle via Monument Avenue, then proceeded west on to Broad Street, eventually ending up at the corner of Hermitage Road and West Leigh Street.

129.    It was there that Schmidt noticed several Richmond Police cars inside the recently renovated Saur's shopping business center.  He turned right on Hermitage, then turned right again into the back entrance to the parking lot, parking in the back north/west corner ("Rear Parking Lot"). A large faction of Richmond Police was in the front of the parking lot, closer to Whole Foods and Broad Street ("Whole Foods Parking Lot"). Schmidt estimates that 45-50 Richmond Police officers were present and upon information and belief, the area was being used by them as staging for some other action offsite or event.

23

130.   Schmidt sat in his car observing from a distance of several dozen yards for a few minutes when an unknown Richmond Police officer crossed the entire length of the Whole Foods Parking to the separate Rear Parking Lot where Schmidt was parked. He asked Schmidt if he "was okay," to which Schmidt responded "yes." The officer walked back to his police car in the Whole Foods Parking Lot.

131.   A second officer, Benjamin Frazer ("Frazer"), approached Schmidt's car with the same question, to which Schmidt again responded "yes, I'm fine."

132.   Frazer then advised Schmidt that he needed to leave the Rear Parking Lot because Richmond Police had been asked to enforce security for a private business Whole Foods, which was not true.

133.   Schmidt questioned Frazer's authority to enforce such an order, given that the Rear Parking Lot appeared to be public space and another car was parked in the same lot.  There were no "No Parking" or "No Trespass" signs in the Rear Parking Lot nor were there any signs indicating the Rear Parking Lot was closed at night.

134.   Schmidt asked Frazer if anyone could verify that the Rear Parking Lot was closed or that he was legally required to leave the premises.

135.   In response to Schmidt's questioning the authority of Richmond Police to demand he leave the Rear Parking Lot; Frazer unnecessarily escalated the situation.

136.   Despite Schmidt identifying himself as an attorney and trained legal observer, Frazer again demanded that Schmidt leave because Richmond Police Department had had people "doxing" them and causing Richmond Police "problems."

137.   By this point, Schmidt's car was surrounded by approximately 6-8 Richmond Police officers; one in front of his car and several others behind and on either side. Schmidt was

unable to leave the Rear Parking Lot as his car was surrounded by officers.

138. Schmidt then asked Frazer his name, who refused, in violation of Richmond Police Department's own policy. Frazer merely repeated that Schmidt needed to leave.

139. Schmidt asked a second officer standing nearby for his name and was told "I'm not allowed to give out that information," again, a violation of Department policy. Schmidt advised that he needed someone's name in order to follow up with Richmond Police. None of the officers would identify themselves.

140. Schmidt then advised Frazer and the other Richmond Police officers that he would leave and put his car into "drive." As he was leaving, Schmidt reached for his smart phone, held it up for the officers to see, and advised he was going to snap a quick picture of the scene before he left.

141. Frazer's knee-jerk reaction to Schmidt's attempt take a picture was to reach through Schmidt's window while he was driving. Frazer advised Schmidt that he was under arrest and that he needed to get out of the car. Frazer and another RPD officer opened Schmidt's car door to forcibly yank him from his car. Schmidt advised that his car was in "drive" and that he needed to put it in "park."

142. By this point, several Richmond Police officers were unnecessarily screaming at Schmidt.

143. Frazer advised Schmidt that was he going to jail and began to process him for arrest.

144. Another officer advised Schmidt to shut off the car and remove his keys.

145. Richmond Police officers thereafter zip-tied Schmidt's hands incredibly tight and detained him while Frazer began to write up the paperwork.



146.    Schmidt again calmly advised the unknown Richmond Police officers that he was a lawyer and there were no grounds to arrest him, quoting the applicable Virginia code sections on criminal procedure (Virginia Code § 19.2-74), which states essentially that an officer shall release someone accused of a misdemeanor on summons, rather than arrest, unless the officer can determine that person is a flight risk, danger to themselves or others, or will not stop doing the offending action. None of those situations applied to Schmidt.

147.    A few minutes later, a higher-ranking Richmond Police officer, or unknown Supervisor Doe, drove over to where Schmidt was being detained and spoke with Frazer. After this, Frazer turned on his body-worn camera.

148.    Frazer then begrudgingly advised Schmidt he would be released on summons and Schmidt was given a ticket.

149.    Frazer did not have probable cause to arrest Schmidt or issue him a citation, and instead it was a pretext employed by Richmond Police to harass and intimidate in retaliation for Schmidt's attempt to take a picture of the scene.

26

150. The zip-ties, now removed, left painful marks on Schmidt's wrists where they had been placed by the officers.



151. Because his signature was illegible on the summons, Schmidt asked Frazer to clarify his name. Frazer said his name for the first time and walked away in a gruff manner. As he walked away, Frazer stated to other officers present that he was "definitely getting sued for this."

152. Frazer cited Schmidt with a violation of Virginia Code § 18.2-119, or "[t]respass after having been forbidden to do so."

153. Thereafter, Schmidt left the Rear Parking Lot and returned to Monument Avenue near the Circle. After the sudden and unwarranted attack by Richmond Police earlier in the evening, demonstrators had retreated a block or so west to North Allen and Park Avenues, which is where Schmidt found the group after his near arrest.

154. Approximately twenty minutes later, several Richmond Police patrol cars suddenly appeared on Park Avenue heading east and stopped in front of the Community Church of Christ, largely where Schmidt and the demonstrators were congregating.

27

155.    The Richmond Police officers jumped out of their patrol cars, which were double-parked and blocking the street. They began aggressively walking towards the crowd, to Schmidt, they appeared agitated and "looking for a fight." Several demonstrators grabbed their phones and began to record their actions.

156.    It was then that Schmidt recognized several of the same Richmond Police officers as having been part of the same group who had tried to arrest him less than an hour before.

157.    Schmidt, now believing that Richmond Police had left the Whole Foods Parking Lot, returned there to photograph the scene.

158.    The Richmond Police cars were now gone, only empty beer cans, cigarette butts and trash remained in the spots where Richmond Police officers had congregated just before.



159.    Schmidt appeared in Richmond General District Court on December 29, 2020 for a trial on his charges, Case No. GC20015498-00, at the conclusion of which all charges against him were dismissed.

160.    Upon dismissal of the charges, Schmidt received a verbal apology from the presiding judge.

161.    At all relevant times alleged herein, Schmidt was engaged in constitutionally protected First Amendment activity.

162.    Schmidt was not committing any crimes or posing a threat to any of the RPD officers he encountered.

163.    The actions taken by Frazer and unidentified Officer Does against Schmidt adversely affected his activities protected by the First Amendment.

164.    But for the actions of RPD officers that evening, Schmidt would have been able to continue exercising his First Amendment rights.

165.    Despite this, Schmidt was seized by Frazer and other Officer Does without probable cause.

166.    Frazer and other's seizure of Schmidt was inappropriate, unnecessary, unlawful and in violation of his Fourth Amendment rights.

167.    In addition, Frazer and other Officer Does did not use reasonable force in detaining Schmidt as he was not part of an unruly or destructive crowd and was peacefully and calmly exercising his First Amendment rights.

168.    Upon information and belief, Supervisor Does either ordered Frazer and Officer Does to unlawfully proceed against Schmidt, or in the alternative, consciously disregarded the actions of Frazer and others in such a manner as to allow his First and Fourth Amendment rights to be violated.

169.    The incident subjected Schmidt to assault, detention and humiliation by Frazer and unknown Officer Does and Supervisor Does.

### (Former) Commonwealth Times Executive Editor and Reporter Andrew Ringle
### June 21, 2020

170.    On the night of June 21, 2020, Plaintiff Andrew Ringle ("Ringle") was covering

the protests and the unrest around Richmond as a reporter and executive editor for the Commonwealth Times, Virginia Commonwealth University's student newspaper.

171.    Ringle was reporting on a demonstration near the former statue of J.E.B. Stuart on Monument Avenue. He was live streaming events on Twitter when dozens of Richmond Police and Virginia State Police ("VSP") formed a line and demanded that demonstrators leave the area.

172.    Around 9:00 p.m., unknown Richmond Police Department officers were using pepper spray to push the crowd off the median. Ringle was sprayed twice in the face by a Richmond Police officer despite clearly identifying himself as press and wearing a state-issued press badge.

173.    The image below shows the unknown Richmond Police officer just before he raises the pepper spray canister directly to Ringle's face.



174.    Upon information and belief, the Richmond officer that sprayed Ringle in the face with pepper spray despite him clearly identifying himself as press is Steve Rawlings.

175.    Ringle immediately felt the effects of the pepper spray and his vision became severely reduced. He stumbled backwards, where another unknown Richmond Police officer picked Ringle up by his shirt and threw him into the street, causing injury to his left knee and left

30

elbow, a scar for which remains to this day.

176.     A protestor helped Ringle to his feet, after which they left the demonstration and went to his friend's apartment to tend to his wounds.

177.     In addition to the injury to his elbow and knee, Ringle suffered the side effects to pepper spray for several days after Richmond Police assaulted him.

*July 26, 2020*

178.     On July 26, 2020, Ringle was reporting on another demonstration in Monroe Park.

179.     Richmond Police officers arrived and announced that everyone must leave.

180.     Ringle was with another student reporter at the time, and they both quickly started walking toward the edge of Monroe Park in order to follow the officers' orders.

181.     As they stepped onto the sidewalk that wraps around the perimeter, they were rushed by unknown Richmond Police officers. Ringle was grabbed and handcuffed before he could make it outside of the park, which is where he was trying to go.

182.     An unknown Richmond Police officer then informed Ringle that he was being detained. Ringle advised that he was present as a reporter and not to protest. He directed the officer to the identification on his person.

183.     The officer took a photo of Ringle's face and demanded that he repeat his social security number multiple times as they worked to verify his state-issued press ID. Once the unknown Richmond Police officers were satisfied, they released Ringle on the condition that he leave Monroe Park and not return to the that night.

184.     Upon information and belief, one of the Richmond Police officer's last names was Peterson.

185.     At all relevant times alleged herein, Ringle was engaged in constitutionally protected First Amendment activity.

186.     The actions taken by Officer Rawlings and other unknown Richmond Police officers on June 21, 2020, and July 26, 2020 adversely affected Ringle's activities protected by the First Amendment.

187.     But for the actions of Richmond Police officers, Ringle would have been able to continue exercising his First Amendment rights.

188.     Ringle was not committing any crimes or pose a threat to any of the Richmond Police officers he encountered on June 21 or July 26, 2020.

189.     Rawlings and Officer Does did not use reasonable force on June 21, 2020 in deploying chemical agents against Ringle and throwing him to the ground as he was not part of an unruly or destructive crowd and was peacefully and calmly exercising his First Amendment rights.

190.     Despite this, Ringle was assaulted with tear gas and thrown to the ground.

191.     Officer Does did not have probable cause to detain Ringle on July 26, 2020.

192.     Richmond Police officers' actions towards Ringle were inappropriate, unnecessary, unlawful and in violation of his First and Fourth Amendment rights.

193.     Upon information and belief, Supervisor Does directed the interaction between Ringle and Officer Rawlings and other subordinate Officers Does on June 21, 2020, and Officer Does on July 26, 2020, or in the alternative, consciously disregarded their actions in such a manner as to allow Ringle's First and Fourth Amendment rights to be violated.

194.     The incident caused Ringle significant physical and emotional stress. The incident subjected him to injury, assault, detention and humiliation by Rawlings and other unknown Officer Does and Supervisor Does.

*(Former) Commonwealth Times News Editor and Reporter Eduardo Acevedo*
*July 25, 2020*

195.    On the night of July 25, 2020, Plaintiff and Commonwealth Times News Editor and reporter Eduardo Acevedo ("Acevedo"), along with two colleagues from the Commonwealth Times, were covering a protest outside of the Richmond Police Headquarters. Police had formed a riot shield wall and shortly after 11:00 p.m., declared the demonstration an "unlawful assembly."

196.    Someone in the crowd threw a flaming object into a Humvee that had been parked to block protesters. About 10 minutes later, Richmond Police lobbied a flash-bang grenade into the middle of a parking lot across from the police station where members of the media were gathered to the side of the protesters.

197.    At this point, Acevedo became separated from his Commonwealth Times colleagues. He was disoriented and "running blind" because of the tear gas.

198.    A fellow reporter from the Richmond Times Dispatch ("RTD Reporter") had also become disoriented trying to leave the area and dropped her press pass.

199.    Acevedo ran to retrieve her press pass and was hit by tear gas. The two journalists ran to another parking lot, where the RTD Reporter helped Acevedo around the corner of a building and began pouring milk in his eyes to help him recover from the gas.

200.    As the RTD Reporter leaned down to return the bottle of milk to her backpack, at least five or more Richmond Police officers came around the corner of the building and suddenly moved in to restrain the two journalists.

201.    Acevedo and the RTD Reporter were swarmed by multiple RPD officers despite loudly screaming that they were press.





202.    One officer threw the RTD Reporter up against the wall.

203.    Other unknown Richmond Police officers grabbed Acevedo, pulled his hands behind his back, and pushed him face down on the ground, despite his shouts identifying himself as a journalist. After he had shouted his identity at least a dozen times, the officers released Acevedo.

204.    When he stood up, Acevedo was feeling claustrophobic from the lingering effects of the tear gas. The Richmond Police officers in riot gear crowded around him, so he asked an officer to give him some more space. The officer responded "no" close to his face.

205.    They released Acevedo approximately ten minutes later and only after he showed them his press credentials containing his photo as working with The Commonwealth Times.

206.    Richmond Police told both Acevedo and the RDT Reporter to leave the area immediately and advised them they would be arrested if seen again.

207.    Acevedo and his RTD colleague went to a nearby convenience store parking lot to collect themselves and inspect their injuries. A few minutes later, some of the same Richmond Police officers appeared and "were making jokes about how they almost arrested members of the press and told [them] to go home."

208.    Upon information and belief, the Richmond Police officers did not believe or understand that members of the media were exempt from rules dictating an unlawful assembly.

209.    On September 1, 2020, concerns about the Richmond Police Department's treatment of the press during protests, including their assault of Acevedo, were included in a letter from Student Press Law Center and other press freedom groups to Mayor Stoney and Chief G. Smith.

210.    Acevedo did not file a complaint with the Richmond Police Department about the incident, however upon information and belief, the RTD Reporter did.

211.    According to an article published in the Times-Dispatch the next day, Chief G. Smith said he would "make a thorough inquiry into the incident and that it will be under review."

212.    Upon information and belief, the RTD Reporter filed a complaint with the Richmond Police Department several weeks later. In March 2021, she was advised in a letter that

35

the Internal Affairs investigation had concluded that the RTD Reporter's claims were unsubstantiated, but that in the course of the investigation other issues were discovered that were not in accordance with Richmond Police Department policy.

213.    At all relevant times alleged herein, Acevedo was engaged in constitutionally protected First Amendment activity.

214.    The actions taken by Richmond Police against Acevedo adversely affected his activities protected by the First Amendment.

215.    But for the actions of RPD officers that evening, Acevedo would have been able to continue exercising his First Amendment rights.

216.    Acevedo was not committing any crimes or posing a threat to any of the RPD officers he encountered.

217.    Despite this, Acevedo was seized by several unknown RPD officers without probable cause.

218.    RPD's seizure of Acevedo was inappropriate, unnecessary, unlawful and in violation of his Fourth Amendment rights.

219.    In addition, unknown Officer Does did not use reasonable force in detaining Acevedo as he was not part of an unruly or destructive crowd and was peacefully and calmly exercising his First Amendment rights.

220.    Upon information and belief, Supervisor Does directed Officer Does to unlawfully proceed against Acevedo, or in the alternative, consciously disregarded their actions in such a manner as to allow Acevedo's First and Fourth Amendment rights to be violated.

221.    The incident caused Acevedo significant physical and emotional stress and subjected him to assault, detention and humiliation by unknown Officer Does.

*Kristopher Goad's Unlawful Arrests: July 26, 2020 and September 28, 2020*
*July 26, 2020*

222.     Plaintiff Kristopher Goad ("Goad") is well known by Richmond Police for his Twitter and social media presence and his observations of police activity in and around Richmond.

223.     He is a frequent critic of the Richmond Police Department and has been singled out by Richmond Police multiple times.

224.     On the night of July 26, 2020, Richmond Police Department declared Monroe Park closed and that all those in the park would be arrested, upon information and belief, for trespass or unlawful assembly.

225.     Goad and several others were gathered on the steps of the Sacred Heart Cathedral ("Sacred Heart"), a public place, across the street from Monroe Park.

226.     Goad's presence on the steps of Sacred Heart was to monitor and record Richmond Police activity from a safe distance, largely in part because the Richmond Police Department's abhorrent track record in dealing with the public in similar settings in the past months.

227.     Goad intentionally avoided Monroe Park because of Richmond Police Department's closure of the same.

228.     Around 10:20 p.m., approximately 10 or more Richmond Police officers left Monroe Park, crossed Franklin Street and made a beeline towards Goad, who was filming them from the Sacred Heart steps.

229.     As they charged towards him, an unknown Richmond Police officer shouted, "there he is" and pointing to Goad, indicating that they were looking for him specifically.



230.    Without warning or justification, Richmond Police Officer Jakob Torres ("Torres"), led by fellow officer Patrick Digirolamo ("Digirolamo"), climbed the church steps and headed straight to Goad. Digirolamo and Torres thereafter ambushed Goad and tackled him to the ground.

231.    Digirolamo and Torres caused injury to Goad's knee in the process of taking him down.

232.    Torres subsequently arrested Goad without probable cause. The arrest was a pretext and in retaliation for Goad's frequent reporting on social media of the Richmond Police Department alarming behavior towards its citizens.

233.    Other similarly situated individuals present on the steps of Sacred Heart church, but not as vocal about Richmond Police Department as Mr. Goad, were not arrested.

234.    Like Schmidt, Goad was charged with a violation of Virginia Code § 18.2-119, or "[t]respass after having been forbidden to do so," Richmond General District Court Case No. GC2015188-00.

235.    Goad was held in a VCU police van with a number of other individuals that evening.

236.    He was released approximately three hours later after a magistrate found no probable cause for his arrest.

237.    Goad's backpack was seized at the time of his arrest, and when returned to him after in the possession of Richmond Police Department, the straps had been cut, rendering it useless.

238.    Upon information and belief, Torres later swore out a criminal complaint against Goad on for the same charge and provided false information to obtain the warrant.

239.    A few days later, Goad was present at Lee Circle when former RPD Sgt. Bridges detained him to issue a citation stemming from Torres' bogus criminal complaint.

*September 28, 2020 Unlawful Arrest*

240.    Goad attended and was documenting a march of peaceful protestors on September 14, 2020 on Broad Street as the crowd proceeded west from Shockoe Bottom.

241.    Richmond Police Officers were present at the march on September 14, but upon information and belief, did not advise the crowd gathered that day they were in violation of any law, nor did they issue summons or citations to anyone in the crowd.

242.    Approximately two weeks later, on September 28, 2020, Goad was present at Lee Circle when he was arrested without warning by former Richmond Police Officer April Dixon ("Dixon") and Officer Nico Young ("Young") for an apparent warrant stemming from the September 14, 2020 peaceful march.

243.    Goad was charged with a violation of Virginia Code § 18.2-404, or "obstructing the free passage of others," Richmond General District Court Case No. GC200116855-00.

244.    He later learned that Richmond Police Department officer Lt. Thomas Lloyd ("Lt. Lloyd") was the officer to swear out a complaint against him.

245.    Lt. Lloyd obtained an arrest warrant for Goad without probable cause. The arrest was a pretext and in retaliation for Goad's frequent reporting on social media of the Richmond

Police Department, and especially Lt. Lloyd's, alarming behavior towards its citizens.

246.    Other similarly situated individuals present at the September 14, 2020 were not subsequently arrested.

247.    Former Richmond Police officer April Dixon ("Dixon) and Officer Nico Young arrested Goad on September 28, 2020 for the warrant obtained by Lt. Lloyd.

248.    Goad's two cases were consolidated in the Richmond General District Court and a hearing was held on February 5, 2021. All charges against Goad were dismissed.

249.    Upon information and belief, former Richmond Police Officer Dixon maintains a Twitter account "@apeyape12," which was used to taunt Goad several months after the Court found all charges against him to be unfounded.

250.    On September 8, 2021, "@apeyape12" responded to a message about a prior misidentification of Dixon with "Hey Christopher you want your phone back? Oh wait I took it. Next time you get arrested ask for the officer's names. Isn't that antifa 101? Ahh they kicked you out I forgot."





251.     @apeyape12 followed that Tweet with a comment directed at Goad.

252.     Aside from being childish and incredibly unprofessional, Dixon's tweets and social media posts targeting and taunting Goad months after his false arrests constitute harassment and police intimidation, chilling Goad's First Amendment rights.

253.     At all relevant times alleged herein, Goad was engaged in constitutionally protected First Amendment activity.

254.    The actions taken by Torres, DiGirolamo, Dixon, Lt. Lloyd and other unidentified Officer Does and Supervisor Does adversely affected Goad in preventing him from engaging in activities protected by the First Amendment.

255.    But for the actions of Richmond Police officers on the evening of July 26, 2020, Goad would have been able to continue exercising his First Amendment rights. Goad was not committing any crimes or posing a threat to any of the Richmond Police Department officers he encountered that evening.

256.    Despite this, Goad was seized by Torres and DiGirolamo on July 26, 2020, who publicly and without cause, singled him out because he was a critic of RPD actions.

257.    Torres and Officer Does seizure of Goad on July 25, 2020 was without probable cause, inappropriate, unnecessary, unlawful and in violation of his Fourth Amendment rights.

258.    Goad was further injured by Lt. Lloyd's bogus arrest warrant for peaceful events on September 14, 2020, and virtually no one else was arrested for the same activity.[3]

259.    Officers Torres, Digiralamo and Officer Does did not use reasonable force in detaining Goad on July 26, 2020 as he was not part of an unruly or destructive crowd, was not trespassing despite Torres' false claims otherwise, and was peacefully and calmly exercising his First Amendment rights.

260.    Upon information and belief, Supervisor Does either ordered Goad's July 26, 2020 arrest or consciously disregarded the interactions of Torres, DiGiralamo and Officer Does in such a manner as to allow Goad's First and Fourth Amendment rights to be violated.

---

[3] Upon information and belief, Lt. Lloyd also obtained a warrant for the arrest of one other individual stemming from the events of September 14, 2020. That person was also a frequent critic of the Richmond Police and was targeted for the same reasons as Mr. Goad.

42

261.     The July 26, 2020 incident subjected Goad to assault, detention and humiliation by multiple Richmond Police officers as described herein.

### *Jimmie Lee Jarvis Unlawful Harassment by Richmond Police Department:*
### *May – Nov. 2020*

262.     Plaintiff Jimmie Lee Jarvis ("Jarvis") is well known by Richmond Police for his Twitter and social media presence and his observations of police activity in and around Richmond.

263.     Jarvis has at times been critical of the Richmond Police on social media and frequently records their public interactions. He has been singled out and harassed by multiple Richmond Police officers many times.

### *May 31, 2020 – June 1, 2020*

264.     Late on the night of May 31, 2020, Jarvis was following behind the main body of protesters through The Fan and The Museum District and then North up Arthur Ashe Boulevard to Broad Street.

265.     As he proceeded East on Broad at approximately 12:30 a.m., he observed that the CVS, GameStop, and DTLR shops had been smashed open and looted. In the company of and attorney and former school board member, who wanted to observe the unrest occurring in his district, Jarvis encountered VSP officers at Broad and Foushee at 1:30 a.m.

266.     VSP did not seem to be taking action against protesters or pedestrians, merely keeping the crowd on Broad Street in check and deterring looting through their visible presence.

267.     Jarvis thereafter proceeded West on Broad Street towards Belvidere, when he observed Richmond Police positioned on Madison Street, just South of Broad, beginning to deploy tear gas and less lethal ammunition at 1:50 a.m. It was unclear to Jarvis who police were specifically targeting, but he witnessed drivers on Broad Street being affected by the gas.

268.     Jarvis was standing peacefully on the sidewalk, across Broad Street from the

Richmond Police, and at least a block east from the body of protesters, when unknown Richmond Police officers began firing less lethal ammunition and tear gas canisters at him with no warning.

269.    Jarvis retreated to the lot on the southeast corner of Broad Street and Belvidere where he took time to recover from the tear gas and less lethal ammunition, invited some injured college students into his car, drove them home, and then proceeded back to the Museum District to survey damage.

### *June 14-15, 2020*

270.    On the night of June 14, 2020, Jarvis joined protesters in the vacant lot on Grace Street across from Richmond Police headquarters. At about 9:30 p.m., Jarvis witnessed a young woman be attacked, pepper sprayed, thrown to the ground and arrested by Richmond Police.

271.    The crowd was irate, and Jarvis learned that Lt. Bridges was the commanding officer.  Jarvis spoke with him multiple times throughout the night, trying to get an update on the status of the woman attacked by police earlier that evening.

272.    Upon information and belief, Lt. Bridges was one of the supervising officers for Richmond Police that evening.

273.    At 10:37 p.m., Jarvis was standing with a group of protesters peacefully filming when unknown Richmond Police officers began spraying pepper spray into the air around them indiscriminately. Jarvis was forced to temporarily quit filming while dealing with the pepper spray.

274.    Around 1:15 a.m., Jarvis again approached Lt. Bridges and the two spoke about the arrest of the young woman earlier that evening.  Jarvis was then joined by a campaign worker for a Richmond City Council member ("Councilmember 1"), who spoke with Lt. Bridges by telephone. Shortly thereafter Bridges gave the phone to Richmond Police Lieutenant Armstead ("Armstead") and said Councilmember 1 requested to speak with him.

275.    While Councilmember 1 spoke with Armstead by telephone, Jarvis had another and this time lengthy conversation with Lt. Bridges about the contradictory statements Lt. Bridges had given to protesters.

276.    By 1:47 a.m., Jarvis was joined in person by Councilmember 1 and a second Richmond City Council member ("Councilmember 2"). In response to concerns about the violent arrest earlier, Lt.  Bridges advised "everyone hold on to your video."

277.    Just a few minutes later, Richmond Police officers began advancing on the crowd along Grace Street, pointing tear gas launchers directly into the faces of protesters, and directly at Jarvis while was filming.

278.    Upon information and belief, Lt. Bridges or some other Supervisor Doe gave the order for the deployment of tear gas into the crowd.

279.    At 1:57 a.m., Councilmember 1 and her staffer were sprayed with pepper spray with no provocation. At this point, the front line of police appeared to be a mix of Henrico Police Department and VSP, based on their riot shields. Police appeared to be making some kind of announcement, but nobody could hear them. Councilmember 1 approached the officers and attempted to ask them to communicate their inaudible announcement. They, along with Jarvis, were positioned at the edge of the lot, abutting the 217 West Grace Street lot.

280.    Around 2:00 a.m., Richmond Police officers began launching explosives, tear gas, pepper spray, and less lethal ammunition into the crowd in the parking lot, sparking a chaotic stampede.

281.    While Jarvis was filming Richmond Police officers assaulting protesters in the parking lot, upon information and belief, a line of what Jarvis believed to be Henrico Police began advancing towards Jarvis and Councilmember 1, slamming their riot shields into their bodies and

faces. Councilmember 1 tried to tell them that there was nowhere for them to go and repeatedly asked why they were doing this. By this time the crowd had mostly fallen back to the far side of the parking lot, and the police organized back into a line of riot shields standing in Grace Street. Jarvis remained filming until about 2:30 a.m.

*June 15, 2020*

282.    Jarvis returned to Richmond Police headquarters on the evening of June 15, 2020, accompanied by his sister. At approximately 10:15 p.m., Richmond Police officers began attacking the crowd without provocation.  As Jarvis began to film police actions from a safe distance, an unidentified Richmond Police officer raced over to him and sprayed Jarvis' face (and camera) with a torrent of pepper spray.

283.    Jarvis wiped the liquid from his camera and resumed filming. He was temporarily and partially blinded and disoriented by the pepper spray and began wandering around the area, continuing to hold his phone up and hoping to capture useable footage.

284.    Jarvis trying to get to the sidewalk on North Jefferson Street when an unknown Richmond Police officer followed him and continued to douse him with pepper spray, despite Jarvis' verbal protestations that he was not doing anything other than peacefully filming.

285.    Two unknown Richmond Police officers thereafter approached Jarvis's sister and shoved her, attempting to provoke her into confrontation, while another unknown Richmond Police officer used his body to block Jarvis from filming.

286.    Jarvis repeatedly asked for the names and badge numbers of the Richmond Police officers, but all refused to answer.

287.    Around 10:25 p.m., Jarvis removed himself from the area to treat his injuries. His face and legs were covered in burning pepper spray and he had multiple scrapes and bruises from

46

being shoved and bashed by police.

288.    Upon information and belief, Lt. Bridges was the officer in charge.

289.    Later the next day, Richmond Mayor Levar Stoney accepted the resignation of Richmond Police Chief William Smith.

### *June 21, 2020*

290.    Around 10:00 p.m. on June 21, 2020, Jarvis was present at the intersection of Monument Avenue and North Lombardy Street at Stuart Circle, when a large body of Richmond Police and VSP officers began massing in the street.

291.    Approximately twenty minutes later, a group of Richmond Police officers headed west on Monument toward the crowd of protesters, and Jarvis observed the deployment of less lethal ammunition. At 10:33 p.m, police detonated a tear gas canister right in front of their line, which gassed both police and bystanders such as Jarvis on the Monument Avenue sidewalk.

292.    At 10:35 p.m., the police continued moving west on Monument Avenue, detonating explosives, tear gas, and deploying less lethal ammunition. Jarvis was standing with a group of residents and bystanders on the sidewalk while two unknown Richmond Police officers began handling their tear gas foggers while facing Jarvis and others. Officers thereafter shined their flashlights directly into Jarvis' camera to prevent his filming.

293.    A few minutes later, a VSP officer began gesturing and shouting at Jarvis, who responded that he was unable to understand what was being said. Jarvis asked the officer if he was ok to film from where he was and was told "yes."

294.    At 10:42 p.m., Jarvis observed officers in the median of Monument Avenue begin chasing an individual with a light and camera, dousing his camera and spraying him in the face at point blank range while he fell to the ground. Jarvis later learned it was Commonwealth Times

reporter Plaintiff Andrew Ringle.

295.    As Jarvis filmed this interaction between Ringle and Richmond Police, another officer dressed in green fatigues shined his flashlight directly into Jarvis' camera lens to prevent his filming.

### July 25, 2020

296.    At about 9:00 p.m. on July 25, 2020, Jarvis was in Monroe Park, photographing and filming a growing number of Richmond Police officers. A group of officers noticed his filming and told Jarvis to leave the park. As Jarvis complied, other Richmond Police officers ran up to Jarvis to rush him along, after which Jarvis exited Monroe Park.

297.    By 11:15 p.m., the demonstrators had marched to the Richmond Police headquarters on Grace Street. Jarvis was standing with journalists and media in the parking lot of 217 West Grace Street, away from the large parking lot that had become a rallying point for protesters.

298.    Richmond Police officers began firing volleys of explosives and gas, and as Jarvis filmed, he was struck with a gas canister that had been launched like a projectile directly at him from only a few yards away.

299.     Jarvis sustained cuts, bruises, and burns on his torso and was disoriented from the tear gas.

300.    Riot police began advancing on the journalists gathered in the side lot, and the group of reporters retreated to the back lot of 217 West Grace Street.

301.    Unidentified Richmond Police officers rushed forward to violently grab journalists Eduardo Acevedo and a Richmond Times-Dispatch Reporter, who were disoriented from the tear gas. Jarvis stood filming on the sidewalk of Madison Street when a white female Richmond Police

officer walked up, arms outstretched shouting "I'm right here! I'm right here," trying to instigate a confrontation.

302. Jarvis continued filming as Acevedo and the other reporter were released, and approximately a dozen Richmond Police officers stood on the sidewalk, shouting insults at protesters and further escalating tensions. As Jarvis remained on the sidewalk filming, yards away from Acevedo, another unknown Richmond Police officer pointed a strobe light at Jarvis to prevent his camera from capturing useable footage.

### *August 16, 2020*

303. At about 9:15 p.m., on August 16, 2020, Jarvis approached a group of Richmond Police officers on the Southwest corner of Broad and Belvidere Streets, including Defendants Lt. Beazley, Captain (then Sgt.) Gleason, Lt. Scarpa, and former Officers Ruiz and Leone.

304. They appeared to be harassing a group of pedestrians on the sidewalk they believed to be protesters. Leone bragged about making overtime for harassing law-abiding pedestrians.

305. At about 9:50 p.m., Jarvis walked a block south, only to realize he was being followed by Lt. Beazley, Captain Gleason, Leone and Ruiz, among others. Leone repeatedly referred to Jarvis by name, despite the fact that he was not engaging with her at all, saying at one point "I hope you have a great night, Jimmie. All rainbows and butterflies." As Jarvis crossed Belvidere Street to remove himself from the situation, Leone and Ruiz called after him, taunting "Bye, Jimmie."

306. At about 10:00 p.m., Jarvis arrived at the intersections of Franklin Street and Belvidere, across from Monroe Park. He filmed unknown Richmond Police officers interacting with protesters until a march began heading west at about 10:30 p.m.

307. Jarvis deliberately trailed the march by several blocks, but found himself, along

with Kristopher Goad, being followed by a white Richmond Police van and cruiser, despite Jarvis and Goad's distance from the protest. Jarvis and Goad walked for about 15 minutes through the Fan before the Richmond Police tail peeled away.

### *August 18, 2020*

308.　On August 18, 2020, starting at approximately 10:00 a.m. through 1:30 p.m., heavily armed right-wing extremists marched through the streets of Richmond, blocking streets, and openly wielding body armor, handguns, rifles, and other weapons.

309.　The march moved west from downtown Richmond to the Virginia Science Museum, where the General Assembly was meeting because of coronavirus precautions.

310.　In sharp contrast to the heavy-handed treatment by Richmond Police Department of the various social justice demonstrations in months prior, there was very little RPD police presence for the heavily armed, right-wing march.



311.　At approximately 2:00 p.m., a "Black Lives Matter" march began at on the very same route, where dozens of VSP and VCU officers swooped in and surrounded the crowd.

312.　Jarvis observed a VSP officer with a camcorder recording the faces of anyone taking pictures or videos. Many officers appeared to have secured their personal phones to their

uniform, taking video of protesters. Many also had their name tags hidden and non-standard weapons on display, such as daggers and Bouie knives.

313.    At approximately 3:08 p.m., while walking east on Broad Street, Jarvis spotted and photographed Lt. Beazley recording protesters from the passenger seat of a black SUV. As he continued east, the SUV followed Jarvis and Lt. Beazley and waved at Jarvis through the open window.

314.    By 3:43 p.m., Jarvis had begun walking south on 8th street, past the Federal Courthouse. Unknown Richmond Police Department vehicles continued to follow Jarvis, and the driver of one Richmond Police SUV vigorously pointed in Jarvis' direction and waved while veering out of his lane.

*August 20, 2020*

315.    At about 10:00 p.m., Jarvis arrived at GWARbar, on West Clay Street to see if anyone would show up after an anonymous call to action was posted earlier in the day. Richmond Police vehicles began arriving in the neighborhood and parking around the restaurant at about 10:15 p.m.

316.    A few minutes later, at approximately 10:18 p.m., several Richmond Police Department Officers, including Lt. Beazley, Officers Peppel, Malone, Craig, Frazer, Mills, Buraliev, O'Rourke, Colombo, Bondy and Kuti, and Sgt. (then Officer) Harris, advanced toward the GWARbar property and began generally harassing customers in the parking lot and the outdoor seating area.

317.    Former RPD Officer O'Rourke was intentionally restraining the crowd while his fellow officers made unlawful arrests.

51

318.    None of the Richmond Police officers appeared to be wearing identifying information.

319.    GWARbar co-owner Michael Derks ("Derks") came outside and informed the Richmond Police officers that the individuals they were harassing were on private property with his permission. Richmond Police ignored Derks and began demanding everyone present produce their identification.

320.    Without warning, one man was grabbed and led off the property, then a woman was thrown to the pavement, where two officers began wrestling with her.

321.    Officer Peppel then launched himself into the crowd, tackling a woman while Frazer rushed forward with a raised tear gas fogger, screaming to "Get back."

322.    While filming the simultaneous violent arrests, Lt. Beazley repeatedly positioned his body to obstruct Jarvis's camera's line of sight, and repeatedly told Jarvis to step back.

323.    Derks repeatedly tried to ask Lt. Beazley what was happening and to leave the private property, but he was ignored.

324.    Lt. Beazley finally told Derks that he was conducting an investigation and Richmond Police would not leave the property and claimed he would come and explain everything to Derks when things settled down, but he did not.

325.    While Richmond Police officers milled around in the parking lot and ignored Derks' repeated demands that they step back onto the sidewalk, Jarvis asked several officers, including Lt. Beazley, to identify themselves for the purposes of filing a formal complaint regarding their violent conduct.

326.    Lt. Beazley refused to identify himself with his name or badge number and demanded to know if Jarvis was carrying his own identification. A bystander reacted by saying

"You know who he is! You shout his name out every time you see him!" to which Lt. Beazley shrugged and said "I don't know who he is."

327.    In succession, Jarvis asked an unknown black female Richmond Police officer, and Buraliev, Frazer, and Craig for their identifying information. Only Craig replied with his last name, claiming "You already know me." At the time, Jarvis did not know Craig.

328.    Jarvis then made the same request to Officer Mills and three other white male officers he did not recognize. None of them identified themselves and Lt. Beazley made no effort to make them do so.

329.    By this point, it was approximately 10:30 p.m. and over two dozen Richmond Police Department officers and multiple vehicles, including an armored truck, had surrounded the GWARbar property. They made no instructions or demands, simply milling around and refusing to leave GWARbar's private property.

330.    A pickup truck with a bed full of VSP officers in riot gear pulled up, and there were now scores of various law enforcement surrounding a bar with approximately 12-15 frightened patrons, unable to leave because of the police siege on the establishment.

331.    Jarvis then realized that even more Richmond Police officers had arrived, including Ruiz and Leone, who were lined up just outside of the property line.

332.    Jarvis filmed the approaching Richmond Police officers, and at approximately 11:00 p.m. witnessed two other women filming the heavy police presence as well. He recognized one of the women as Alice Minium, who was filming Ruiz.

333.    Ruiz thereafter advanced onto the GWARbar property and pushed her way into Minium and the other woman's face, without provocation.

334. A few moments later, Ruiz grabbed Minium and violently yanked her off the property and subsequently arrested her and seized Minium's cellphone.

335. As Jarvis filmed Minium's arrest, without provocation or warning, Malone dashed over to Jarvis and threw him onto the ground unprovoked, resulting in injury to Jarvis' wrist, the damage of which persists to this day.

336. A petite woman behind Jarvis was knocked to the ground under Jarvis and began crying, clearly injured.

337. Officer Leone then rushed forward without a facemask to be front and center in Jarvis' recording, where she began performatively smirking directly into the camera.

338. Jarvis thereafter repeatedly asked Malone to identify himself so for the purposes of Jarvis filing a complaint with the Richmond Police for the unwarranted assault upon him. Malone refused to identify himself.

339. Upon information and belief, Captain (then Sgt.) Gleason was the supervising Richmond Police officer that evening and was directing his subordinate to harass and arrest lawfully abiding citizens on private property, or consciously disregarded the unlawful behavior of his subordinates when they did so.

340. In the alternative, Supervisor Doe(s) were in command that evening and either gave the order to harass and detain the peaceful crowd or consciously disregarded the behavior of RPD subordinate officers.

341. At this point, Jarvis contacted Councilmember 1 and asked that she come and survey the scene. Her arrival appeared to prompt a drastic change in behavior of the Richmond Police still present.

342.     At 11:15 p.m., VSP officers in riot gear replaced the Richmond Police Department officers who had been surrounding the GWARbar establishment, where they remained until 11:51 p.m.

### *September 25, 2020*

343.     Shortly after midnight on September 25, 2020, Jarvis was documenting a protest outside of Richmond Police Department headquarters when a group of VSP and Richmond Police officers in riot gear stood in a line across Grace Street, facing off with angry protesters.

344.     While filming, Sgt. (then Officer) Harris charged forward to grab a young woman, but he was rebuffed and began bashing Jarvis with his riot shield instead. Richmond Police Sergeant Anthony Catoggio grabbed Sgt. Harris by the arm and pulled him back into the police line.

345.     Sgt. Harris made another attempt to rush and grab the young woman, but multiple Richmond Police Officers wrapped their arms around Harris' arms and head, and again pulled him back to the police line. Harris was then removed from the front line until about 1:00 a.m., when he returned, noticeably calmer.

346.     At about 1:30 a.m., Jarvis spotted Lt. Bridges moving up and down the police line. As Jarvis was filming, a VSP officer in green fatigues and armor pointed his gas launcher directly at Jarvis from only a couple feet away.

347.     Then Ruiz rushed forward without warning or provocation, putting her hand over Jarvis' camera lens, slapping his arm, and yelling "Move, Jimmie! Move, Jimmie! Move, Jimmie!" while shoving Jarvis backwards into another individual.

*October 17, 2020*

348.    At approximately 11:30 a.m. on October 17, 2020, Jarvis was walking to a planned demonstration at 8th Street and East Grace Streets when he spotted Lt. Lloyd's car down the block, appearing to be following Jarvis.

349.    Later, at 1:15 p.m., Jarvis was walking west on Grace Street when a line of four Richmond Police Department vehicles pulled up next to Jarvis. Lt. Bridges leaned out of the passenger side of the lead vehicle and shouted something Jarvis was unable to hear. Jarvis asked him to repeat it, and Lt. Bridge's replied "Happy Birthday." Jarvis's birthday was two days prior.

350.    Lt. Bridges was intentionally attempting to intimidate Jarvis by letting him know he knew personal details about Jarvis.

351.    About twenty minutes later, Jarvis walked to the parking lot of Davis Market near the Richmond Police Department headquarters, where Sgt. Harris saw him and crossed the street. He loudly mocked Jarvis to a bystander on the street.

352.    Later that afternoon around 2:15 p.m., Jarvis noted that Lt. Lloyd was again following him as Jarvis walked along Park Avenue.

*October 27, 2020*

353.    On October 27, 2020, Jarvis was walking past Monroe Park just before 9:00 p.m. when he saw a group of Richmond Police officers, including Sgt. Harris, milling around on the sidewalk. The group beckoned Jarvis over, to which he complied, and Sgt. Harris made a series of sarcastic and defamatory remarks to Jarvis.

354.    When asked why he was filming police, Jarvis responded that public servants should not mind being filmed. Sgt. Harris pretended that he had never heard the term "public

servant" before and accused Jarvis of likening a Black man to a slave. He repeatedly tried to goad Jarvis to cease filming, which Jarvis did not do.

355.    Harris then claimed he was scared of Jarvis' "physically imposing" presence and that this was causing Harris "to fear for his life." Jarvis is approximately 5'2" and several inches shorter than Harris.

356.    Harris was now joined by Ruiz, who yelled at Jarvis to move out of her way. Defendant Brides chimed in and repeatedly asked Jarvis "did you have a good birthday, Jimmie Lee?"

357.    Jarvis continued to film this ridiculous behavior and an unknown Richmond Police officer rushed over to block his filming, telling Jarvis to back up. Jarvis asked how far, and Defendant Bridges said to back up ten feet.

358.    Jarvis complied, but the unknown officer continued pushing Jarvis backwards and blocking his camera. Jarvis continued filming until the group loaded up into their vehicles and drove away.

359.    Later that night, at approximately 10:35 p.m., Jarvis was walking through the Fan when he witnessed an arrest happening on the sidewalk. He began filming and a crowd began to gather around the commotion. An unknown Richmond Police officer approached Jarvis and began repeatedly referring to him by his full name. The officer directed his flashlight into Jarvis's face and camera, and Jarvis was unable to see. The unknown Richmond officer refused multiple requests to identify himself before jumping in his car and driving away.

### *November 7, 2020*

360.    Around noon on November 7, 2020, Jarvis was walking to the State Capital to document a pro-Trump rally falsely claiming that the 2020 presidential election was stolen.

361. At 12:30 p.m., Jarvis noticed that Defendant Lloyd was once again following him on foot.

362. Jarvis continued to film and photograph the event and left at 2:19 p.m., when Jarvis noted that Lloyd was also preparing to leave by getting into his car. Jarvis spoke with Lloyd briefly, asking Lloyd why he was always following him.

363. Lloyd responded with sarcastic and derogatory statements, which Jarvis ignored.

### November 12, 2020

364. Jarvis spent the evening of November 12, 2020 documenting a "Stop the Steal" rally represented by a large truck headlined by InfoWars host Alex Jones, who was not present.

365. At approximately 8:30 p.m., after Jarvis publicly posted on Twitter that he would be observing the event, noticed that Lt. Lloyd was once again following Jarvis on foot, while speaking on the phone.

366. About twenty minutes later, Jarvis observed Richmond Police chatting casually with pro-Trump demonstrators, who demanded to know why no counter-protestors across the street had been arrested. The counter-protestors were breaking no laws.

367. The unknown Richmond Police officer replied that "this has been going on since May 29. Once we leave… you're on your own," suggesting to the pro-Trump crowd they were free to do as they like with regard to the counter-protestors.

368. At all relevant times alleged herein, Jarvis was engaged in constitutionally protected First Amendment activity.

369. In the span of sixth months, Richmond Police Department Officers:

    a. Shot at Jarvis with tear gas canisters and non-lethal ammunition on May 31, 2020 (unknown officer);

58

b.      Tear-gassed Jarvis in the face on June 14, 2020 (officer unknown);

c.      Pepper-sprayed Jarvis in the face and followed him down the street as he attempted to get out of the torrent of spray on June 15, 2020 (officer unknown);

d.      Shined flashlights in his camera to prevent Jarvis from filming on June 21, 2020 (unknown officers);

e.      Fired volleys of explosives and tear gas at Jarvis, and hitting him with a gas cannister fired from close range on July 25, 2020 (unknown officers) and pointed a strobe light at his camera to prevent him from filming;

f.      Threw Jarvis to the ground without provocation to prevent him from filming an unlawful arrest on August 20, 2020 (Officer Malone); and

g.      On September 25, 2020, bashing Jarvis with his riot shield to prevent him from filming (Sgt. Harris), and slapping his arm and placing her hand over his camera, also to prevent Jarvis from filming (Ruiz);

370.    Other examples of harassment at the hands of Richmond Police, including Lt. Beazley, Captain Gleason, Leone, Ruiz, Sgt. Harris and other, unknown RPD officers, include repeatedly following him on foot and by police car, shining flashlights directly in his camera as he was filing, alternatively ridiculing him or sharing personal details about Jarvis in an attempt to intimidate on August 16, August 18, October 17, October 27, November 7 and November 12, 2020.

371.    All of the above-described actions by the Richmond Police were targeted to prevent Jarvis from recording public or intimidate him.

59

372.     The actions taken by Richmond Police adversely affected Jarvis and his activities protected by the First Amendment.

373.     But for the actions of RPD officers, Jarvis would be able to exercise his First Amendment rights free from harassment and intimidation.

374.     Jarvis was not committing any crimes or pose a threat to any of the RPD officers he encountered.

375.     On multiple occasions, Richmond Police did not use reasonable force in assaulting and seizing Jarvis as he was not part of an unruly or destructive crowd and was peacefully and calmly exercising his First Amendment rights.

376.     At no time was Jarvis interfering with Richmond Police's ability to conduct their jobs.

377.     Officer Malone, Sgt. Harris, Ruiz and other unknown Richmond Police officers' multiple assault of Jarvis with tear gas, non-lethal weapons, pepper spray and riot shields were inappropriate, unnecessary, unlawful and in violation of his Fourth Amendment rights.

378.     In addition to the constitutional injuries suffered, the above descried incidents have subjected Jarvis to assault, detention and humiliation and he has suffered physical, financial and emotional injuries as a result of the actions of the Richmond Police Department.

*Alice Minium's Unlawful Arrest: August 20-21, 2020*

379.     On August 20, 2020, Plaintiff Alice Minium ("Minium") was with a group of individuals outside of GWARbar. The group was in the parking lot on private property when a dozen or more Richmond Police officers lined up along the sidewalk and across the street with Virginia State Police.

380.     Captain (then Sgt.) Gleason was present at the scene and upon information and

60

belief, was the supervising officer.

381. Captain Gleason gave the initial order for the entire crowd to present their identification to police.

382. GwarBar co-owner Michael Derks asked Sergeant Gleason and the assembled Richmond police to leave and was shoved by police in response.

383. Minium's group was neither marching nor protesting and was there with the permission of Derks.

384. Without provocation or justification, Richmond Police grabbed one individual and led them off the premises, and another woman was thrown to the pavement where she was tackled by unknown officers.

385. Alarmed at the unwarranted escalation and violence by Richmond Police, Minium called Councilmember One upon witnessing the unprovoked arrests of her friends. After hearing the details, Councilmember One responded with "[t] They promised us they wouldn't do that." She said she would personally contact Chief G. Smith once the two got off the phone.

386. Without explanation, an unknown Richmond Police officer then walked up to Minium and demanded identification from her and everyone in the crowd.

387. Upon witnessing four Richmond Police officers tackle a young Black individual onto the pavement, another officer place his knee on their back, and another lock their neck, then drag them away for arrest entirely unprovoked, Minium calmly and without aggression approached the Richmond Police officers and requested the names and badge numbers of the officers present.

388. No single officer answered her question, although one unidentified officer responded with "I'm not required to provide that."

389. One unknown female officer in the row said she knew who Minium was and

thereafter demanded Minium's identification.

390.    When Minium inquired as to the purpose, former RPD Officers Ruiz and Bondy, without provocation, forcibly yanked Minium from her peers, marched her across the street and threw her to the ground, where she suffered injuries as a result.

391.    Ruiz arrested Minium without probable cause and charged her with violating Virginia Code § 18.2-408 for conspiracy to incite a riot, a Class 5 felony.

392.    Minium was taken to the magistrate's Office, where Ruiz falsely claimed to the magistrate that Minium was an extremist and a known "organizer."

393.    In the process of her arrest, Richmond Police confiscated Minium's phone and other personal belongings. She was also strip-searched in the process.

394.    Five days later, on August 25, 2020, Ruiz provided a misleading statement in order to obtain a search warrant for Minium's phone, which she had unlawfully seized five days before. The warrant also granted Richmond Police the right to monitor Mimium's social media, contacts and location history.

395.    At a hearing in the Richmond General District Court on November 12, 2020, Case No. GC20015008, Minium's charges were dismissed.

396.    Despite repeated demands, Minium's phone was not returned to her until January 11, 2021.

397.    At all relevant times alleged herein, Minium was engaged in constitutionally protected First Amendment activity. She was in fact singled out because she was filming.

398.    The actions taken Ruiz, Bondy and other unknown Richmond officers against Minium adversely affected her activities protected by the First Amendment.

62

399.     But for the actions of RPD officers that evening, Minium would have been able to continue exercising her First Amendment rights.

400.     Minium was not committing any crimes or pose a threat to any of the RPD officers she encountered.

401.     RPD did not use reasonable force in detaining Minium as she was not part of an unruly or destructive crowd and was peacefully and calmly exercising her First Amendment rights.

402.     Despite this Minium was seized Ruiz and Bondy.

403.     Their seizure of Minium was inappropriate, unnecessary, unlawful and in violation of her Fourth Amendment rights.

404.     Ruiz lacked probable cause to arrest Minium and it was done as a pretext in retaliation for Minium's filming the out-of-control behavior of Richmond Police that evening. Other similarly situated individuals not filming police activity were not arrested.

405.     The incident subjected Minium to assault, detention and humiliation by Ruiz and Bondy.

406.     In addition to her constitutional injuries, Minium sustained physical, mental, emotional and financial injuries as a result of the actions of Ruiz, Bondy and the other Richmond Police who failed to intervene.

***Vanna Goodenow's Unlawful Arrest: October 27, 2020***

407.     Plaintiffs incorporate the preceding paragraphs of the Amended Complaint as if the same are set forth herein.

408.     Plaintiff Vanna Goodenow ("Goodenow") attended several social justice protests in and around Richmond during the summer/fall of 2020.

409.      On October 27, 2020, she has planned to attend a rally that ultimately did not occur.

410. As Goodenow walked home in the City's Northside, she approached Brookland Parkway and North Street and specifically noted a heavy police presence around the general area.

411. At the intersection of Norwood and Barton, Goodenow observed that two Richmond Police officers had pulled someone over and had him/her out of the car.

412. Goodenow approached the scene and started filming with her camera, from at least twenty feet away. The police appeared to be arresting the individual who had been pulled over.

413. The unknown Richmond Police officers ordered Goodenow to leave the scene and go all the way down the block, out of filming sight. One stated that Goodenow did not need to record because their body-worn cameras were recording.

414. At no time was Goodenow interfering with the officer's ability to perform their jobs.

415. Goodenow declined to leave and stated that she was far enough away and they would not get anywhere closer to the scene. Goodenow insisted on recording on the grounds that body-worn camera footage is frequently missing in cases of injustice.

416. The two Richmond Police officers left the individual they had been arresting and approached Goodenow, ordering her to retreat to the end of the street (approximately 50-60 additional feet away, or half a block away) or she would be arrested.

417. Goodenow was subsequently arrested by Richmond Police Officer Junius Thorpe ("Thorpe") and charged with a violation of Virginia Code § 18.2-460(B), which provides in part that "any person who, by threats or force, knowingly attempts to intimidate or impede a judge, magistrate, justice, juror, attorney for the Commonwealth, witness, any law-enforcement officer, …lawfully engaged in his duties as such …is guilty of a Class 1 misdemeanor."

418. Thorpe did not have probable cause to arrest Goodenow as she was not in close

proximity to the officers making the arrest and was in no way impeding their ability to do their job.

419.    Goodenow was placed in handcuffs and told to sit on the curb, while 2-3 more Richmond Police cars drove up to the scene. She was released on scene.

420.    At the conclusion of a trial conducted in the Richmond General District Court on March 10, 2021, Case No. GC20017905-00, Goodenow was found not guilty.

421.    Goodenow observed during her trial that Thorpe was intentionally vague and misleading. Goodenow's attorney had to remind him several times he was under oath after he was unable to recall the answers to many of the questions.

422.    The presiding judge found Goodenow not guilty, stating at the conclusion that "while officers' jobs are becoming increasingly difficult, and maybe that's a good thing, due to legal precedent, making an officers job 'more' difficult is not obstruction of justice."

423.    At all relevant times alleged herein, Goodenow was engaged in constitutionally protected First Amendment activity. She was in fact singled out because she was filming.

424.    The actions taken by Thorpe and his partner against Goodenow adversely affected her activities protected by the First Amendment.

425.    But for the actions of RPD officers that evening, Goodenow would have been able to continue exercising her First Amendment rights.

426.    Goodenow was not committing any crimes or pose a threat to any of the RPD officers she encountered.

427.    RPD did not use reasonable force in detaining Goodenow as she was not part of an unruly or destructive crowd and was peacefully and calmly exercising her First Amendment rights.

428.    Despite this, Goodenow was seized by Officer Thorpe.

429.     The seizure of Goodenow was inappropriate, unnecessary, unlawful and in violation of her Fourth Amendment rights.

430.     Thorpe lacked probable cause to arrest Goodenow and it was done as a pretext in retaliation for her filming police activity.

431.     The incident subjected Minium to unlawful seizure, detention and humiliation by Thorpe.

432.     In addition to her constitutional injuries, Goodenow sustained physical, mental, emotional and financial injuries as a result of the actions of Thorpe and other Richmond Police who failed to intervene.

### *Éilís Weller's Unlawful Arrest: June 16, 2021*

433.     On June 16, 2021, Plaintiff Éilís Weller ("Weller") attended a peaceful protest for Palestine in Scuffletown Park on Strawberry Street in Richmond. The protestors marched from that address to the Circle at Monument Avenue.

434.     As the group turned around and headed back to Scuffletown Park, Weller observed that they were approached by approximately fifteen or more Richmond Police officers and quickly there were multiple police cars on the scene.

435.     Upon seeing the mass of Richmond Police officers, Weller pulled out their phone to record activities. The police instructed the group to get on the sidewalk.

436.     As a disabled individual, Weller had difficulty getting to the sidewalk quickly. In addition, there were Richmond Police vehicles surrounding them as they tried to navigate their way towards the sidewalk.

437.     Not less than two minutes later, Weller, while attempting to get to the sidewalk, and already complying with RPD orders, an unknown Richmond Police officer forcibly dragged

Weller toward the sidewalk, knocking their shoe off in the process and causing Weller to become further unbalanced.

438. Richmond Police Officer Paul Campbell ("Campbell") thereafter arrested Weller.

439. Campbell had no probable cause to arrest Weller and it was a pretext in retaliation for their filming police activity. Similarly situated individuals also at the protest and not yet on the sidewalk were not detained or arrested by Richmond Police. The only difference was that Weller was filming while others were not.

440. Weller was detained for approximately 5-10 minutes. Richmond Police officers also repeatedly misgendered Weller despite being corrected of their proper pronouns.

441. At this this same time, they also arrested a black individual who was on a grassy area and no longer in the road. He was released a few minutes after Weller.

442. Both Weller and the other individual were given summons upon their release with the same court date and time. Weller was verbally advised that the charge was an "illegal participation in a parade" but the charging part of their summons was intentionally blank and the charge code was Virginia Code § 46.2-928: "[w]alk in road – sidewalk available."

443. A hearing was held in the Richmond General District Court on July 28, 2021, Case No. GT21011221-00. Campbell failed to appear and the presiding judge dismissed the charges.

444. At all relevant times alleged herein, Weller was engaged in constitutionally protected First Amendment activity.

445. The actions taken by Campbell and other RPD officers against Weller adversely affected their activities protected by the First Amendment.

446. But for the actions of RPD officers, Weller would have been able to continue exercising their First Amendment rights.

447. Weller was not a threat to any of the RPD officers, was complying with police orders to return to the sidewalk and not in any way interfering with RPD's ability to do their job.

448. Despite this, Weller was seized by Officer Campbell.

449. RPD did not use reasonable force in detaining Weller as they were not part of an unruly or destructive crowd and was peacefully and calmly exercising their First Amendment rights.

450. Campbell's seizure and use of force of Weller was inappropriate, unnecessary, unlawful and in violation of their Fourth Amendment rights.

451. The incident subjected Weller to assault, detention and humiliation by Campbell and unknown Richmond officers.

452. In addition to their constitutional injuries, Weller sustained physical, mental, emotional and financial injuries as a result of the actions of Campbell and other Richmond Police who failed to intervene.

## INJURY TO PLAINTIFFS

453. Plaintiffs incorporate the preceding paragraphs of the Amended Complaint as if the same are fully set forth herein.

454. As a result of Defendants' unlawful policies, customs and conduct, Plaintiffs have suffered constitutional injuries, physical pain and injury, emotional distress, property loss, lost employment opportunities and economic injuries.

455. Plaintiffs have suffered the short and long-term effects of chemical weapons, excessive force and use of violent tactics used by Defendants.

456. Plaintiffs have suffered emotional trauma and injury, which persist to the present, including fear, anxiety and emotional distress.

457.    Plaintiffs' rights to peacefully observe the Defendants' conduct were chilled and curtailed by the Defendants' unlawful actions.

## CLAIMS FOR RELIEF

**Applicable to all Claims:**

458.    42 U.S.C. § 1983 provides, in pertinent part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

### COUNT I
### 42 U.S.C. § 1983 – FIRST AMENDMENT RETALIATION
### CITY OF RICHMOND
### Seeking Declaratory and Injunctive Relief and Compensatory Damages

459.    Plaintiffs incorporate the preceding paragraphs of the Amended Complaint as if the same are fully set forth herein.

460.    The First Amendment provides that Congress "make no law respecting an establishment of religion or prohibiting its free exercise. It protects freedom of speech, the press, assembly, and the right to petition the Government for a redress of grievances." U.S. CONST. AMEND I

461.    With the exception of Schmidt and Minium's interaction with Richmond Police, all of the events alleged herein took place in a public forum such as a park, sidewalk or street.

462.    Observing public police activities, including public demonstrations and the conduct of police officers without interfering with those duties, is but one form of this constitutionally protected, legitimate means of gathering information for public dissemination and is expressive

conduct explicitly protected by the First Amendment.

463. A First Amendment claim under §1983 is comprised of three elements: "(1) the plaintiff is engaged in constitutionally protected First Amendment activity; (2) the defendant took an action that adversely affected that protected activity; and (3) there is a causal relationship between the plaintiff's protected activity and the defendant's conduct." Booker v. S.C. Dep't of Corr., 855 F.3d 533, 537 (4th Cir. 2017); Suarez Corp. Ind. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000)(accord).

464. Each of the Plaintiffs are "citizens of the United States or other persons within the jurisdiction thereof."

465. The City is a "person" for the purposes of 42 U.S.C. § 1983.

466. Each and every Plaintiff was engaged in expressive activity by in a public forum, conduct that is unequivocally protected by the First Amendment. Am. Life League, Inc. v. Reno, 47 F.3d 642 (4th Cir. 642 1995).

467. The City, at all relevant times herein, was acting under the color of state law.

468. At the time of the events complained of herein, each Plaintiff had a clearly established constitutional right under the First Amendment to peaceably observe and record activity (whether it involved the police or not).

469. Any properly trained police would have known that places in which the above-described actions took place were traditional public forums are subject to sweeping constitutional protections.

470. Any properly trained police officer would have known that peaceful assembly and protesting are forms of expression protected by the First Amendment.

471. Any properly trained police officer would have known that photography is a form

of public expression protected by the First Amendment.

472.    The City of Richmond has an obligation to properly train officers on their behavior towards citizens gathered in public places, especially in times of peaceful assembly or demonstrations.

473.    The City has an obligation to supervise its police officers to assure that they complied with the First Amendment when confronted with the public's expression of their First Amendment rights.

474.    The City failed to supervise its police officers to assure that they complied with the First Amendment when dealing with the public.

475.    Alternatively, the City has a policy or custom of indifference by Richmond Police officers to aggressively challenge its citizens expression of their First Amendment rights without regard to the protections afford therein.

476.    The sheer volume of First Amendment violations by Richmond police are not isolated incidents, but are so persistent and widespread that it is clear that the Richmond police have no idea how they are supposed to behave when one exercises his or her First Amendment rights.

477.    In addition, upon information and belief, the City has a policy or custom of tolerating indifference to misconduct by Richmond police officers by failing to properly investigate complaints of misconduct and to discipline officers.

478.     For example, upon information and belief, the City found no wrongdoing at the conclusion of investigations into the treatment at the hands of the Richmond Police Department of Roldan, Ringle or the RTD Reporter.

479.    With regard to Roldan, the City did nothing despite Mayor Stoney's public

statement on June 1, 2020 that "[t]here is no reason this should have happened to a member of the

press. No reason. It is unacceptable, and we are investigating the matter."

480.    In connection with another incident related to the demonstrations of June 13, 2020,

Mayor Stoney said the following:





481.    A few days later, Mayor Stoney advised that the City was reviewing policies,

procedures and practices for "immediate change, like strengthening the duty to intervene":



482.    All of the Plaintiffs herein were engaged in lawful, protected First Amendment activity.

483.    The City of Richmond, through the actions of its officers, took actions that adversely affected the Plaintiffs' First Amendment rights. A non-exhaustive list of those unlawful actions include:

a.    On May 31, 2020, Roberto Roldan was pepper sprayed and assaulted by an unknown Richmond Police officer despite clearly identifying himself as a member of the press multiple times.

b.    Jimmie Lee Jarvis was singled out and pepper sprayed by an unknown Richmond officer on June 15, 2020 for filming police activity from a distance well away from Richmond police's unprovoked attack on a peaceful assembly. Another unknown officer followed Jarvis as he walked to a place of safety, dousing him with pepper spray.

c.    Andrew Ringle was covering protests on the night of June 21, 2020. Despite clearly identified himself as a member of the press and while complying with police orders to leave the scene, when he was pepper-sprayed by Richmond police.

d.    In response to Schmidt's lawful observation of police activity on June 26, 2020, in an attempt to intimidate him, Defendant Frazer's lied to Schmidt by telling him was required to leave the Rear Parking Lot and that Richmond Police were handling security for Whole Foods. Despite Schmidt's attempt to comply with Frazer's directive to leave the area, Frazer's placed under arrest only after Schmidt tried to photograph him.

73

e.  Eduardo Acevedo was swarmed and attacked by Richmond Police on July 25, 2020 near Richmond Police headquarters, after he had complied with police directive to clear the area and moved to behind a building. He identified himself as press but was assaulted and detained.

f.  Also on July 25, 2020, Jarvis, standing with members of the local media and he himself filming, was struck with a tear gas cannister launched by an unknown Richmond officer from close range, despite his location away from the ongoing demonstration. An unknown officer then shined a flashlight in Jarvis's camera in an attempt to stop his filming.

g.  Andrew Ringle was covering protest events in the City on the night of July 25, 2020. Police ordered people to vacate Monroe Park and Ringle was attempting to comply. Instead, police rushed towards and handcuffed him.

h.  Kristopher Goad was singled out on July 26, 2020 for his independent reporting and social media commentary on the abhorrent behavior of Richmond Police when he was arrested and assaulted without probable cause. He was released the same night, only to have Officer Torres obtain a warrant by providing untruthful information to obtain the warrant.

i.  Mr. Goad was again the target of Richmond Police on September 28, 2020 when he was arrested for an alleged violation of Virginia Code § 18.2-404 on September 14, 2020.

j.  Richmond police repeatedly followed and harassed Jarvis in an attempt to intimidate him and retaliation for his social media commentary regarding the actions of Richmond police.

74

      k.     On August 20, 2020, Alice Minium was on private property with the permission of the owner when Richmond police when while filming, Richmond police officers forcibly yanked her from the crowd, threw her to the ground, arrested her and confiscated her phone.

      l.     Vanna Goodenow was arrested for filming the actions of Richmond police from a distance  on October 27, 2020.

      m.     Eilis Weller was arrested on June 16, 2021 for filming Richmond police in their efforts to break up a demonstration. Weller was complying with police orders to get to the sidewalk. Others similarly situated were not arrested – Weller happened to be the only person filming.

      n.     April Dixon abused her power as a sworn office of the Richmond Police Department when she took to social media in September 2021 to harass and intimidate Goad.

484.   The actions taken by Richmond police were a direct result of the Plaintiffs' expression of their First Amendment rights, and but for the Plaintiffs' efforts to express those rights, they would not have suffered injuries at the hands of police.

485.   The City of Richmond is liable for violating the Plaintiffs' clearly established First Amendment right to freedom of speech and freedom of assembly in failing to properly train its police officers.

486.   The City of Richmond is also liable for its deliberate indifference and failure to act on the widespread and pervasive custom and practice First Amendment violations committed by its police force.

487.   The City is further liable to the Plaintiffs for its deliberate indifference and failure

to properly investigate complaints of First Amendment violations by its police force and to discipline officers, despite apologies from Former Chief W. Smith and multiple promises by Mayor Stoney to conduct meaningful investigations into multiple incidents by the Richmond Police Department that violated the First and Fourth Amendments.

488.    Compensatory damages are appropriate for the Plaintiff's physical and emotional injuries, the chilling effect of City's indifference to Plaintiff's First Amendment rights, as well as any out-of-the-pocket expenses or lost income, incurred by the Plaintiffs as a direct and proximate result of the City's conduct in violation of the Plaintiffs' First Amendment rights.

489.    Declaratory judgment that the City's conduct violated the First Amendment rights of the Plaintiffs is appropriate.

490.    Injunctive relief is warranted here to prohibit similar action in the future.

491.    An award of costs and attorney fees, pursuant to 42 U.S.C. § 1988, is appropriate.

**COUNT II**
**42 U.S.C. § 1983 - EXCESSIVE USE OF FORCE**
**IN VIOLATION OF THE FOURTH AMENDMENT**
**CITY OF RICHMOND**
**Seeking Declaratory and Injunctive Relief and Compensatory Damages**

492.    Plaintiffs incorporate the preceding paragraphs of the Amended Complaint as if the same are fully set forth herein.

493.    The Fourth Amendment guarantees, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. AMEND. IV

494.    The Fourth Amendment prohibitions on unreasonable seizures bars police officers

from using excessive force to seize a free citizen." James v. Buchanan, 325 F.3d 520 (4th Cir. 2003).

495.    All force used by a law enforcement officer against an individual must be "objectively reasonable" in order to not violate the Fourth Amendment's prohibition against excessive force.

496.    Each of the Plaintiffs herein are "citizens of the United States or other persons within the jurisdiction thereof" for the purposes of a § 1983 claim.

497.    The City is a "person" for the purposes of 42 U.S.C. § 1983.

498.    The City, at all relevant times herein, was acting under the color of state law.

499.    Any properly trained police officer would have known that the use of excessive force against individuals who were neither acting in a violent manner or attempting to flee is an impermissible under the Fourth Amendment.

500.    Any properly trained police officer would have known that the use of excessive force in retaliation for one's exercise of free speech is unlawful.

501.    The City of Richmond has an obligation to properly train officers on their use of excessive force.

502.    The City had an obligation to supervise its police officers to assure that they complied with the Fourth Amendment when confronted with the public's expression of their First Amendment rights.

503.    The City failed to supervise its police officers to assure that they complied with the Fourth Amendment and the impermissible use of excessive force.

504.    Alternatively, the City has a policy or custom of indifference by Richmond Police officers to aggressively challenge its citizens expression of their First Amendment rights without

regard to the protections afford therein and permit the use of excessive force to quell such expression.

505. In addition, upon information and belief, the City had a policy or custom of tolerating indifference to misconduct by Richmond police officers by failing to properly investigate complaints of misconduct and to discipline officers.

506. For example, upon information and belief, the City found no wrongdoing at the conclusion of investigations into the treatment at the hands of the Richmond Police Department of Roldan, Ringle or the RTD Reporter.

507. With regard to Roldan, upon information and belief, the City found no evidence of wrongful conduct or took any corrective action, despite Mayor Stoney's public statement on June 1, 2020 that "[t]here is no reason this should have happened to a member of the press. No reason. It is unacceptable, and we are investigating the matter."

508. The City of Richmond, through the actions of its officers, took actions that adversely affected the Plaintiffs' Fourth Amendment protection against the use of excessive force. A non-exhaustive list of those unlawful actions include:

a. On May 31, 2020, an unknown Richmond police officer targeted Roberto Roldan in the face with pepper spray upon Roldan's identifying himself as a member of the press. He doubled over in anguish and was pushed off the sidewalk by another unidentified officer.

b. Jimmie Lee Jarvis was singled out and pepper sprayed by an unknown Richmond officer on June 15, 2020 for filming police activity from a distance well away from Richmond police's unprovoked attack on a peaceful assembly. Another unknown officer followed Jarvis as he walked to a place of

safety, dousing him with pepper spray. Roldan was not acting in a violent manner nor attempting to flee from police.

c.     Andrew Ringle was covering protests on the night of June 21, 2020. Despite clearly identified himself as a member of the press and while complying with police orders to leave the scene, he was pepper-sprayed by Richmond police, who threw him into the street causing him injury. Ringle was not acting in a violent manner nor attempting to flee from police.

d.     On June 26, 2020, in response to Schmidt's lawful observation of police activity on June 26, 2020, placing Schmidt under arrest and placing zip-tie restraints on his wrists so tight that they caused injury.

e.     Eduardo Acevedo was swarmed and attacked by Richmond Police on July 25, 2020 near Richmond Police headquarters, after he had complied with police directive to clear the area and moved to behind a building. He identified himself as press but was assaulted and detained. Acevedo was not acting in a violent manner nor attempting to flee from police.

f.     On July 25, 2020, Jarvis, standing with members of the local media and he himself filming, was struck with a tear gas cannister launched by an unknown Richmond officer from close range, despite his location away from the ongoing demonstration.  An unknown officer then shined a flashlight in Jarvis's camera in an attempt to stop his filming. Jarvis was not acting in a violent manner nor attempting to flee from police.

g.     Kristopher Goad was singled out on July 26, 2020 for his independent reporting and social media commentary on the abhorrent behavior of

79

Richmond Police when he was arrested and assaulted without probable cause. Mr. Goad was injured when police officers tacked him to the ground without warning or provocation. Mr. Goad was not acting in a violent manner nor attempting to flee from police.

        h.      On August 20, 2020, Alice Minium was on private property with the permission of the owner when Richmond police when while filming, Richmond police officers forcibly yanked her from the crowd, threw her to the ground, arrested her and confiscated her phone. Ms. Minium was injured by the police. She was not acting in a violent manner nor attempting to flee from police.

509.    The City of Richmond is liable for violating the Plaintiffs' clearly established Fourth Amendment right to be free from the use of excessive force.

510.    The City is further liable to the Plaintiffs for its deliberate indifference and failure to properly investigate complaints of Fourth Amendment violations by its police force and to discipline officers.

511.    The City is further liable to the Plaintiffs for its deliberate indifference and failure to properly investigate complaints of Fourth Amendment violations by its police force and to discipline officers, despite apologies from Former Chief W. Smith and multiple promises by Mayor Stoney to conduct meaningful investigations into multiple incidents by the Richmond Police Department that violated the Fourth Amendment.

512.    Compensatory damages are appropriate for the Plaintiffs' physical and emotional injuries, the chilling effect of City's indifference to Plaintiffs' Fourth Amendment rights, as well as any out-of-the-pocket expenses or lost income, incurred by the Plaintiffs as a direct and proximate result of the City's conduct in violation of the Plaintiffs' Fourth Amendment rights.

513. Declaratory judgment that the City's conduct violated the Fourth Amendment rights of the Plaintiffs and similarly situated individuals is appropriate.

514. Injunctive relief is appropriate to prevent future harm to the Plaintiffs.

Pursuant to 42 U.S.C. § 1988, an award of costs and attorneys' fees is warranted,

## COUNT III
## 42 U.S.C. § 1983 – UNLAWFUL SEARCH AND SEIZURE
## IN VIOLATION OF THE FOURTH AMENDMENT
## CITY OF RICHMOND
### Seeking Declaratory and Injunctive Relief and Compensatory Damages

515. Plaintiffs incorporate the preceding paragraphs of the Amended Complaint as if the same are fully set forth herein.

516. As stated above, the Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

517. The Fourth Amendment prohibits detention or arrest without probable cause.

518. Each of the Plaintiffs herein are "citizens of the United States or other persons within the jurisdiction thereof" for the purposes of a § 1983 claim.

519. The City is a "person" for the purposes of 42 U.S.C. § 1983.

520. The City, at all relevant times herein, was acting under the color of state law.

521. At the time of the events complained of herein, each Plaintiff had a clearly established constitutional right under the Fourth Amendment to be free from the unlawful search and/or seizure of their person by the Richmond Police.

522. Any properly trained police officer would have known that unlawful search and seizure is an impermissible under the Fourth Amendment.

81

523. Any properly trained police officer would have known that the improper search and seizure of a person in retaliation for one's exercise of free speech is unlawful.

524. The City of Richmond has an obligation to properly train officers on Fourth Amendment search and seizure laws.

525. The City had an obligation to supervise its police officers to assure that they complied with the Fourth Amendment when confronted with the public's expression of their First Amendment rights.

526. The City failed to supervise its police officers to assure that they complied with the Fourth Amendment.

527. In addition, upon information and belief, the City had a policy or custom of tolerating indifference to misconduct by Richmond police officers by failing to properly investigate complaints of misconduct and to discipline officers.

528. For example, upon information and belief, the City found no wrongdoing at the conclusion of investigations into the treatment at the hands of the Richmond Police Department of Roldan, Ringle or the RTD Reporter.

529. With regard to Roldan, upon information and belief, the City found no evidence of wrongful conduct nor took corrective action despite Mayor Stoney's public statement on June 1, 2020 that "[t]here is no reason this should have happened to a member of the press. No reason. It is unacceptable, and we are investigating the matter."

530. The City of Richmond, through the actions of its officers, took actions that adversely affected the Plaintiffs' Fourth Amendment protection against unreasonable seizure. A non-exhaustive list of those unlawful actions include:

        a. Charles Schmidt was unlawfully seized when Richmond police

detained him on June 26, 2020 in retaliation for observing their behavior. He was placed in zip ties and told he was being arrested. He was unlawfully detained without probable cause in violation of the Fourth Amendment.

b.      Eduardo Acevedo was swarmed and attacked by Richmond Police on July 25, 2020 near Richmond Police headquarters, after he had complied with police directive to clear the area and moved to behind a building. He identified himself as press but was assaulted and detained. Acevedo was not acting in a violent manner nor attempting to flee from police. He was unlawfully detained without probable cause in violation of the Fourth Amendment.

c.      Andrew Ringle was covering protest events in the City on the night of July 25, 2020. Police ordered people to vacate Monroe Park and Ringle was attempting to comply. Instead, police rushed towards him and handcuffed him. He was unlawfully detained without probable cause in violation of the Fourth Amendment.

d.      Kristopher Goad was singled out on July 26, 2020 for his independent reporting and social media commentary on the abhorrent behavior of Richmond Police when he was arrested and assaulted him without warning or provocation. He was unlawfully detained without probable cause in violation of the Fourth Amendment.

e.      On August 20, 2020, Alice Minium was on private property with the permission of the owner when Richmond police when while filming, Richmond police officers forcibly yanked her from the crowd, threw her to the ground, arrested her and confiscated her phone. Minium was arrested while others similarly situated

that evening were not. She was unlawfully detained without probable cause in violation of the Fourth Amendment.

        f.     Mr. Goad was again the target of Richmond Police on September 28, 2020 when he was arrested for an alleged violation of Virginia Code § 18.2-404 on September 14, 2020. Others similarly situated were not arrested. He was unlawfully detained without probable cause in violation of the Fourth Amendment.

        g.     Vanna Goodenow was arrested for filming the actions of Richmond police from a distance on October 27, 2020. She was unlawfully detained without probable cause in violation of the Fourth Amendment.

        h.     Eilis Weller was arrested on June 16, 2021 for filming Richmond police in their efforts to break up a demonstration. Weller was complying with police orders to get to the sidewalk. Others similarly situated were not arrested – Weller happened to be the only person filming. Weller therefore was unlawfully detained without probable cause in violation of the Fourth Amendment.

531.    The City of Richmond is liable for violating the Plaintiffs' clearly established Fourth Amendment right to be free from seizure by law enforcement without probable cause.

532.    The City is further liable to the Plaintiffs for its deliberate indifference and failure to properly investigate complaints of Fourth Amendment unlawful seizure violations by its police force and to discipline officers.

533.    The City is further liable to the Plaintiffs for its deliberate indifference and failure to properly investigate complaints of Fourth Amendment violations by its police force and to discipline officers, despite apologies from Former Chief W. Smith and multiple promises by Mayor Stoney to conduct meaningful investigations into multiple incidents by the Richmond

Police Department that violated the Fourth Amendment.

534.     Compensatory damages are appropriate for the Plaintiffs' physical and emotional injuries, the chilling effect of City's indifference to Plaintiffs' Fourth Amendment rights, as well as any out-of-the-pocket expenses or lost income, incurred by the Plaintiffs as a direct and proximate result of the City's conduct in violation of the Plaintiffs' Fourth Amendment rights.

535.     Declaratory judgment that the City's conduct violated the Fourth Amendment rights of the Plaintiffs and similarly situated individuals is appropriate.

536.     Injunctive relief is appropriate to prevent identical harm to the Plaintiffs for the City's future constitutional violations.

537.     An award of costs and attorney fees, pursuant to 42 U.S.C. § 1988, is appropriate.

**COUNT IV**
**42 U.S.C. § 1983 –FIRST AMENDMENT RETALIATION**
**SUPERVISOR LIABILITY**
**DEFENDANTS W. SMITH, BLACKWELL. G. SMITH,**
**BRIDGES, GLEASON and SUPERVISOR DOES 1-20**
**Seeking Declaratory and Injunctive Relief, Compensatory and Punitive Damages**

538.     Plaintiffs incorporate the preceding paragraphs of the Amended Complaint as if set forth fully herein.

539.     The First Amendment provides that Congress "make no law respecting an establishment of religion or prohibiting its free exercise. It protects freedom of speech, the press, assembly, and the right to petition the Government for a redress of grievances."

540.     Each of the Plaintiffs are "citizens of the United States or other persons within the jurisdiction thereof."

541.     Defendant Chiefs W. Smith, Blackwell and G. Smith are "persons" for the purposes of 42 U.S.C. § 1983.

542.     Defendants Sgt. Bridges, Captain Gleason and Supervisor Does 1-20 at all relevant

times herein were acting under the color of state law.

543.    Observing public police activities, including public demonstrations and the conduct of police officers without interfering with those duties, is but one form of this constitutionally protected, legitimate means of gathering information for public dissemination and is expressive conduct explicitly protected by the First Amendment.

544.    A First Amendment retaliation claim under §1983 is comprised of three elements: "(1) the plaintiff is engaged in constitutionally protected First Amendment activity; (2) the defendant took an action that adversely affected that protected activity; and (3) there is a causal relationship between the plaintiff's protected activity and the defendant's conduct." Booker v. S.C. Dep't of Corr., 855 F.3d 533, 537 (4th Cir. 2017); Suarez Corp. Ind. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000)(accord).

545.    Each and every Plaintiff was engaged in expressive activity by in a public forum, conduct that is unequivocally protected by the First Amendment. The City, at all relevant times herein, was acting under the color of state law.

546.    At the time of the events complained of herein, each Plaintiff had a clearly established constitutional right under the First Amendment to peaceably observe and record activity (whether it involved the police or not).

547.    Therefore, Former Chief W. Smith, Interim Chief Blackwell, Chief G. Smith, former Lt. Bridges, Captain Gleason and Supervisor Does 1-20 are not entitled to qualified immunity.

*Former Chief William Smith*

548.    Defendant W. Smith was Chief of the Richmond Police Department from 2019 until approximately June 16, 2020.

549.    For the events described herein through and including June 15, 2020, Defendant W. Smith had actual or constructive knowledge that subordinate Richmond Police Department Officers were engaged in conduct that posed a pervasive and unreasonable risk of First Amendment injuries to the Plaintiffs.

550.    On June 1, 2020, without warning or justification, Richmond Police deployed chemical weapons with the intent to cause injury on a peaceful, kneeling crowd, with families and children present.

551.    Former Chief W. Smith's knowledge of the severe and injurious behavior of his officers is clear from a June 1, 2020 Twitter post wherein the Richmond Police Department apologized for its actions in deploying tear gas near the Lee Monument earlier that evening. At the time however, the Department insisted its use of gas was because "violent" protestors were endangering the safety of its officers.

552.    It went on to state that "some RPD officers in that area were cut off by violent protestors. The gas was necessary to get them to safety."

553.    Many individuals responded to the Richmond Police Department's June 1, 2020 Twitter posts as false, and detailed a variety of ways the police has violated citizens' constitutional rights.

554.    Mayor Stoney and Former Chief W. Smith also apologized the next day and promised to discipline the officers.

555.    Upon information and belief, as part of a 2022 settlement against the City recently made public, the Richmond Police Department was forced to retract its June 1, 2020 statement and admit that its June 1, 2020 statements were false and that the demonstration was peaceful.

556.    As the Chief of Richmond Police on June 1, 2020, W. Smith knew the

demonstrations were peaceful and that the use of tear gas was unwarranted. He also knew his public statements were false.

557. During Former Chief W. Smith's tenure, the conduct of subordinate Richmond Police Department officers posed a pervasive and unreasonable risk that First Amendment violations would occur.

558. This out-of-control behavior by subordinate Richmond police officers was widespread and used on several different occasions.

559. Former Chief W. Smith's response to this knowledge was so inadequate as to show a deliberate indifference or tacit authorization of the Richmond Police Department's practices in offense to the First Amendment.

560. Not only did he fail to act, but mislead the public in the face of documented widespread abuses.

561. Former Chief W. Smith's inactions were a direct and proximate cause of the First Amendment injuries suffered by the Plaintiffs.

562. Upon information and belief, W. Smith resigned at the request of Mayor Stoney following the incidents of May 31, 2020 through June 15, 2020.

*Former Interim Chief William Blackwell*

563. Defendant Interim Chief Blackwell served as the Chief of Police of the Richmond Police Department from approximately June 16, 2020 to June 26, 2020.

564. For the events described herein from June 16, 2020 through and including June 26 2020, Interim Chief Blackwell had actual or constructive knowledge that subordinate Richmond Police Department Officers were engaged in conduct that posed a pervasive and unreasonable risk of First Amendment injuries to the Plaintiffs.

565.    He was on notice of the First Amendment violation risks first and foremost because his immediate predecessor, Former Chief W. Smith, was forced to resign, upon information and belief, because of the multiple incidents by Richmond Police that trampled on the constitutional rights of Richmond's citizens.

566.    A number of lawsuits against the City and Former Chief W. Smith alleging constitutional violations were also filed weeks before Interim Chief Blackwell took over, additionally providing Interim Chief Blackwell with actual or constructive knowledge of the same.

567.    The conduct of subordinate Richmond Police Department officers during Interim Chief Blackwell's tenure posed a pervasive and unreasonable risk that First Amendment violations would occur.

568.    This out-of-control behavior by subordinate Richmond police officers was widespread and used on several different occasions during his short duration as Chief.

569.    Interim Chief Blackwell's  response to this knowledge was so inadequate as to show a deliberate indifference or tacit authorization of the Richmond Police Department's practices in offense to the First Amendment.

570.    Interim Chief Blackwell's inactions and/or deliberate indifference were a direct and proximate cause of the First Amendment injuries suffered by the Plaintiffs.

*Chief Gerald Smith*

571.    Defendant Chief G. Smith is the current Chief of Police of the Richmond Police Department.

572.    For the events described herein from June 26, 2020 forward, Defendant Chief G. Smith had actual or constructive knowledge that subordinate Richmond Police Department officers were engaged in conduct that posed a pervasive and unreasonable risk of First Amendment injuries

89

to the Plaintiffs.

573. Chief Smith had actual or constructive knowledge of these violations because of the abrupt resignation of Former Chief W. Smith, reassignment of Former Interim Chief Blackwell after only 10 days and the many lawsuits filed against the City and the Richmond Police Department for constitutional violations prior to the commencement of Chief Smith's tenure.

574. The conduct of subordinate Richmond Police Department officers during Chief Smith's tenure has posed and continues to pose a pervasive and unreasonable risk that First Amendment violations would occur.

575. This conduct was widespread and least has been used on several different occasions.

576. Chief G. Smith's response to this knowledge has been so inadequate as to show a deliberate indifference or tacit authorization of the Richmond Police Department's practices in offense to the First Amendment.

577. Chief G. Smith's inactions and/or deliberate indifference are a direct and proximate cause of the First Amendment injuries suffered by the Plaintiffs.

*(Former) Richmond Police Officer Lt. Bridges*

578. Upon information and belief, former Lt. Jon Bridges was the supervising officer for the events described on June 14 and 15, 2020, September 25, 2020, October 17, 2020, and October 27, 2020 and gave orders to his subordinate officers on those dates to deploy chemical agents against anyone, regardless of their proximity to the crowd Richmond Police were trying to control.

579. Alternatively, Lt. Bridges had actual or constructive knowledge that subordinate Richmond Police Department officers were engaged in conduct that posed a pervasive and unreasonable risk of First Amendment injuries to Plaintiff Jimmie Lee Jarvis.

90

580.    Lt. Bridges has actual or constructive knowledge of these violations because he was present on each of the days alleged and witnessed the behavior of his subordinate officers.

581.    Upon information and belief, Lt. Bridges also received telephone calls from City councilmembers who expressed alarm at the treatment of innocent protestors at the hands of police.

582.    The conduct of subordinate Richmond Police Department officers while Lt. Bridges was in charge on these dates posed a pervasive and unreasonable risk that First Amendment violations would occur.

583.    This conduct was widespread and least has been used on several different occasions during which Lt. Bridges was in charge.

584.    Lt. Bridges response to this knowledge was so inadequate as to show a deliberate indifference or tacit authorization of the Richmond Police Department's practices in offense to the First Amendment.

585.    Lt. Bridges inactions are a direct and proximate cause of the First Amendment injuries suffered by Jimmie Lee Jarvis on June 14 and 15, 2020, September 25, 2020, October 17, 2020, and October 27, 2020,

*Captain Gleason*

586.    Upon information and belief, Captain Gleason was the supervising officer on August 20, 2020.

587.    Upon information and belief, Captain Gleason gave orders that date to his subordinate Richmond Police Officers to harass and arrest lawfully abiding citizens on private property, or alternatively, consciously disregarded the unlawful behavior of his subordinates when they did so.

588.    Gleason's direct orders and/or conscious disregard of subordinate actions are the

resulted in the First Amendment injuries suffered by Alice Minium.

589.     Captain Gleason had actual knowledge on August 20, 2020 that subordinate Richmond Police Department officers were engaged in conduct that posed a pervasive and unreasonable risk of First Amendment injuries to the public, including Minium, because he was present at the scene and able to witness.

590.     Captain Gleason was additionally on notice of the potential for constitutional injuries, because upon information and belief, Councilmember One has communications with Chief G. Smith expressing her concern as to the same. Chief G. Smith would presumably pass these concerns along to Captain Gleason as the supervising officer.

591.     The conduct of subordinate Richmond Police Department officers while Captain Gleason was in charge posed a pervasive and unreasonable risk that First Amendment violations would occur.

592.     Captain Gleason's response to this knowledge was so inadequate as to show a deliberate indifference or tacit authorization of the Richmond Police Department's practices in offense to the First Amendment.

593.     Captain Gleason's direct orders or deliberate indifference to these inactions are a direct and proximate cause of the First Amendment injuries suffered by the Alice Minium on August 20, 2020.

*Supervisor Does 1 -20*

594.     For the events alleged in the preceding paragraphs herein on May 31, 2020 (Roldan, Jarvis), June 15, 2020 (Jarvis) June 21, 2020 (Jarvis, Ringle), June 26, 2020 (Schmidt), July 25, 2020 (Acevedo, Ringle), July 26, 2020 (Goad) and June 16, 2021 (Weller), Supervisor Does 1-20 were in charge,  and such officers had actual or constructive knowledge that subordinate Richmond

Police Department officers were engaged in conduct that posed a pervasive and unreasonable risk of First Amendment injuries to Plaintiffs.

595.    Supervisor Does had actual or constructive knowledge by way of their presence at the various scenes.

596.    The conduct of subordinate Richmond Police Department officers while Supervisor Does were in charge posed a pervasive and unreasonable risk that First Amendment violations would occur.

597.    This conduct was widespread and least has been used on several different occasions.

598.    Supervisor Does responses to this knowledge was so inadequate as to show a deliberate indifference or tacit authorization of the Richmond Police Department's practices in offense to the First Amendment.

599.    Supervisors Does direct orders and/or deliberate indifference to the actions of their subordinate officers are a direct and proximate cause of the First Amendment injuries suffered by the Plaintiffs.

*Applicable to All Supervisors*

600.    Any reasonable police officer knew or should have known, by virtue of his or her training and experience and the case law and opinions of federal courts concerning these rights at the time of the events complained of herein (as the law was clearly established at that time), that his or her conduct violated the Plaintiffs' clearly established First Amendment rights.

601.    Supervisory Defendants identified in this Count IV, including Supervisor Does 1-20, are not entitled to qualified immunity.

602.    Compensatory damages are appropriate for the physical and emotional injuries, and

the chilling effect of the Supervisory Defendants' conduct, as well as any out-of-the-pocket expenses or lost income, incurred by the Plaintiffs as a direct and proximate result of their conduct in violation of the Plaintiffs' First Amendment rights.

603.　Declaratory judgment that the conduct of the Supervisory Defendants violated the First Amendment rights of the Plaintiffs is appropriate.

604.　Injunctive relief is warranted to prevent future identical harm to Plaintiffs.

605.　Punitive damages are appropriate as to the Supervisory Defendants, as their conduct of showed actual malice, willful and wanton, or gross and reckless disregard of the Plaintiffs' rights.

606.　An award of costs and attorney fees, pursuant to 42 U.S.C. § 1988, is appropriate.

**COUNT V**
**42 U.S.C. § 1983 –FOURTH AMENDMENT- EXCESSIVE FORCE**
**SUPERVISOR LIABILITY**
**DEFENDANTS W. SMITH, BLACKWELL. G. SMITH,**
**BRIDGES, GLEASON and SUPERVISOR DOES 1-20**
**Seeking Declaratory and Injunctive Relief,  Compensatory and Punitive Damages**

607.　Plaintiffs incorporate the preceding paragraphs of the Amended Complaint as if set forth fully herein.

608.　Each of the Plaintiffs are "citizens of the United States or other persons within the jurisdiction thereof."

609.　Defendant Former Chief W. Smith, Former Interim Chief Blackwell and Chief G. Smith are "persons" for the purposes of 42 U.S.C. § 1983.

610.　Defendants Sgt. Bridges, Captain Gleason and Supervisor Does 1-20 at all relevant times herein were acting under the color of state law.

611.　The Fourth Amendment prohibitions on unreasonable seizures bars police officers from using excessive force to seize a free citizen." James v. Buchanan, 325 F.3d 520 (4th Cir. 2003).

94

612. All force used by a law enforcement officer against an individual must be "objectively reasonable" in order to not violate the Fourth Amendment's prohibition against excessive force.

613. At the time of the events complained of herein, each Plaintiff had a clearly established constitutional right under the Fourth Amendment to be free from the use of excessive force against their persons by Richmond Police.

*Former Chief William Smith*

614. Defendant W. Smith was Chief of the Richmond Police Department from 2019 until approximately June 16, 2020.

615. For the events described herein through and including June 15, 2020, Defendant W. Smith had actual or constructive knowledge that subordinate Richmond Police Department Officers were engaged in conduct that posed a pervasive and unreasonable risk of Fourth Amendment injuries to the Plaintiffs.

616. On June 1, 2020, without warning, Richmond Police teargassed a peaceful crowd that included children and families.

617. Former Chief W. Smith's knowledge of the severe and injurious behavior of his officers is clear from a June 1, 2020 social media post in which the Richmond Police Department apologized for its actions in deploying tear gas near the Lee Monument earlier that evening. At the time however, the Department insisted its use of gas was because violent protestors were endangering the safety of its officers.

618. It went on to state that "some RPD officers in that area were cut off by violent protestors. The gas was necessary to get them to safety."

619. Many individuals responded to the Richmond Police Department's June 1, 2020

Twitter posts as false, and detailed a variety of ways the police has violated citizens' constitutional rights.

620.   Mayor Stoney and Former Chief W. Smith also apologized the next day and promised to discipline the officers.

621.   As part of a 2022 settlement against the City recently made public, the Richmond Police Department was forced to retract its June 1, 2020 statement and admit that its June 1, 2020 statements were false and that the demonstration was peaceful.

622.   As the Chief of Richmond Police on June 1, 2020, Former Chief W. Smith knew the demonstrations were peaceful and that the use of tear gas was unwarranted. He also knew his public statements were false.

623.   During Former Chief W. Smith's tenure, the conduct of subordinate Richmond Police Department officers posed a pervasive and unreasonable risk that Fourth Amendment violations would occur.

624.   This out-of-control behavior by subordinate Richmond police officers was widespread and used on several different occasions.

625.   Former Chief W. Smith's response to this knowledge was so inadequate as to show a deliberate indifference or tacit authorization of the Richmond Police Department's practices in offense to the Fourth Amendment.

626.   Not only did he fail to act, but he covered up the abuses in the face of documented widespread abuses.

627.   Former Chief W. Smith's inactions were a direct and proximate cause of the Fourth Amendment injuries suffered by the Plaintiffs.

628.   Upon information and belief, W. Smith resigned at the request of Mayor Stoney

following the incidents of May 31, 2020 through June 15, 2020.

*Former Interim Chief William Blackwell*

629.    Defendant Interim Chief Blackwell served as the Chief of Police of the Richmond Police Department from approximately June 16, 2020 to June 26, 2020.

630.    For the events described herein from June 16, 2020 through and including June 26 2020, Interim Chief Blackwell had actual or constructive knowledge that subordinate Richmond Police Department Officers were engaged in conduct that posed a pervasive and unreasonable risk of Fourth Amendment injuries to the Plaintiffs.

631.    He was on notice of the First Amendment violation risks first and foremost because his immediate predecessor, Former Chief W. Smith, was forced to resign.

632.    A number of lawsuits against the City and Former Chief W. Smith alleging constitutional violations were also filed weeks before Interim Chief Blackwell took over.

633.    The conduct of subordinate Richmond Police Department officers during Interim Chief Blackwell's tenure posed a pervasive and unreasonable risk that Fourth Amendment excessive force violations would occur.

634.    This out-of-control behavior by subordinate Richmond police officers was widespread and used on several different occasions during his short duration as Chief.

635.    Interim Chief Blackwell's response to this knowledge was so inadequate as to show a deliberate indifference or tacit authorization of the Richmond Police Department's practices in offense to the Fourth Amendment.

636.    Interim Chief Blackwell's inactions were a direct and proximate cause of the Fourth Amendment injuries suffered by the Plaintiffs.

*Chief Gerald Smith*

637.    Defendant Chief G. Smith is the current Chief of Police of the Richmond Police Department.

638.    For the events described herein from June 26, 2020 forward, Defendant Chief G. Smith had actual or constructive knowledge that subordinate Richmond Police Department officers were engaged in conduct that posed a pervasive and unreasonable risk of Fourth Amendment injuries to the Plaintiffs.

639.    Chief Smith has actual or constructive knowledge of these violations because of the abrupt resignation of Former Chief W. Smith, reassignment of Former Interim Chief Blackwell after only 10 days and the many lawsuits filed against the City, the Richmond Police Department for constitutional violations.

640.    The conduct of subordinate Richmond Police Department officers during Chief Smith's tenure has posed and continues to pose a pervasive and unreasonable risk that Fourth excessive force Amendment violations would occur.

641.    This conduct was widespread and least has been used on several different occasions.

642.    Chief G. Smith's response to this knowledge has been so inadequate as to show a deliberate indifference or tacit authorization of the Richmond Police Department's practices in offense to the Fourth Amendment.

643.    Chief G. Smith's inactions are a direct and proximate cause of the First Amendment injuries suffered by the Plaintiffs.

*(Former) Richmond Police Officer Lt. Bridges*

644.    Upon information and belief, former Lt. Bridges was the supervising officer for the

98

events described on June 14 and 15, 2020, September 25, 2020, October 17, 2020, and October 27, 2020, and either gave orders to deploy chemical agents or failed to act when subordinate officers took such actions.

645.    In the alternative, Lt. Bridges had actual or constructive knowledge that subordinate Richmond Police Department officers were engaged in conduct that posed a pervasive and unreasonable risk of Fourth Amendment injuries to Plaintiff Jimmie Lee Jarvis.

646.    Lt. Bridges has actual or constructive knowledge of these violations because of the disastrous response by Richmond Police to the events between May 31 and June 13, 2020 and the abrupt resignation of Former Chief W. Smith, reassignment of Former Interim Chief Blackwell after only 10 days and the many lawsuits filed against the City, the Richmond Police Department for constitutional violations.

647.    The conduct of subordinate Richmond Police Department officers while Lt. Bridges was in charge posed a pervasive and unreasonable risk that Fourth Amendment violations would occur.

648.    This conduct was widespread and least has been used on several different occasions.

649.    Lt. Bridges response to this knowledge was so inadequate as to show a deliberate indifference or tacit authorization of the Richmond Police Department's practices in offense to the Fourth Amendment.

650.    Lt. Bridges direct orders, or in the alternative, conscious disregard for the his subordinates actions are a direct and proximate cause of the Fourth Amendment injuries suffered by the Plaintiffs present on June 14 and 15, 2020, September 25, 2020, October 17, 2020, and October 27, 2020,

*Captain Gleason*

651.    Upon information and belief, Captain Gleason was the supervising officer on August 20, 2020.

652.    Captain Gleason's ordered his subordinate RPD Officers on that date to harass and arrest lawfully abiding citizens on private property, or in the alternative consciously disregarded the unlawful behavior of his subordinates when they did so, are the direct and proximate cause of the Fourth Amendment excessive force Fourth Amendment injuries suffered by Alice Minium.

653.    Captain Gleason had actual or constructive knowledge that subordinate Richmond Police Department officers were engaged in conduct that posed a pervasive and unreasonable risk of Fourth Amendment injuries to the public, including Minium.

654.    Captain Gleason was additionally on notice because upon information and belief, Councilmember One has communications with Chief G. Smith about the public's fear that Richmond Police would overreact on the night of GwarBar, concerns the Chief would presumably pass along to the supervising officer, Gleason.

655.    The conduct of subordinate Richmond Police Department officers while Captain Gleason was in charge posed a pervasive and unreasonable risk that Fourth Amendment violations would occur.

656.    This conduct was widespread and least has been used on several different occasions.

657.    Captain Gleason's response to this knowledge was so inadequate as to show a deliberate indifference or tacit authorization of the Richmond Police Department's practices in offense to the Fourth Amendment.

658.    Captain Gleason's direct orders or inactions are a direct and proximate cause of the

100

First Amendment injuries suffered by the Alice Minium on August 20, 2020.

*Supervisor Does 1 -20*

659.    For the events described herein on May 31, 2020,  June 21, 2020, June 26, 2020, July 25, 2020 and July 26, 2020, Supervisor Does 1-20 were in charge,  and such officers had actual or constructive knowledge that subordinate Richmond Police Department officers were engaged in conduct that posed a pervasive and unreasonable risk of Fourth Amendment injuries to Plaintiffs Roberto Roldan, Charles Schmidt, Kristopher Goad, Andrew Ringle and Eduardo Acevedo.

660.    Supervisor Does had actual or constructive knowledge of these violations because of the disastrous response by Richmond Police to the events between May 31 and June 13, 2020 and the abrupt resignation of Former Chief W. Smith, reassignment of Former Interim Chief Blackwell after only 10 days and the many lawsuits filed against the City, the Richmond Police Department for constitutional violations.

661.    The conduct of subordinate Richmond Police Department officers while Supervisor Does were in charge posed a pervasive and unreasonable risk that Fourth Amendment violations would occur.

662.    This conduct was widespread and least has been used on several different occasions.

663.    Supervisor Does responses to this knowledge was so inadequate as to show a deliberate indifference or tacit authorization of the Richmond Police Department's practices in offense to the Fourth Amendment.

664.    Supervisors Does direct orders and/or inactions are a direct and proximate cause of the Fourth Amendment injuries suffered by the Plaintiffs.

*Applicable to All Supervisors*

665.    Any reasonable police officer knew or should have known, by virtue of his or her training and experience and the case law and opinions of federal courts concerning these rights at the time of the events complained of herein (as the law was clearly established at that time), that his or her conduct violated the Plaintiffs' clearly established Fourth Amendment rights.

666.    Supervisory Defendants in this Count V, including Supervisor Does 1-20, are not entitled to qualified immunity.

667.    Compensatory damages are appropriate for the physical and emotional injuries, and the chilling effect of the Supervisory Defendants' conduct, as well as any out-of-the-pocket expenses or lost income, incurred by the Plaintiffs as a direct and proximate result of their conduct in violation of the Plaintiffs' Fourth Amendment rights.

668.    Declaratory judgment that the conduct of the Supervisory Defendants violated the First Amendment rights of the Plaintiffs and similarly situated individuals is appropriate.

669.    Injunctive relief is warranted to prevent identical injury to the Plaintiffs in the future.

670.    Punitive damages are appropriate as to the Supervisory Defendants, as their conduct of showed actual malice, willful and wanton, or gross and reckless disregard of the Plaintiffs' rights.

671.    An award of costs and attorney fees, pursuant to 42 U.S.C. § 1988, is appropriate.

**COUNT VI**
**42 U.S.C. § 1983 –FOURTH AMENDMENT- UNLAWFUL SEIZURE**
**SUPERVISOR LIABILITY**
**DEFENDANTS W. SMITH, BLACKWELL. G. SMITH,**
**GLEASON and SUPERVISOR DOES 1-20**
**Seeking Declaratory and Injunctive Relief and Compensatory and Punitive Damages**

672.    Plaintiffs incorporate the preceding paragraphs of the Amended Complaint as if set forth fully herein.

673.     Each of the Plaintiffs are "citizens of the United States or other persons within the jurisdiction thereof."

674.     Defendant Former Chief W. Smith, Former Interim Chief Blackwell and Chief G. Smith are "persons" for the purposes of 42 U.S.C. § 1983.

675.     Defendants Captain Gleason and Supervisor Does 1-20 at all relevant times herein were acting under the color of state law.

676.     The Fourth Amendment prohibitions the search and seizure of free citizens without probable cause.

677.     At the time of the events complained of herein, each Plaintiff had a clearly established constitutional right under the Fourth Amendment to be free from unlawful seizure without probable cause.

*Former Chief William Smith*

678.     Defendant W. Smith was Chief of the Richmond Police Department from 2019 until approximately June 16, 2020.

679.     For the events described herein through and including June 15, 2020, Defendant W. Smith had actual or constructive knowledge that subordinate Richmond Police Department Officers were engaged in conduct that posed a pervasive and unreasonable risk of Fourth Amendment injuries to the Plaintiffs.

680.     On June 1, 2020, without warning, Richmond Police teargassed a peaceful crowd that included children and families.

681.     Former Chief W. Smith's knowledge of the severe and injurious behavior of his officers is clear from a June 1, 2020 social media post in which the Richmond Police Department apologized for its actions in deploying tear gas near the Lee Monument earlier that evening. At the

103

time however, the Department insisted its use of gas was because violent protestors were endangering the safety of its officers.

682.     It went on to state that "some RPD officers in that area were cut off by violent protestors. The gas was necessary to get them to safety."

683.     Many individuals responded to the Richmond Police Department's June 1, 2020 Twitter posts as false, and detailed a variety of ways the police has violated citizens' constitutional rights.

684.     Mayor Stoney and Former Chief W. Smith also apologized the next day and promised to discipline the officers.

685.     As part of a 2022 settlement against the City recently made public, the Richmond Police Department was forced to retract its June 1, 2020 statement and admit that its June 1, 2020 statements were false and that the demonstration was peaceful.

686.     As the Chief of Richmond Police on June 1, 2020, Former Chief W. Smith knew the demonstrations were peaceful and that the use of tear gas was unwarranted. He also knew his public statements were false.

687.     During Former Chief W. Smith's tenure, the conduct of subordinate Richmond Police Department officers posed a pervasive and unreasonable risk that Fourth Amendment violations would occur.

688.     This out-of-control behavior by subordinate Richmond police officers was widespread and used on several different occasions.

689.     Former Chief W. Smith's response to this knowledge was so inadequate as to show a deliberate indifference or tacit authorization of the Richmond Police Department's practices in offense to the Fourth Amendment.

690. Not only did he fail to act, but he covered up the abuses in the face of documented widespread abuses.

691. Former Chief W. Smith's inactions were a direct and proximate cause of the Fourth Amendment injuries suffered by the Plaintiffs.

692. Upon information and belief, W. Smith resigned at the request of Mayor Stoney following the incidents of May 31, 2020 through June 15, 2020.

*Former Interim Chief William Blackwell*

693. Defendant Interim Chief Blackwell served as the Chief of Police of the Richmond Police Department from approximately June 16, 2020 to June 26, 2020.

694. For the events described herein from June 16, 2020 through and including June 26 2020, Interim Chief Blackwell had actual or constructive knowledge that subordinate Richmond Police Department Officers were engaged in conduct that posed a pervasive and unreasonable risk of Fourth Amendment injuries to the Plaintiffs.

695. He was on notice of the First Amendment violation risks first and foremost because his immediate predecessor, Former Chief W. Smith, was forced to resign.

696. A number of lawsuits against the City and Former Chief W. Smith alleging constitutional violations were also filed weeks before Interim Chief Blackwell took over.

697. The conduct of subordinate Richmond Police Department officers during Interim Chief Blackwell's tenure posed a pervasive and unreasonable risk that Fourth Amendment excessive force violations would occur.

698. This out-of-control behavior by subordinate Richmond police officers was widespread and used on several different occasions during his short duration as Chief.

699. Interim Chief Blackwell's response to this knowledge was so inadequate as to show

a deliberate indifference or tacit authorization of the Richmond Police Department's practices in offense to the Fourth Amendment.

700. Interim Chief Blackwell's inactions were a direct and proximate cause of the Fourth Amendment injuries suffered by the Plaintiffs.

*Chief Gerald Smith*

701. Defendant Chief G. Smith is the current Chief of Police of the Richmond Police Department.

702. For the events described herein from June 26, 2020 forward, Defendant Chief G. Smith had actual or constructive knowledge that subordinate Richmond Police Department officers were engaged in conduct that posed a pervasive and unreasonable risk of Fourth Amendment injuries to the Plaintiffs.

703. Chief Smith has actual or constructive knowledge of these violations because of the abrupt resignation of Former Chief W. Smith, reassignment of Former Interim Chief Blackwell after only 10 days and the many lawsuits filed against the City, the Richmond Police Department for constitutional violations.

704. The conduct of subordinate Richmond Police Department officers during Chief Smith's tenure has posed and continues to pose a pervasive and unreasonable risk that Fourth excessive force Amendment violations would occur.

705. This conduct was widespread and least has been used on several different occasions.

706. Chief G. Smith's response to this knowledge has been so inadequate as to show a deliberate indifference or tacit authorization of the Richmond Police Department's practices in offense to the Fourth Amendment.

707. Chief G. Smith's inactions are a direct and proximate cause of the First Amendment injuries suffered by the Plaintiffs.

*Captain Gleason*

708. Upon information and belief, Captain Gleason was the supervising officer on August 20, 2020.

709. Captain Gleason's ordered his subordinate RPD Officers on that date to harass and arrest lawfully abiding citizens on private property, or in the alternative consciously disregarded the unlawful behavior of his subordinates when they did so, are the direct and proximate cause of the Fourth Amendment unlawful seizure Amendment injuries suffered by Alice Minium.

710. Captain Gleason had actual or constructive knowledge that subordinate Richmond Police Department officers were engaged in conduct that posed a pervasive and unreasonable risk of Fourth Amendment injuries to the public, including Minium.

711. Captain Gleason was additionally on notice because upon information and belief, Councilmember One has communications with Chief G. Smith about the public's fear that Richmond Police would overreact on the night of GwarBar, concerns the Chief would presumably pass along to the supervising officer, Gleason.

712. The conduct of subordinate Richmond Police Department officers while Captain Gleason was in charge posed a pervasive and unreasonable risk that Fourth Amendment violations would occur.

713. This conduct was widespread and least has been used on several different occasions.

714. Captain Gleason's response to this knowledge was so inadequate as to show a deliberate indifference or tacit authorization of the Richmond Police Department's practices in

offense to the Fourth Amendment.

715.    Captain Gleason's direct orders or inactions are a direct and proximate cause of the First Amendment injuries suffered by the Alice Minium on August 20, 2020.

*Supervisor Does 1 -20*

716.    For the events described herein on June 26, 2020, July 25, 2020, July 26, 2020, and June 16, 2021, Supervisor Does 1-20 were in charge,  and such officers had actual or constructive knowledge that subordinate Richmond Police Department officers were engaged in conduct that posed a pervasive and unreasonable risk of Fourth Amendment injuries to Plaintiffs Charles Schmidt, Andrew Ringle, Eduardo Acevedo, Kristopher Goad and Eilis Weller.

717.    Supervisor Does had actual or constructive knowledge of these violations.

718.    The conduct of subordinate Richmond Police Department officers while Supervisor Does were in charge posed a pervasive and unreasonable risk that Fourth Amendment violations would occur.

719.    This conduct was widespread and least has been used on several different occasions.

720.    Supervisor Does responses to this knowledge was so inadequate as to show a deliberate indifference or tacit authorization of the Richmond Police Department's practices in offense to the Fourth Amendment.

721.    Supervisors Does direct orders and/or inactions are a direct and proximate cause of the Fourth Amendment injuries suffered by the Plaintiffs.

*Applicable to All Supervisors*

722.    Any reasonable police officer knew or should have known, by virtue of his or her training and experience and the case law and opinions of federal courts concerning these

rights at the time of the events complained of herein (as the law was clearly established at that time), that his or her conduct violated the Plaintiffs' clearly established Fourth Amendment rights.

723.    Supervisory Defendants in this Count VI, including Supervisor Does 1-20, are not entitled to qualified immunity.

724.    Compensatory damages are appropriate for the physical and emotional injuries, and the chilling effect of the Supervisory Defendants' conduct, as well as any out-of-the-pocket expenses or lost income, incurred by the Plaintiffs as a direct and proximate result of their conduct in violation of the Plaintiffs' Fourth Amendment rights.

725.    Declaratory judgment that the conduct of the Supervisory Defendants violated the Fourth Amendment rights of the Plaintiffs and similarly situated individuals is appropriate.

726.    Injunctive relief is warranted to prevent identical injury to the Plaintiffs in the future.

727.    Punitive damages are appropriate as to the Supervisory Defendants, as their conduct of showed actual malice, willful and wanton, or gross and reckless disregard of the Plaintiffs' rights.

728.

## COUNT VII
### 42 U.S.C. § 1983 –FIRST AMENDMENT RETALIATION
**INDIVIDIAL OFFICERS FRAZER, RAWLINGS, BRIDGES, TORRES, DIGIRALAMO, LLOYD, DIXON, BEAZLEY, GLEASON, LEONE, RUIZ,MALONE, PEPPEL, HARRIS, CRAIG, KEEGAN, MILLS, BURALIEV, O'ROARKE, COLOMBO, BONDY, KUTI, THORPE, CAMPBELL and OFFICER DOES 1-50**
**Seeking Declaratory and Injunctive Relief, Compensatory and Punitive Damages**

729.    The allegations of the preceding paragraphs are incorporated as if fully set forth herein.

730.    A First Amendment claim under §1983 is comprised of three elements: "(1) the plaintiff is engaged in constitutionally protected First Amendment activity; (2) the defendant took

109

an action that adversely affected that protected activity; and (3) there is a causal relationship between the plaintiff's protected activity and the defendant's conduct." Booker v. S.C. Dep't of Corr., 855 F.3d 533, 537 (4th Cir. 2017); Suarez Corp. Ind. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000)(accord).

731.    An "adverse action" may also be established when a fellow officer fails to intervene. An officer may be liable under § 1983 on a theory of bystander liability if he/she "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm and (3) chooses not to act." Randall v. Prince George's County, Md., 302 F.3d 188, 204 (4th Cir. 2002).

732.    Each of the Plaintiffs are "citizens of the United States or other persons within the jurisdiction thereof."

733.    Each of the Richmond Police Officers listed in this Count VII, including any unknown Officer Doe, is a "person" for the purposes of 42 U.S.C. § 1983.

734.    Each and every Plaintiff herein was engaged in expressive activity by in a public forum, conduct that is unequivocally protected by the First Amendment. Am. Life League, Inc. v. Reno, 47 F.3d 642 (4th Cir. 642 1995).

735.    Each of the Defendants, at all relevant times herein, was acting under the color of state law.

736.    At the time of the events complained of herein, each Plaintiff had a clearly established constitutional right under the First Amendment to peaceably observe and record activity (whether it involved the police or not).

737.    As such, Count VII Defendants are not entitled to qualified immunity.

*Roberto Roldan (Officer Does)*

738.    Roldan was lawfully engaged in protected First Amendment activity as a member of the press, when on May 31, 2020, he and a colleague were covering protests in downtown Richmond.

739.    Officer Doe violated Roldan First Amendment rights when, despite Roldan identifying himself as press a number of times, shot pepper spray directly in Roldan's face and then pushed him into the street as Roldan doubled over in pain.

740.    The evidence is clear Officer Doe responded to Roldan's presence as a member of the press by unlawfully attacking him with teargas and physical assault.

741.    Upon information and belief, fellow Officer Does are also liable to Roldan because they knew the unknown RPD officer intended to pepper spray Roldan and chose not to despite being able.

*Charles Schmidt        (Frazer and Officer Does)*

742.    On June 26, 2020, Defendants Frazer and multiple Officer Does took actions that adversely affected Schmidt's rights to engaged in protected First Amendment activity by demanding he leave the Rear Parking Lot when he was peacefully observing the activity of officers of the Richmond Police in a public space without interfering, an activity clearly protected by the First Amendment.

743.    Schmidt was nowhere the police activity and RPD sought him out, having to cross an empty parking lot many yards away to engage him.

744.    Frazer and Officer Does violated Schmidt's First Amendment rights when they forcibly detained him for the sole reason that he attempted to photograph the scene as he was leaving the parking lot.

111

745. The evidence is clear that Frazer and Officer Does responded to Schmidt's lawful presence at the Rear Parking Lot and his attempt to take a picture by unlawfully detaining him and placing him under arrest.

746. Fellow Officer Does are also liable to Schmidt because they watched his First Amendment rights being violated, were in a position to intervene and chose not to. Given that Frazer himself believed he "getting sued for this," upon information and belief, his fellow officers knew it too.

*Andrew Ringle          (Rawlings, Officer Does)*

747. Andrew Ringle was engaged in protected First Amendment activity when he was covering protests on the night of June 21, 2020. Despite clearly identified himself as a member of the press and while complying with police orders to leave the scene, when he was pepper-sprayed by Officer Rawlings. Another unknown officer threw Ringle to the ground causing him injury.

748. Ringle was again engaged in protected First Amendment activity when he was covering protests on the night of July 26, 2020. Despite clearly identified himself as a member of the press and while complying with police orders to leave, he was detained by unknown officers of the Richmond Police.

749. Rawlings and Officer Does violated Ringle's First Amendment rights when they teargassed and assaulted him on June 21, 2020 and forcibly and unlawfully detained him with handcuffs on July 25, 2020.

750. The evidence is clear that Rawlings and Officer Does responded to Ringle's lawful presence as a member of the press and his attempts to report the news by unlawfully dousing him the face, assaulting him and detaining him.

751. Fellow Officer Does are also liable to Ringle on the grounds because upon

112

information and belief, they knew that his First Amendment rights were being violated, were in a position to intervene and chose not to.

*Kristopher Goad        (Torres, Digiralamo, Lloyd, Dixon, Officer Does)*

752.    Kristopher Goad was peacefully observing police activity in Monroe Park on July 26, 2020, conduct that is unequivocally protected by the First Amendment.

753.    Officers Torres, Digiralamo and several unknown Officer Does took actions that adversely affected Kristopher Goad's rights to engaged in protected First Amendment activity when they singled him out that night and unlawfully arrested him without probable cause and assaulted him.

754.    Goad was also engaged in lawful activity protected by the First Amendment when he attended a peaceful rally in Richmond on September 14, 2020. Upon information and belief, no one attending the rally was warned by Richmond Police they were breaking the law nor was anyone detained or arrested that day.

755.    Lt. Lloyd took adverse against Goad's First Amendment right to engage in protected by obtaining a warrant for Goad's activities on September 14 what is happening. Lt. Lloyd singled out Goad for his frequent critique of the Richmond Police Department and did not obtain arrest warrants for other individuals similarly situated.

756.    The evidence is clear that Lt. Lloyd, Torres, Digiralamo and several unknown Officer Does' response to Goad's lawful First Amendment activity was to unlawfully detain and arrest him on multiple occasions.

757.    Fellow Officer Does are also liable to Goad for the July 26, 2020 incident because they witnessed his First Amendment rights were being violated, were in a position to intervene and chose not to.

758.    Former officer Dixon is liable to Goad for her use of social media to taunt and harass Goad in an attempt to intimate and chill his expression of First Amendment rights.

*Eduardo Acevedeo        (Officer Does)*

759.    Eduardo Acevedo was engaged in protected First Amendment activity on the night of July 25, 2020 when, as a member of the press, he was covering the protests in the City.

760.    Officer Does violated on Acevedo's First Amendment rights when they swarmed and attacked him and another colleague and detained them for a period of time, despite knowledge that he was a member of the press.

761.    The evidence is clear that Officer Does responded to Acevedo's lawful presence as a member of the press and his attempts to report the news by unlawfully, assaulting him and detaining him.

762.    Fellow Officer Does are also liable to Acevedo on the grounds that they knew his First Amendment rights were being violated, were in a position to intervene and chose not to.

*Jimmie Lee Jarvis        (Beazley, Gleason, Leone, Ruiz, Malone, Peppel, Harris, Frazer, Craig,
Keegan, Mills, Dario, Buraliev, O'Roarke, Colombo, Bondy, Kuti, Ruiz and
Officer Does)*

763.    Jimmie Lee Jarvis was engaged in lawful activity protected by the First Amendment when he attended a variety of protests and attempted to documents the activities of Richmond Police from a safe distance without interfering.

764.    At other times relevant herein, Jarvis was simply walking down the street to or from a demonstration or protest.

765.    As described in more detail in the preceding paragraphs, the following Richmond Police offers violated Jarvis' First Amendment rights on the following dates:

a.    May 31, 2020        Officer Does

114

| b. | June 15, 2020 | Lt. Bridges, Officer Does |
| c. | June 21, 2020 | Officer Does |
| d. | August 16, 2020 | Lt. Beazley, Captain Gleason, Leone, Ruiz, Does |
| e. | August 18, 2020 | Lt. Beazley, Officer Does |
| f. | August 20, 2020 | Direct: Beazley, Malone, Leone, Officer Does Failed to Intervene: Peppel, Harris, Frazer, Craig, Keegan, Mills, Dario, Buraliev, O'Roarke, Colombo, Bondy, Kuti, Ruiz and Officer Does |
| g. | Sept. 14, 2020 | Lloyd |
| h. | Sept. 25, 2020 | Harris, Ruiz |
| i. | Oct. 14, 2020 | Lloyd, Harris |
| j. | Oct. 25, 2020 | Harris, Ruiz, Officer Does |
| k. | Nov. 11, 2020 | Lloyd |
| l. | Nov. 12, 2020 | Lloyd |

766.    The evidence is clear that Lt. Beazley and Officers Leone and Malone responded to Jarvis' peaceful presence and his attempts to document the activities of police and demonstrators at various times dousing him with noxious chemicals, assaulting him, ridiculing him and following him, all in an attempt to intimidate him.

767.    With respect to August 20, 2020, fellow Officers Peppel, Harris, Frazer, Craig, Keegan, Mills, Dario, Buraliev, O'Roarke, Colombo, Bondy, Kuti, Ruiz and Officer Does are also liable to Jarvis on the grounds that, upon information and belief, knew or should have known that his First Amendment rights were being violated, were in a position to intervene and chose not to.

*Alice Minium*          *(Ruiz, Bondy and Officer Does)*

768.    On August 20, 2020, Alice Minium was on private property with the permission of the owner and without interfering, filming Richmond Police, a right clearly protected by the First

115

Amendment.

769.    Officer Ruiz and Bondy adversely affected Minium's rights to engaged in protected First Amendment activity when they forcibly yanked her from the crowd, threw her to the ground, arrested her without probable cause, and confiscated her phone.

770.    Ruiz additionally violated Minium's First Amendment rights when she subsequently provided false information to obtain a search warrant for Minium's phone.

771.    The evidence is clear that Ruiz and Bondy responded to Minium's lawful presence and filming by assaulting her, unlawfully detaining her and placing her under arrest.

772.    Fellow Officers Peppel, Harris, Frazer, Craig, Keegan, Mills, Dario, Buraliev, O'Roarke, Colombo, Bondy, Kuti and Officer Does are also liable to Minium on the grounds that, upon information and belief, they witnessed the abuse to Minium, knew that her First Amendment rights were being violated, were in a position to intervene and chose not to.

*Vanna Goodenow*        *(Thorpe, Officer Doe)*

773.    Vanna Goodenow was in a public place, without interfering, while filming the actions of Richmond Police arresting another individual October 27, 2020, an activity clearly protected by the First Amendment.

774.    Officer Thorpe and another Office Doe adversely affected Goodenow's First Amendment rights when they arrested her without probable cause merely for filming their making an arrest.

775.    The evidence is clear that Thorpe and Officer Doe responded to Goodenow's lawful presence and her attempt to take a document their actions during an arrest by unlawfully detaining her and placing her under arrest.

116

*Eilis Weller      (Campbell, Officer Does)*

776.     Eilis Weller was engaged in peaceful protest on June 16, 2021, an activity clearly protected by the First Amendment.

777.     Officer Campbell instructed the crowd to move back to the sidewalk. Weller was attempting to comply. Campbell adversely affected Weller's First Amendment rights when he arrested her but failed to arrest others similarly situated. The arrest was a pretext because Weller happened to filming, whereas others were not.

778.     Fellow Officer Does are also liable to Weller because they knew Weller's First Amendment rights were being violated, were in a position to intervene and chose not to.

*Applicable to All Defendants in Count VII*

779.     Any reasonable police officer knew or should have known, by virtue of his or her training and experience and the case law and opinions of federal courts concerning these rights at the time of the events complained of herein (as the law was clearly established at that time), that his or her conduct violated the Plaintiff' clearly established First Amendment rights.

780.     Therefore, Count VII Defendants and Officers Doe 1-50 are not entitled to qualified immunity.

781.     The acts of Defendants and Officer Does 1-50, as described herein, retaliated against the Plaintiffs and involved the use of force and conduct that intimated the threat of an imminent use of force, unlawful detainers, arrests for purposes other than making an arrest supported by probable cause and unlawful harassment, in retaliation for protected First Amendment activity.

782.     Compensatory damages are appropriate for the physical and emotional injuries, and the chilling effect of the Defendants' conduct, as well as any out-of-the-pocket expenses or lost

income, incurred by the Plaintiffs as a direct and proximate result of their conduct in violation of the Plaintiffs' First Amendment rights.

783.    Declaratory judgment that the conduct of the Defendants violated the Fourth Amendment rights of the Plaintiffs and similarly situated individuals is appropriate.

784.    Injunctive relief to prevent future similar behavior is warranted.

785.    Punitive damages are appropriate as to Count VII Defendants, as their conduct of showed actual malice, willful and wanton, or gross and reckless disregard of the Plaintiffs' rights.

786.    An award of costs and attorney fees, pursuant to 42 U.S.C. § 1988, is appropriate.

**COUNT VIII**
**U.S.C. § 1983 –FOURTH AMENDMENT VIOLATIONS**
**EXCESSIVE FORCE**
**INDIVIDIAL OFFICERS FRAZER, RAWLINGS, TORRES, DIGIRALAMO, MALONE, RUIZ, BONDY AND HARRIS and OFFICER DOES 1-50**
**Seeking Declaratory and Injunctive Relief, Compensatory and Punitive Damages**

787.    Plaintiffs incorporate the preceding paragraphs of the Amended Complaint as if the same are set fully forth herein.

788.    The Fourth Amendment prohibitions on unreasonable seizures bars police officers from using excessive force to seize a free citizen."  James v. Buchanan, 325 F.3d 520 (4th Cir. 2003).

789.    All force used by a law enforcement officer against an individual must be "objectively reasonable" in order to not violate the Fourth Amendment's prohibition against excessive force.

790.    Liability may also be established when a fellow officer fails to intervene. An officer may be liable under § 1983 on a theory of bystander liability if he/she "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm and (3) chooses not to act." Randall v. Prince George's County, Md., 302 F.3d 188, 204

(4th Cir. 2002).

791.     Each of the Plaintiffs are "citizens of the United States or other persons within the jurisdiction thereof."

792.     Each of the Richmond Police Officers listed in this Count VIII including any unknown Officer Doe, is a "person" for the purposes of 42 U.S.C. § 1983.

793.     Each and every Plaintiff herein was engaged in expressive activity by in a public forum, conduct that is unequivocally protected by the First Amendment. Am. Life League, Inc. v. Reno, 47 F.3d 642 (4th Cir. 642 1995).

794.     Each of the Defendants, at all relevant times herein, was acting under the color of state law.

795.     At the time of the events complained of herein, each Plaintiff had a clearly established constitutional right under the Fourth Amendment to be free from the use of excessive force by Richmond Police.

796.     As such, Count VIII Defendants, including Officer Does, are not entitled to qualified immunity.

*Roberto Roldan          (Officer Does)*

797.     Roldan was lawfully engaged in protected First Amendment activity as a member of the press, when on May 31, 2020, he and a colleague were covering protests in downtown Richmond. He has not committed any crime, was not behaving in a violent manner or threatening police officers.

798.     Nonetheless, Officer Doe deployed pepper spray at Roldan, a chemical agent intended to cause pain and suffering against those whom it is deployed. Officer Doe further pushed Roldan into the street as Roldan doubled over in pain.

799.     Officer Doe did not use reasonable force in dispersing Roldan, as he was not being destructive or unruly, but rather lawfully engaged in protected First Amendment

800.     Upon information and belief, fellow Officer Does are also liable to Roldan they knew the unknown RPD officer intended to pepper spray Roldan and chose not to despite being able.

*Charles Schmidt          (Frazer and Officer Does)*

801.     On June 26, 2020, Defendants Frazer and multiple Officer Does took actions that adversely affected Schmidt's rights to engaged in protected First Amendment activity by demanding he leave the Rear Parking Lot when he was peacefully observing the activity of officers of the Richmond Police. He has not committed any crime, was not behaving in a violent manner or threatening police officers.

802.     Nonetheless, Frazer and Officer Does placed him in zip ties so tight they left painful marks on Schmidt's wrists

803.     Frazer and Officer Does did not use reasonable force in restraining Schmidt, who was not being destructive or unruly, but rather lawfully engaged in protected First Amendment activity.

804.     Fellow Officer Does are also liable to Schmidt because they knew excessive force was being applied, were in a position to intervene and chose not to.

805.     Given that Frazer himself believed he "getting sued for this," upon information and belief, his fellow officers knew it too.

*Andrew Ringle          (Rawlings, Officer Does)*

806.     Ringle was engaged in protected First Amendment activity when he was covering protests on the night of June 21, 2020. He clearly identified himself as a member of the press and

was complying with police orders to leave the scene. He has not committed any crime, was not behaving in a violent manner or threatening police officers.

807.     Nonetheless, Rawlings deployed pepper spray a chemical agent intended to cause pain and suffering against those whom it is deployed. Officer Doe further threw Ringle into the street, causing him injury.

808.     Rawlings and Officer Doe did not use reasonable force in dispersing Ringle, as he was not being destructive or unruly, but rather lawfully engaged in protected First Amendment activity.

*Kristopher Goad*          *(Torres, Digiralamo, Lloyd, Dixon, Officer Does)*

809.     Kristopher Goad was peacefully observing police activity in Monroe Park on July 26, 2020, conduct that is unequivocally protected by the First Amendment. He has not committed any crime, was not behaving in a violent manner or threatening police officers.

810.     Nonetheless, Torres, Digiralamo and Officer Does violently tackled him to the ground without provocation, injuring him in the process.

811.     Torres, Digiralamo and Officer Does did not use reasonable force in dispersing Ringle, as he was not being destructive or unruly, but rather lawfully engaged in protected First Amendment activity.

812.     Fellow Officer Does are also liable to Goad because they knew excessive force was being deployed, were in a position to intervene, and chose not to.

*Eduardo Acevedo*          *(Officer Does)*

813.     Eduardo Acevedo was engaged in protected First Amendment activity on the night of July 25, 2020, when, as a member of the press, he was covering the protests in the City.

814.     He has not committed any crime, was not behaving in a violent manner or

threatening police officers.

815.     Nonetheless, Officer Does swarmed and attacked him and another colleague.

816.     Officer Does did not use reasonable force in their interactions with Acevedo as he was not committing any crime, being destructive or unruly, but rather was lawfully engaged in protected First Amendment activity.

817.     Fellow Officer Does are also liable to Acevedo because they knew the Officer Does excessive force was being deployed, were in a position to intervene, and chose not to.

*Jimmie Lee Jarvis*        *(Ruiz, Malone and Officer Does)*

818.     Jimmie Lee Jarvis was engaged in lawful activity protected by the First Amendment when he attended a variety of protests and attempted to documents the activities of Richmond Police from a safe without interfering.

819.     Jarvis had not committed any crime, was not behaving in a violent manner or threatening police officers.

820.     Nonetheless, on May 31, 2020 (Officer Does), June 15, 2020 (Officer Does), June 21, 2020 (Officer Does), August 20, 2020 (Gleason, Lt. Beazley, Malone, Leone, Peppel, Harris, Frazer, Craig, Keegan, Mills, Dario, Buraliev, O'Rourke, Colombo. Bondy, Kuti, Leone and Ruiz), September 25, 2020 (Harris, Ruiz) and October 27, 2020 (Officer Does) violated Jarvis's right to First Amendment expression in the manner alleged previously herein.

821.     The Richmond Police Department identified in this Count VIII did not use reasonable force in their interactions with Jarvis as he was not committing any crime, being destructive or unruly, but rather was lawfully engaged in protected First Amendment activity.

*Alice Minium*           *(Ruiz, Bondy and Officer Does)*

822.     On August 20, 2020, Alice Minium was on private property with the permission of

the owner and without interfering, filming Richmond Police, a right clearly protected by the First Amendment.

823.     Nonetheless, Ruiz and Bondy forcibly yanked her from the crowd, threw her to the ground and arrested her without probable cause.

824.     Ruiz and Bondy did not use reasonable force in their assault on Minium as she was not committing any crime, was not behaving in a violent manner or threatening police officers, being destructive or unruly, but rather was lawfully engaged in protected First Amendment activity.

825.     Upon information and belief, Officers Peppel, Harris, Frazer, Craig, Keegan, Mills, Dario, Buraliev, O'Roarke, Colombo, Kuti and Officer Does knew that excessive force was being deployed against Minium, were in a position to intervene and chose not to.

*Applicable to All Defendants in Count VII*

826.     Any reasonable police officer knew or should have known, by virtue of his or her training and experience and the case law and opinions of federal courts concerning these rights at the time of the events complained of herein (as the law was clearly established at that time), that his or her conduct violated the Plaintiff' clearly established Fourth Amendment rights.

827.     Therefore, Count VIII Defendants and Officers Doe 1-50 are not entitled to qualified immunity.

828.     Compensatory damages are appropriate for the physical and emotional injuries, and the chilling effect of the Defendants' conduct, as well as any out-of-the-pocket expenses or lost income, incurred by the Plaintiffs as a direct and proximate result of their conduct in violation of the Plaintiffs' Fourth Amendment rights.

829.     Declaratory judgment that the conduct of the Defendants violated the Fourth

Amendment rights of the Plaintiffs is appropriate.

830.    Injunctive relief to prevent future similar behavior against Plaintiff is warranted.

831.    Punitive damages are appropriate as to these Count VIII Defendants, as their conduct of showed actual malice, willful and wanton, or gross and reckless disregard of the Plaintiffs' Fourth Amendment rights.

832.    An award of costs and attorney fees, pursuant to 42 U.S.C. § 1988, is appropriate.

**COUNT IX**
**U.S.C. § 1983 –FOURTH AMENDMENT VIOLATIONS**
**UNLAWFUL SEACRH AND SEIZURE**
**INDIVIDIAL OFFICERS FRAZER, TORRES, DIGIRALAMO, LLOYD,**
**RUIZ, BONDY and OFFICER DOES 1-50**
**Seeking Declaratory and Injunctive Relief, Compensatory and Punitive Damages**

833.    Plaintiffs incorporate the preceding paragraphs of the Amended Complaint as if the same are set fully forth herein.

834.    The Fourth Amendment prohibitions the search and seizure of free citizens without probable cause.

835.    An officer may be liable under § 1983 on a theory of bystander liability if he/she "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm and (3) chooses not to act." Randall v. Prince George's County, Md., 302 F.3d 188, 204 (4th Cir. 2002).

836.    Each of the Plaintiffs are "citizens of the United States or other persons within the jurisdiction thereof."

837.    Each of the Richmond Police Officers listed in this Count IX, including any unknown Officer Doe, is a "person" for the purposes of 42 U.S.C. § 1983.

838.    Each of the Defendants, at all relevant times herein, was acting under the color of state law.

839. At all relevant times here, none of the lawful activity of the Plaintiffs provided the basis for a lawful seizure by Richmond Police.

840. At the time of the events complained herein, each Plaintiff has a clearly established constitutional right under the Fourth Amendment to be free from unlawful seizure without probable cause.

841. As such, Count IX Defendants are not entitled to qualified immunity.

*Charles Schmidt (Frazer and Officer Does)*

842. On June 26, 2020, Defendants Frazer and multiple Officer Does took actions that adversely affected Schmidt's rights to engaged in protected First Amendment activity by demanding he leave the Rear Parking Lot when he was peacefully observing the activity of officers of the Richmond Police in a public space without interfering, an activity clearly protected by the First Amendment.

843. Schmidt was nowhere near the police activity and RPD sought him out, having to cross an empty parking lot many yards away to engage him.

844. Schmidt had not committed any crime, was not behaving in a violent manner or threatening police officers.

845. Despite this and without probable cause, Frazer and Officers Doe seized Schmidt and placed him in zip ties.

846. Frazer and Officer Does' seizure of Schmidt was inappropriate, unlawful, unnecessary and in violation of Schmidt's Fourth Amendment rights.

847. Fellow Officer Does knew Schmidt's First Amendment rights were being violated, were in a position to intervene and chose not to.

*Andrew Ringle*          *(Rawlings, Officer Does)*

848.    Andrew Ringle was engaged in protected First Amendment activity when he was covering protests on the night of July 26, 2020. Despite clearly identified himself as a member of the press and while complying with police orders to leave, he was detained by unknown officers of the Richmond Police.

849.    Ringle had not committed any crime, was not behaving in a violent manner or threatening police officers.

850.    Despite this and without probable cause, Officers Doe seized Ringle and placed him in handcuffs.

851.    Their seizure of Ringle was inappropriate, unlawful, unnecessary and in violation of his Fourth Amendment rights.

852.    Upon information and belief, fellow Officer Does knew Ringle's Fourth Amendment rights were being violated, were in a position to intervene and chose not to.

*Kristopher Goad*          *(Torres, Digiralamo, Lloyd, Dixon, Officer Does)*

853.    Kristopher Goad was peacefully observing police activity in Monroe Park on July 26, 2020, conduct unequivocally protected by the First Amendment.

854.    Goad had not committed any crime, was not behaving in a violent manner or threatening police officers.

855.    Despite this, Officers Torres, Digiralamo and several unknown Officer Does singled Goad out that night, unlawfully arrested him without probable cause and assaulted him.

856.    Moreover, Goad was not treated in the same manner as other similarly situated individuals and was specifically targeted by Richmond Police.

857.    Goad was also engaged in lawful activity protected by the First Amendment when

126

he attended a peaceful rally in Richmond on September 14, 2020. Upon information and belief, no one attending the rally was warned they were breaking the law nor were they detained or arrested.

858.    Lt. Lloyd obtained a warrant for Goad's arrest for the September 14, 2020 events.

859.    Lt. Lloyd did not have probable cause to arrest Goad and singled him out for his frequent critique of the Richmond Police Department.

860.    Lt. Lloyd did not obtain arrest warrants for other individuals similarly situated on September 14, 2020.

861.    Goad was in fact arrested on September 28, 2020 for activities stemming from September 14, 2020.

862.    RPD's seizure of Goad was inappropriate, unlawful, unnecessary and in violation of his Fourth Amendment rights.

863.    Upon information and belief, fellow Officer Does present on July 26, 2020 knew Goad's Fourth Amendment rights were being violated, were in a position to intervene and chose not to.

*Eduardo Acevedo        (Officer Does)*

864.    Eduardo Acevedo was engaged in protected First Amendment activity on the night of July 25, 2020 when, as a member of the press, he was covering the protests in the City.

865.    Acevedo had not committed any crime, was not behaving in a violent manner or threatening police officers.

866.    Despite this, Officers Does swarmed him and a colleague and detained them for several minutes.

867.    Officer Does did not have probable cause to detain Acevedo.

868.    Officer Does seizure of Acevedo was inappropriate, unlawful, unnecessary and in

violation of his Fourth Amendment rights.

869.    Upon information and belief, fellow Officer Does present knew Acevedo's Fourth Amendment rights were being violated, were in a position to intervene and chose not to.

*Alice Minium*          *(Ruiz, Bondy and Officer Does)*

870.    On August 20, 2020, Alice Minium was on private property with the permission of the owner and without interfering, filming Richmond Police, a right clearly protected by the First Amendment.

871.    Minium had not committed any crime, was not behaving in a violent manner or threatening police officers.

872.    Despite this, Officer Ruiz and Body unlawfully arrested her without probable cause and assaulted her in retaliation for Minium's exercise of her First Amendment rights.

873.    Ruiz and Bondy's seizure of Minium was inappropriate, unlawful, unnecessary and in violation of her Fourth Amendment rights.

874.    Ruiz additionally trampled on Minium's Fourth Amendment rights when she subsequently provided false information to obtain a search warrant for Minium's phone.

875.    Fellow Officers Peppel, Harris, Frazer, Craig, Keegan, Mills, Dario, Buraliev, O'Rourke, Colombo, Bondy, Kuti and Officer Does are also liable to Minium on the grounds that, upon information and belief, they knew that her First Amendment rights were being violated, were in a position to intervene and chose not to.

*Vanna Goodenow*

876.    Vanna Goodenow was in a public place, without interfering, while filming the actions of Richmond Police arresting another individual October 27, 2020, an activity clearly protected by the First Amendment.

877. Goodenow had not committed any crime, was not behaving in a violent manner or threatening police officers.

878. Despite this, Thorpe unlawfully arrested her without probable cause.

879. Their seizure of Goodenow was inappropriate, unlawful, unnecessary and in violation of her Fourth Amendment rights.

880. Upon information and belief, fellow Officer Doe knew Goodnow's Fourth Amendment rights were being violated, were in a position to intervene and chose not to.

*Eilis Weller    (Campbell, Officer Does)*

881. Eilis Weller was engaged in peaceful protest on June 16, 2021, an activity clearly protected by the First Amendment.

882. Despite this, Officer Campbell arrested Weller.

883. Campbell did not have probable cause to arrest Weller. He did not arrest other individuals similarly situated that day. On the contrary, Campbell singled out and arrested Weller for filming whereas those not filming were not arrested.

884. Campbell's seizure of Weller was inappropriate, unlawful, unnecessary and in violation of their Fourth Amendment rights.

885. Upon information and belief, fellow Officer Does knew Weller's Fourth Amendment rights were being violated, were in a position to intervene and chose not to.

*Applicable to All Defendants in Count VI*

886. Any reasonable police officer knew or should have known, by virtue of his or her training and experience and the case law and opinions of federal courts concerning these rights at the time of the events complained of herein (as the law was clearly established at that time), that his or her conduct violated the Plaintiff' clearly established Fourth Amendment rights.

887.    Therefore, Count IX Defendants and Officers Doe 1-50 are not entitled to qualified immunity.

888.    Compensatory damages are appropriate for the physical and emotional injuries, and the chilling effect of the Defendants' conduct, as well as any out-of-the-pocket expenses or lost income, incurred by the Plaintiffs as a direct and proximate result of their conduct in violation of the Plaintiffs' Fourth Amendment rights.

889.    Injunctive relief is warranted to prohibit similar conduct in the future.

890.    Declaratory judgment that the conduct of the Defendants violated the Fourth Amendment rights of the Plaintiffs and similarly situated individuals is appropriate.

891.    Punitive damages are appropriate as to these Count IX Defendants, as their conduct of showed actual malice, willful and wanton, or gross and reckless disregard of the Plaintiffs' rights.

892.    An award of costs and attorney fees, pursuant to 42 U.S.C. § 1988, is appropriate.

## INJUNCTIVE RELIEF

893.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs of this Complaint as if set forth fully herein.

894.    A real and immediate difference exists between Plaintiffs and Defendant City of Richmond, Chief G. Smith and individual Defendant officers still employed by the Richmond Police Department.

895.    Plaintiffs have each suffered irreparable injuries as a result of the Defendants' repeated violations of their First and Fourth Amendment rights. As alleged previously herein, each Plaintiff has suffered harassment, physical abuse, the deployment of chemical agents, unlawful detention or arrest without probable cause all because they dared to record the activities of the Richmond Police Department in its interaction with the public.

896. Money damages are insufficient to compensate the Plaintiffs for these injuries because the violations are likely to continue to occur.

897. Defendants regarding Plaintiffs' rights and Defendants' duty owed to Plaintiffs to protect Plaintiffs' constitutional rights under the First and Fourth Amendments.

898. Defendants' motives have made clear by their repeated escalation and retaliation against members of the press and citizens who dare video or photograph Richmond Police at work.

899. Defendants have made clear that they intend to continue the practices described above that make it impossible for citizens and members of the press to be confidant that their First, and Fourth rights will not be violated.

900. Unless restrained by this Court, Defendants will continue to implement these unlawful policies and practices.

901. Defendants' acts alleged above violate established constitutional rights of Plaintiffs and Defendants could not reasonably have thought that the conduct of their agents and employees was lawful.

902. An actual controversy exists between Plaintiffs and Defendants in that Defendants, their agents and employees, have engaged in the unlawful and unconstitutional acts alleged herein and intend to continue to do so. Plaintiffs claim that these acts are contrary to law and seek a declaration of their rights with regard to this controversy.

903. As a direct and proximate consequence of the acts of Defendants' agents and employees, Plaintiffs have suffered and will continue to suffer damages through injury to their person and to their constitutional rights.

## PRAYER FOR RELIEF

Plaintiffs request that this Court:

1.      Enter a declaratory judgment that the Defendants' conduct, policies and practices violated Plaintiffs' rights under the First Amendment to the United States Constitution;

2.      Enter a declaratory judgment that the Defendants' conduct, policies and practices violated Plaintiffs' rights under the Fourth Amendment;

3.      For a permanent injunction, enjoining and restraining Defendants from engaging in the policies, practices and conduct complained of herein;

4.      Enter judgment awarding Plaintiffs compensatory damages against all Defendants in an amount appropriate to the evidence adduced at trial;

5.      Enter judgment awarding Plaintiffs punitive damages against all Defendants except the City of Richmond in an amount appropriate to the evidence adduced at trial;

6.      Enter judgment awarding Plaintiffs their costs and reasonable attorneys' fees in this action as provided in 42 U.S.C. § 1988(b); and

7.      Grant Plaintiffs such further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.


Dated:  September 5, 2020

Respectfully submitted,

*/s/ Terry C. Frank, Esq.*
Terry C. Frank, Esq. (VSB No. 74890)
Terry Frank Law
108 E. Grace Street, Suite 001
Richmond, VA 23219
Phone: (804) 899.8090
Fax: (804) 899.8229
E-mail: terry@terryfranklaw.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this September 5, 2022, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system, which will send notice of said filing to the

following counsel of record:

Steven D. Brown, Esq.
Lindsey A. Strachan, Esq.
Whitney E. Nelson, Esq.
IslerDare, PC
1111 East Main Street, Suite 1605
Richmond, VA 23219
sbrown@islerdare.com
lstrachan@islerdare.com
wnelson@islerdare.com
*Counsel for Defendants William C. Smith and William Blackwell*

Mark C. Nanavati, Esq. (VSB #38709)
G. Christopher Jones, Jr., Esq. (VSB #82260)
Benjamin F. Dill, Esq. (VSB #93000)
Sinnott, Nuckols & Logan, PC
13811 Village Mill Drive
Midlothian, VA 23114
mnanavati@snllaw.com
cjones@snllaw.com
bdill@snllaw.com
*Counsel for Defendant Gerald M. Smith*

133

Wirt P. Marks, Esq. (VSB #36770)
Senior Assistant City Attorney
Zachary P. Grubaugh, Esq. (VSB #83944)
Assistant City Attorney
City Hall, Room 400
900 East Broad Street
Richmond, VA 23219
wirt.marks@richmondgov.com
Zachary.Grubaugh@rva.gov
*Counsel for Defendant City of Richmond*

Blaire H. O'Brien (VSB #83961)
David P. Corrigan (VSB #26341)
M. Scott Fisher, Jr., (VSB #78485)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, VA 23255
bobrien@hccw.com
dcorrigan@hccw.com
sfisher@hccw.com
*Counsel for Defendants, John Bridges, Thomas W. Lloyd, Jakob A. Torres, Benjamin J. Frazer, Brenda Ruiz, April M. Dixon, Patrick Digiolamo, Paul D. Campbell, Junius Thorpe, Nico Young, John Beazley, Tyler Craig, Christopher Gleason, Frank Scarpa, Duane Peppel, Khalid Harris, Ben Malone, Keegan Mills, Dario Buraliev, Dominic Colombo, Dan Bondy, Jason Kuti, Kate Leone, and Steve Rawlings*

*/s/ Terry C. Frank, Esq.*<br>
Terry C. Frank, Esq. (VSB No. 74890)<br>
Terry Frank Law<br>
108 E. Grace Street, Suite 001<br>
Richmond, VA 23219<br>
Phone: (804) 899.8090<br>
Fax: (804) 899.8229<br>
E-mail: terry@terryfranklaw.com<br>
*Counsel for Plaintiffs*